Electronically FILED by
Superior Court of California,
County of Los Angeles
3/14/2024 9:13 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By C. Nava, Deputy Clerk

1   SEYFARTH SHAW LLP
    Jason J. DeJonker (*pro hac vice* forthcoming)
2   jdejonker@seyfarth.com
    William S. Hackney (*pro hac vice* forthcoming)
3   whackney@seyfarth.com
    233 South Wacker Drive, Suite 8000
4   Chicago, Illinois 60606-8448
    Telephone: (312) 460-5220
5   Facsimile: (312) 460-7000

6   M. Ryan Pinkston (SBN 310971)
    rpinkston@seyfarth.com
7   560 Mission Street, 31st Floor
    San Francisco, California 94105
8   Telephone: (415) 397-2823
    Facsimile: (415) 397-8549

9
    Attorneys for Plaintiff
10  RUC14 Playa LLC

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                     COUNTY OF LOS ANGELES

13  RUC14 PLAYA LLC, on its own behalf and       Case No.  24TRCV00859
    derivatively on behalf of TA PARTNERS
14  APARTMENT FUND II, LLC,                      COMPLAINT FOR:

15                Plaintiff,                     1.  **Injunctive Relief**
                                                 2.  **Intentional Misrepresentation**
16          v.                                   3.  **Concealment**
                                                 4.  **False Promise**
17  TA PARTNERS LLC, TA PARTNERS                 5.  **Negligent Misrepresentation**
    APARTMENT FUND II LLC, JOHNNY LU,            6.  **Breach of Contract**
18  ALFA IDG LLC, YAOJUN LIU, THRIVING           7.  **Breach of Covenant of Good Faith and**
    FUTURE LLC, GREENWELL HHC LLC,                   **Fair Dealing**
19  ZHONGJUN ZHENG, LCS CONSULTING              8.  **Breach of Fiduciary Duty**
    GROUP LLC, CAIYING CHANG, HANKEY            9.  **Aiding and Abetting Breach of Fiduciary**
20  CAPITAL, LLC, CHICAGO TITLE                     **Duty**
    INSURANCE COMPANY, PARTNERS                 10. **Accounting and Inspection**
21  CAPITAL SOLUTIONS FUND, PREFERRED           11. **Judicial Order to Expel Manager**
    BANK, VARDE PARTNERS, INC., VP IRVINE       12. **Declaratory Judgment**
22  LENDER LLC, and DOES 1-50, inclusive,

              Defendants.
23

24

25

26

27

28

                              COMPLAINT

For its Complaint, Plaintiff RUC14 Playa LLC ("Plaintiff") alleges as follows:

**NATURE OF THE ACTION**

1.      This action relates to Plaintiff's investment and membership interest in TA Partners Apartment Fund II LLC ("TA Fund II"), an investment vehicle managed by TA Partners LLC ("TA Partners") and its two ultimate principals, Johnny Chien Sheng Lu ("Johnny Lu") and Yaojun (Larry) Liu ("Larry Liu").

2.      In short summary, Johnny Lu and Larry Liu promised that TA Fund II, utilizing Plaintiff's and others' capital contributions, would be the owner of and develop real property located at 6055 West Center Drive, Los Angeles, California 90045 (the "Property").  Alongside their purported development of the Property, Johnny Lu and Larry Liu have engaged in serial acts of fraud, forgery, breaches of fiduciary duties, illicit fraudulent transfers, commingling and misuse of funds, conversion of Plaintiff's contribution, and other serious misconduct, all to enrich themselves and others at the extreme detriment of Plaintiff.  To make matters more complicated, Johnny Lu and Larry Liu have engaged in such acts through the utilization of a web of legal entities (perhaps not all yet known to Plaintiff) as alter egos, as a single, unified enterprise, and without proper observation of the corporate form.

3.      Plaintiff's investigation of Johnny Lu's and Larry Liu's tortious and fraudulent conduct is still underway, and Plaintiff brings this action at this time for two important reasons.  First, although Johnny Lu and Larry Liu have provided snippets of information to Plaintiff and continue to promise that they can orchestrate a deal that may rectify, in part, the harms Plaintiff indisputably has suffered, they refuse to comply with their affirmative obligations to provide Plaintiff with books and records and accurate financial information so that Plaintiff may determine the nature and scope of Johnny Lu's and Larry Liu's bad acts.  Thus, this Court's immediate intervention is required.

4.      Second, Johnny Lu and Larry Liu previously encumbered the Property in exchange for loans from certain third-party lenders.  Neither Johnny Lu or Larry Liu disclosed these loans to Plaintiff or the other innocent, third-party investors in the Property.  Moreover, Johnny Lu and Larry Liu obtained these loans without proper corporate consent which, on information and belief, makes one or all these loans invalid as a matter of law.  Johnny Lu, Larry Liu, and TA Fund II have allegedly defaulted on these loans (a fact only discovered by Plaintiff after continued requests for information to

certain Defendants).  As a result, certain lenders to Johnny Lu, Larry Liu, and TA Fund II have sought to exercise remedies, including a foreclosure, against the property and Plaintiff's ownership interests in the Property.

5.      Despite repeated requests from Plaintiff to allow it to seek alternatives to the existing loans (including a refinancing of the senior loan against the Property), lenders have refused to cease their exercise of remedies, even if only for a short period of time.  At least one of those lenders is now rushing to enforce its purported rights in the Property and forever change the status quo by conducting a trustee sale of the Property before Plaintiff has time to complete its investigation into Johnny Lu and Larry Liu's misconduct and what role the lenders may have played in their schemes.  As one example, Larry Liu has openly admitted to engaging in forgery to obtain at least some of the financing at issue that purportedly serves as the basis for one lender's security interest.  The senior lender has admitted to allowing Larry Liu to obtain this financing as a "favor" to him.

6.      Given the refusal of all interested parties to provide concrete and accurate information about what transpired, Plaintiff has no choice but to commence this action and take all necessary measures to protect and prosecute its rights, including by requesting that the Court enjoin the planned trustee sale of the Property until such time as that the various parties' rights may be adjudicated *on the merits*.

## THE PARTIES

7.      Plaintiff is a member of TA Fund II and holds a 23.036% membership interest in TA Fund II.

8.      Defendant TA Partners Apartment Fund II LLC is an investment fund organized for the purpose of carrying on the business of, among other things, purchasing, owning, managing, and developing the Property.

9.      Defendant TA Partners is a member and the manager of TA Fund II, as well as the developer and general contractor responsible for the development of the Property, and holds a 0.087% membership interest in TA Fund II.

COMPLAINT

10.     Defendant Johnny Lu is a member and manager of ALFA IDG LLC, which, in turn, is a member of TA Partners and also a member of TA Fund II.  ALFA IDG LLC holds a 28.205% membership interest in TA Fund II.

11.     Defendant Yaojun (Larry) Liu is a member and manager of Thriving Future LLC, which, in turn, is a member of TA Partners and also a member of TA Fund II.  Thriving Future LLC holds a 34.179% membership interest in TA Fund II.

12.     Upon information and belief, Defendant Hankey Capital, LLC ("Hankey Capital") is a commercial lender and a party to that certain Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents, dated December 14, 2021, as modified (the "Hankey Deed of Trust"), by and between Hankey Capital, TA Fund II, and Chicago Title Insurance Company as trustee.  TA Fund II is not a signatory to the Hankey Deed of Trust.  Hankey Capital is believed to have loaned money to Johnny Lu and Larry Liu, directly or indirectly through legal entities, in exchange for a putative security interest in the Property.

13.     Upon information and belief, Defendant Chicago Title Insurance Company is a trustee pursuant to the Hankey Deed of Trust.

14.     Upon information and belief, Defendant Varde Partners, Inc. is a commercial lender and an affiliate of Defendant VP Irvine Lender LLC (together, the "Varde Parties").  VP Irvine Lender LLC is a party to that certain Junior Mezzanine Loan Pledge and Security Agreement (Playa) (the "Forged Pledge") upon which Johnny Lu and/or Larry Liu forged the signatures of several of TA Fund II's members.  In connection with the Forged Pledge and VP Irvine Lender LLC's purported loan to TA Fund II (which loan proceeds were not used for the benefit of TA Fund II, a fact known to the Varde Parties), Johnny Lu and Larry Liu also forged members' signatures on that certain Joint Action By Written Consent of The Manager And Members Of TA Partners Apartment Fund II LLC (the "Forged Resolution").

15.     Upon information and belief, Defendant Preferred Bank is a commercial lender and a party to that certain Deed of Trust (Revolving Line of Credit), dated January 26, 2021, by and between TA Fund II and Preferred Bank.  Preferred Bank is believed to have loaned money to Johnny Lu and

Larry Liu, directly or indirectly through legal entities, in exchange for a putative security interest in the Property.

16.     Upon information and belief, Defendant Partners Capital Solutions Fund is a commercial lender.  Partners Capital Solutions Fund is believed to have loaned money to Johnny Lu and Larry Liu, directly or indirectly through legal entities, in exchange for a putative security interest in the Property.

17.     Upon information and belief, Defendant Greenwell HHC LLC is a member of TA Fund II and holds a 9.552% membership interest in TA Fund II.  Defendant Greenwell HHC LLC is a nominal defendant and not alleged to be involved in the unscrupulous acts alleged herein.

18.     Upon information and belief, Zhongjun Zheng is a member of TA Fund II and holds a 2.637% membership interest in TA Fund II.  Defendant Zhongjun Zheng is a nominal defendant and not alleged to be involved in the unscrupulous acts alleged herein.

19.     Upon information and belief, LCS Consulting Group LLC is a member of TA Fund II and holds a 1.412% membership interest in TA Fund II.  Defendant LCS Consulting Group LLC is a nominal defendant and not alleged to be involved in the unscrupulous acts alleged herein.

20.     Upon information and belief, Caiying Chang is a member of TA Fund II and holds a 0.893% membership interest in TA Fund II.  Defendant Caiying Chang is a nominal defendant and not alleged to be involved in the unscrupulous acts alleged herein.

21.     The true names and capacities, whether individual, corporate, associate, representative, or otherwise, of defendants named herein as DOES 1 through 50 inclusive (hereinafter "Doe Defendants") are unknown to Plaintiff at this time, who therefore sues said Doe Defendants by such fictitious names. Plaintiff will seek leave of Court to amend this Complaint to allege the true names and capacities of these Doe Defendants when they are ascertained.  Upon information and belief, at all relevant times, each of the fictitiously named Doe Defendants was in some manner responsible for the acts alleged herein and/or was in some manner responsible for the act(s) of, was acting as the agent of, or was working for the benefit of, a non-fictitiously named defendant in this action.

22.     The individual and entity defendants identified above are collectively referred to herein as the "Defendants."

COMPLAINT

**JURISDICTION AND VENUE**

23.     Jurisdiction is proper in this Court, as this Court is a court of general jurisdiction.  The present action seeks, among other things, the recovery of damages and other relief in an amount suited to the unlimited jurisdiction of this Court.

24.     Venue is proper in this Court because a substantial part of the events giving rise to the causes of action alleged herein and the injuries alleged herein occurred in Los Angeles County, California and also because the Property that is the subject of this action is located in Los Angeles County, California.

**FACTUAL ALLEGATIONS**

25.     Prior to  March 28, 2021, Johnny Lu and Larry Liu entered into certain agreements by which TA Partners became or was recognized as the managing member of TA Fund II, which they used for the purpose of purchasing, owning, managing, and developing the Property.

26.     Johnny Lu is the sole member of ALFA IDG LLC, Larry Liu is the sole member of Thriving Future LLC, and ALFA IDG LLC and Thriving Future LLC each hold a fifty percent (50%) membership interest in TA Partners.

27.     In other words, through ALFA IDG LLC and Thriving Future LLC, Johnny Lu and Larry Liu control TA Partners and, in turn, were and are responsible for the management of TA Fund II.

28.     In concert with the structuring of TA Fund II, the various members executed that certain Updated and Restated Operating Agreement of TA Partners Apartment Fund II LLC, dated March 28, 2021 (the "Operating Agreement"), a copy of which is attached hereto as **Exhibit A**.

29.     In connection with Plaintiff's capital contribution and investment in TA Fund II, TA Partners, Johnny Lu, and Larry Liu represented to Plaintiff that the Property was unencumbered and that TA Fund II had no debt obligations.  On information and belief, this representation was intentionally false, as these Defendants have admitted they did not disclose the existence of such debt because they did not want Plaintiff and others to know of it.

30.     In accordance with the Operating Agreement, TA Fund II is the sole owner of the Property.

COMPLAINT

31.    Pursuant to Section 3.1 of the Operating Agreement, management and control of TA Fund II was vested in TA Partners as the manager of TA Fund II.  However, at all relevant times, TA Partners' management of TA Fund II was and is subject to the limitations and terms of the Operating Agreement and also subject to all of the duties and obligations, including fiduciary duties, that a manager of a limited liability company owes to the constituent members of the company.

32.    Pursuant to Section 3.5(b) of the Operating Agreement, TA Partners "shall have the duty for the safekeeping and use of all of Company assets, whether or not in the immediate possession or control of [TA Partners], and shall not employ or permit another entity to employ Company assets in any manner *except for the exclusive benefit of the Company*."  (emphasis added).

33.    Johnny Lu and Larry Liu have not fulfilled their obligations as the *de facto* managers of TA Fund II and, as alleged herein and as expressly admitted by Larry Liu, have instead used their positions to enrich themselves to the detriment of Plaintiff.

34.    Plaintiff has been damaged on account of TA Partners', Johnny Lu's, and Larry Liu's breaches of the Operating Agreement, breaches of the covenant of good faith and fair dealing, breaches of fiduciary duties, aiding and abetting such breaches of fiduciary duties, failure to provide an accounting to which Plaintiff is entitled, and other misconduct.  The following constitute non-exhaustive examples of the ways in which such breaches and failures have occurred.

35.    Throughout the lifetime of TA Fund II, as well as Johnny Lu's and Larry Liu's attempt to develop the Property, TA Partners, Johnny Lu, and Larry Liu, directly and also through the use of Johnny Lu's and Larry Liu's various legal entities as alter egos and without proper observation of the corporate form, have, among other misconduct, undertaken numerous acts in breach of their contractual and fiduciary obligations to Plaintiff.

36.    Plaintiff's investigation into TA Partners', Johnny Lu's, and Larry Liu's wrongful actions is ongoing and has been hampered by those parties' refusal—individually and through their agents—to provide information to which Plaintiff is entitled.  For that reason, Plaintiff brings this action and seeks, as part of the relief to which Plaintiff is entitled, immediate access to certain books and records and other information within the possession, custody, and control of TA Partners, Johnny Lu, and Larry Liu and other parties with which they have engaged in perpetuating their fraudulent schemes.

37.    By way of a letter, dated February 13, 2024, true and correct copies of which are attached hereto as **Exhibit B** (Chinese) and **Exhibit C** (English), Larry Liu admitted the following bad acts:

- Johnny Lu and Larry Liu obtained and did not disclose to investors in TA Fund II project loans relating to the Property.

- In June 2019, Johnny Lu and Larry Liu obtained, from Partners Capital Solutions Fund and in the name of TA Fund II, a loan in the approximate amount of $13.5 million, the proceeds of which loan were transferred by Johnny Lu and Larry Liu to repay their own personal debts.

- In January 2021, Johnny Lu and Larry Liu refinanced the prior loan with a loan, from Preferred Bank and in the name of TA Partners, in the approximate amount of $14 million, with such loan characterized as an operating loan to TA Partners with the Property owned by TA Fund II used as collateral.

- In March 2021, Plaintiff invested in TA Fund II, and in order to induce such investment, Johnny Lu and Larry Liu made a material omission regarding the existence of the aforementioned loan transactions and encumbrances on the Property.

- In October 2021, Johnny Lu and Larry Liu obtained a supplemental loan from Preferred Bank in the approximate amount of $5.5 million (apparently still secured by the Property), approximately $4 million of which amount Johnny Lu and Larry Liu used to acquire a 95% equity interest in Revo Fast LLC, an investment opportunity having nothing at all to do with TA Fund II or the Property.

- Thereafter, Johnny Lu and Larry Liu utilized funds, illicitly obtained by using the Property as collateral, for a speculative investment in an electric vehicle startup company.

- In light of these investment failures, Johnny Lu and Larry Liu yet again raised additional funds by obtaining a loan purportedly secured by the Property, this time from Hankey Capital in or about December 2021.  Johnny Lu and Larry Liu defaulted on the loan from Hankey Capital.

- In or about May 2023, Johnny Lu and Larry Liu obtained yet another loan, this time from Varde Partners, Inc. and its lending subsidiary, in order to fund insurance premiums required by a separate third party with a security interest in real estate projects unrelated to the Property.  In exchange for such loan, Varde Partners, Inc. and its lending subsidiary required that Johnny Lu and Larry Liu provide as security an interest in the Property, which Johnny Lu and Larry Liu purported to grant by forging signatures on behalf of the members of TA Fund II, including that of Plaintiff.

38.    In other words, Johnny Lu and Larry Liu, in clear breach of the Operating Agreement and the fiduciary duties they owe to Plaintiff, surreptitiously utilized the Property in order to obtain funds to be used for their own purposes and without any benefit to TA Fund II or Plaintiff.

39.    Upon information and belief, in or about April or May 2023, as referenced in the above letter from Larry Liu and unbeknownst to Plaintiff at the time, Johnny Lu and Larry Liu, directly and through various entities, apparently owed insurance premiums with respect to two parcels of real property pledged as collateral to a separate lender (separate and apart from the Property at issue here).

7

To make such premium payments, Johnny Lu and Larry Liu concocted a scheme by which they would obtain a loan from the Varde Parties secured by various pledges of collateral, including a pledge of all of the membership interests in TA Fund II.

40.    Plaintiff, and presumably the other members of TA Fund II *not* under the direction and control of Johnny Lu and Larry Liu, had no knowledge of the aforementioned scheme, the purported pledge of membership interest as collateral, or the apparent loan from the Varde Parties.

41.    To memorialize the loan and pledge, TA Partners, as manager of TA Fund II and at the direction of TA Partners, ALFA IDG LLC, Johnny Lu, Thriving Future LLC, and Larry Liu, purported to execute on behalf of TA Fund II and each of its members, including Plaintiff, the Forged Resolution and the Forged Pledge.  A copy of the Forged Resolution is attached hereto as **Exhibit D**.  A copy of the Forged Pledge is attached hereto as **Exhibit E**.

42.    As Larry Liu has expressly admitted (as described above), Larry Liu and Johnny Lu forged the signatures of members of TA Fund II, including that of Plaintiff.

43.    Upon information and belief, the Varde Parties knew or should have known that the signatures placed upon the Forged Resolution and the Forged Pledge (including without notarizations) were not those of the members of TA Fund II.  Upon information and belief, the Varde Parties conducted no due diligence to confirm that Larry Liu and Johnny Lu (and their related entities) had obtained corporate authority to provide the Forged Pledge or that the alleged signatories to the Forged Pledge even knew about the Varde loan  transaction (which, with respect to Plaintiff and likely the other third-party, innocent investors, they did not).

44.    As referenced in Larry Liu's confession and apology letter discussed above, TA Partners, at the direction of Johnny Lu and Larry Liu, also caused TA Fund II to obtain a loan from Hankey Capital in or about December 2022.  The loan from Hankey Capital and the corresponding security interest purportedly granted in the Property in exchange for such loan were not disclosed to Plaintiff at the time.

45.    Upon information and belief, Hankey Capital did not conduct due diligence regarding the membership interest holders in TA Fund II and/or such holders' knowledge of and consent to the loan requested by TA Partners, Johnny Lu, and Larry Liu.

46.     Upon information and belief, Hankey Capital did not disburse the loan proceeds to TA Fund II, as such funds were never deposited into TA Fund II's bank account.

47.     Plaintiff is informed that approximately $5.87 million of the loan from Hankey Capital was paid directly to a third-party unknown to Plaintiff and not connected to the Property or the project.

48.     Upon information and belief, the purported grant of a security interest in the Property to Hankey Capital constituted an avoidable transfer, including because such grant was made with actual intent to defraud the true creditors of TA Fund II and also because such grant occurred at a time when TA Fund II was insolvent and for which TA Fund II did not receive reasonably equivalent value.

49.     Furthermore, the acquisition of a loan from Hankey Capital, the purported grant of a security interest in the Property in exchange for such loan, and the use of the proceeds from such loan all constituted, among other things, a breach by TA Partners of the terms of the Operating Agreement and a breach by TA Partners, Johnny Lu, and Larry Liu of fiduciary duties owed to TA Fund II and Plaintiff.

50.     In particular, Section 3.5(b) of the Operating Agreement, as well as the fiduciary obligations owed to TA Fund II by TA Partners, Johnny Lu, and Larry Liu under applicable, requires that TA Fund II's assets be used "for the exclusive benefit of [TA Fund II]."

51.     Upon information and belief, the use of the Property as collateral for a loan from Hankey Capital was not for the exclusive benefit of TA Fund II, including because the acquisition of such loan and loan proceeds was utilized by TA Partners, Johnny Lu, and Larry Liu to enrich themselves at the expense of TA Fund II.

52.     Upon information and belief, Hankey Capital failed to monitor TA Partners', Johnny Lu's, and Larry Liu's expenditures and disbursement of loan proceeds.  Contrary to how a typical, diligent lender would have operated, Hankey Capital either paid no attention to the progress of the development of the Property and use of funds intended therefor or deliberately and consciously ignored the lack of progress and illicit use of such funds by TA Partners, Johnny Lu, and Larry Liu.

53.     Although Plaintiff's investigation is far from complete, it is readily apparent that TA Partners, Johnny Lu, and Larry Liu have diverted loan proceeds and capital contributions earmarked for the development of the Property to themselves and to other projects which they are involved, all in violation of the terms of the Operating Agreement and also in breach of their fiduciary duties.

54.     As a result, at least in part, of such misconduct, on or about November 15, 2023, unbeknownst to Plaintiff at the time, Chicago Title Insurance Company, as trustee and on behalf of Hankey Capital, issued a notice of default with respect to TA Fund II's outstanding loan.  A copy of such notice of default is attached hereto as **Exhibit F**.

55.     Although Plaintiff did not immediately learn of it, on or about February 21, 2024, Chicago Title Insurance Company, as trustee and on behalf of Hankey Capital, issued a notice of trustee's sale scheduling a sale of the Property at public auction on March 18, 2024, at 11:00 a.m.  A copy of such notice of trustee's sale is attached hereto as **Exhibit G**.

56.     TA Partners, Johnny Lu, and Larry Liu have deliberately concealed from Plaintiff, and continue to conceal from Plaintiff, material facts relating to the development (or lack thereof) of the Property, the nature of the finances and expenditure of funds earmarked for the development of the Property, and their misuse of such funds and disbursements to other projects and other third parties with no legitimate relationship to the Property.

57.     Specifically, until only recently, Plaintiff had no knowledge of the foregoing loans, the illicit use of the Property as collateral, the other misconduct in which Johnny Lu and Larry Liu have engaged, and Hankey Capital's intention to proceed with an imminent disposition of the Property.

58.     Even still, Plaintiff has been unable to obtain sufficient reliable information to determine precisely what occurred in connection with the above and also with respect to other bad acts by Johnny Lu and Larry Liu.  In fact, TA Partners, Johnny Lu, and Larry Liu continue to obstruct Plaintiff's ability to investigate their misconduct in direct contravention of Plaintiff's rights under the Operating Agreement.

59.     In particular, Section 8.1 of the Operating Agreement provides as follows:

Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at other locations that the Manager shall determine from time to time, and shall be open to inspection and copying on reasonable Notice by any Member or the Member's authorized representatives during normal business hours with a three business [day] notice.  The costs of inspection and copying shall be borne by the Member.

60.     Section 8.5 of the Operating Agreement provides, in relevant part, that "[a]t the end of each fiscal year, . . . statements reflecting the financial condition of the Company and its Profits or

Losses shall be prepared, and a report about those matters shall be issued by the Company's accountants. Copies of the financial statements shall be given to all Members."

61.    Plaintiff has repeatedly requested records from TA Partners, Johnny Lu, and Larry Liu regarding TA Fund II's business, its transactions, and its books of account, but Plaintiff has not been provided with full access to any such books and records other than unaudited, incomplete financial statements and partial (and incomplete) copies of bank statements (which Plaintiff cannot verify).

62.    It is apparent that TA Partners, Johnny Lu, Larry Liu, and their counsel have refused to provide Plaintiff with access to TA Fund II's books and records and to permit Plaintiff to review TA Fund II's financial transactions because TA Partners, Johnny Lu, and/or Larry Liu have improperly diverted TA Fund II's assets to themselves and third parties in breach of their fiduciary duties to TA Fund II and Plaintiff.

63.    Moreover, upon information and belief, Johnny Lu and Larry Liu have operated the entities with which they are affiliated as alter egos and without observing the corporate form, including by failing to maintain corporate records, commingling funds and other assets, using the funds for illicit purposes, utilizing the same office and business location, exercising control through the same directors and officers, employing the same employees, using the entities as a mere shell, instrumentality, and conduit for a single venture, and failing to maintain an arm's length relationship among the entities.

64.    On account of the foregoing and also on account of facts and information presently only within Defendants' possession, custody, or control, Plaintiff brings the following causes of action on behalf of itself and, to the extent available or appropriate, derivatively on behalf of TA Fund II. At all relevant times, Plaintiff was a member of TA Fund II. Additionally, Plaintiff has been unable to obtain or coerce the cooperation of TA Partners or the individuals controlling it, Johnny Lu and Larry Liu. Any request by Plaintiff that TA Partners, under the control of Johnny Lu and Larry Liu, direct TA Fund II to investigate and prosecute causes of action that TA Fund II has and/or may have against TA Partners, Johnny Lu, and/or Larry Liu would be futile, and a true copy of this Complaint has been delivered to TA Partners as the manager of TA Fund II.

**FIRST CAUSE OF ACTION**
**(Injunctive Relief against All Defendants)**

65.    Plaintiff hereby realleges every allegation set forth in the preceding paragraphs and incorporates them by reference as though set forth fully herein.

66.    Hankey Capital has taken steps to enforce its purported security interest and to foreclose on the Property on account an alleged default on its loan.

67.    Other than entities under the common control of Johnny Lu and Larry Liu and utilized as instruments of their misconduct, Plaintiff is the largest membership interest holder in TA Fund II, which owns the Property.

68.    Completion of a trustee's sale of the Property, through which such parcel will be sold to Hankey Capital or to a third-party bidder, will deprive Plaintiff of its ownership and beneficial interests in the Property and the value thereof.

69.    The completion of a trustee's sale of the Property will constitute great and irreparable harm to Plaintiff, including by materially changing the status quo and depriving Plaintiff of an asset in which it has rights before Plaintiff is permitted to investigate the misconduct and circumstances alleged herein.

70.    Plaintiff has no adequate remedy at law.

71.    A stay, temporary restraining order, preliminary injunction, and permanent injunction are necessary to preserve the status quo during the pendency of this action.

72.    A stay, temporary restraining order, and preliminary injunction are each appropriate under the circumstances in light of the facts that Plaintiff is likely to prevail on the merits in this action and also that the harm to Plaintiff if a stay, temporary restraining order, and preliminary injunction is not issued far outweighs the harm to Hankey Capital and other Defendants if a stay, temporary restraining order, and preliminary injunction is issued.

73.    Such injunctive relief should be granted as to all Defendants in order to ensure that Plaintiff receives complete relief vis-à-vis all interested parties.

COMPLAINT

**SECOND CAUSE OF ACTION**
**(Intentional Misrepresentation against TA Partners, ALFA IDG LLC,**
**Johnny Lu, Thriving Future LLC, and Larry Liu)**

74.     Plaintiff hereby realleges every allegation set forth in the preceding paragraphs and incorporates them by reference as though set forth fully herein.

75.     TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC solicited from Plaintiff a capital contribution to and investment in TA Fund II.

76.     As part of that solicitation, TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC intentionally made false representations to Plaintiff, including that TA Fund II had no existing debt obligations and also that the Property was not subject to any encumbrances.

77.     TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC knew that such representations were false at the time they were made or, in the alternative, made such representations recklessly and without regard for their truth.

78.     TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC intended that Plaintiff rely on such false representations, and Plaintiff, in fact, reasonably relied upon such false representations.

79.     As a result of the foregoing, Plaintiff decided to make a capital contribution and investment in TA Fund II and the development of the Property and thereby was harmed in an amount not less than $12.9 million.

80.     Plaintiff's reliance on the false representations alleged herein was a substantial factor in causing Plaintiff's harm.

81.     As a proximate result of the foregoing, Plaintiff has incurred damages in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**(Concealment against TA Partners, ALFA IDG LLC,**
**Johnny Lu, Thriving Future LLC, and Larry Liu)**

82.     Plaintiff hereby realleges every allegation set forth in the preceding paragraphs and incorporates them by reference as though set forth fully herein.

83.     TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC solicited from Plaintiff a capital contribution to and investment in TA Fund II.

84.    As part of that solicitation, TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC concealed from Plaintiff certain material information, including that TA Fund II had no existing debt obligations and also that the Property was not subject to any encumbrances.

85.    TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC and Plaintiff made representations to Plaintiff, but intentionally failed to disclose contrary facts to Plaintiff, thereby making such representations deceptive.

86.    Plaintiff did not know the true nature of the facts concealed by TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC.

87.    TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC intended to deceive Plaintiff through their concealment of such facts.

88.    Had TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC disclosed the facts they concealed from Plaintiff, Plaintiff would not have made a capital contribution to and investment in TA Fund II.

89.    As a result of the foregoing, Plaintiff decided to make a capital contribution and investment in TA Fund II and the development of the Property and thereby was harmed in an amount not less than $12.9 million.

90.    Plaintiff's reliance on the concealment and omission of material facts alleged herein was a substantial factor in causing Plaintiff's harm.

91.    As a proximate result of the foregoing, Plaintiff has incurred damages in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**(False Promise against TA Partners, ALFA IDG LLC,**
**Johnny Lu, Thriving Future LLC, and Larry Liu)**

92.    Plaintiff hereby realleges every allegation set forth in the preceding paragraphs and incorporates them by reference as though set forth fully herein.

93.    TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC made various promises to Plaintiff, including that they would properly manage TA Fund II and develop the Property for the exclusive benefit of TA Fund II.

94.    TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC did not intend to perform such promises at the time they were made, but intended that Plaintiff would rely on such promises.

95.    Plaintiff reasonably relied on such promises by TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC.

96.    TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC did not keep and perform the various promises they made to Plaintiff.

97.    As a result of the foregoing, Plaintiff decided to make a capital contribution and investment in TA Fund II and the development of the Property and thereby was harmed in an amount not less than $12.9 million.

98.    Plaintiff's reliance on the concealment and omission of material facts alleged herein was a substantial factor in causing Plaintiff's harm.

99.    As a proximate result of the foregoing, Plaintiff has incurred damages in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**(Negligent Misrepresentation against TA Partners, ALFA IDG LLC,**
**Johnny Lu, Thriving Future LLC, and Larry Liu)**

100.    Plaintiff hereby realleges every allegation set forth in the preceding paragraphs and incorporates them by reference as though set forth fully herein.

101.    TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC solicited from Plaintiff a capital contribution to and investment in TA Fund II.

102.    As part of that solicitation, TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC intentionally made false representations to Plaintiff, including that TA Fund II had no existing debt obligations and also that the Property was not subject to any encumbrances.

103.    TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC made such representations recklessly and without regard for their truth and had no reasonable grounds for believing such representations were true at the time.

104.    TA Partners, Johnny Lu, ALFA IDG LLC, Larry Liu, and Thriving Future LLC intended that Plaintiff would rely on such representations, and Plaintiff, in fact, did reasonably rely upon such representations.

105.    As a result of the foregoing, Plaintiff decided to make a capital contribution and investment in TA Fund II and the development of the Property and thereby was harmed in an amount not less than $12.9 million.

106.    Plaintiff's reliance on the concealment and omission of material facts alleged herein was a substantial factor in causing Plaintiff's harm.

107.    As a proximate result of the foregoing, Plaintiff has incurred damages in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**(Breach of Contract against TA Partners, ALFA IDG LLC,**
**Johnny Lu, Thriving Future LLC, and Larry Liu)**

108.    Plaintiff hereby realleges every allegation set forth in the preceding paragraphs and incorporates them by reference as though set forth fully herein.

109.    Plaintiff, TA Partners, ALFA IDG LLC, Johnny Lu, Thriving Future LLC, and Larry Liu, among others, entered into the Operating Agreement.

110.    TA Partners breached the Operating Agreement in at least the following ways:

    a.    By utilizing the assets of TA Fund II in a manner other than for the exclusive benefit of TA Fund II in contravention of Section 3.5(b) of the Operating Agreement;

    b.    By pledging the Property and membership interests in TA Fund II as collateral to secure Hankey Capital's and the Varde Parties' loans;

    c.    By failing to maintain and provide access to the books and records of TA Fund II as required by California law and the Operating Agreement;

    d.    By failing to provide Plaintiff with annual financial statements, quarterly financial statements prepared in the ordinary course of business, an annual report including a balance sheet, income statement, statement of cash flows, and statement of

capital accounts and distributions, and copies of tax returns, all as required under California law and the Operating Agreement;

    e.    By improperly diverting capital and project funds to uses other than the development of the Property; and

    f.    By failing to develop and timely complete the development of the Property in a timely and workmanlike manner.

111.    Upon information and belief, TA Partners has materially breached its contractual obligations to TA Fund II and Plaintiff in other ways.

112.    Plaintiff has performed all conditions, covenants, and promises required by it to be performed in accordance with the terms and conditions of the Operating Agreement and/or was excused from any such conditions, covenants, or promises that have not been performed.

113.    As a proximate result of TA Partners' breaches, Plaintiff has incurred damages in an amount to be proven at trial.

114.    Upon information and belief, TA Partners, ALFA IDG LLC, Johnny Lu, and Thriving Future LLC, and/or Larry Liu are alter egos of one another and/or have commingled their affairs to such a manner that they can and should be held jointly liable for any breach of contract by TA Partners.

**SEVENTH CAUSE OF ACTION**
**(Breach of Covenant of Good Faith and Fair Dealing against TA Partners,**
**ALFA IDG LLC, Johnny Lu, Thriving Future LLC, and Larry Liu)**

115.    Plaintiff hereby realleges every allegation set forth in the preceding paragraphs and incorporates them by reference as though set forth fully herein.

116.    Plaintiff, TA Partners, ALFA IDG LLC, Johnny Lu, Thriving Future LLC, and Larry Liu, among others, entered into the Operating Agreement.

117.    Plaintiff has performed all conditions, covenants, and promises required by it to be performed in accordance with the terms and conditions of the Operating Agreement and/or was excused from any such conditions, covenants, or promises that have not been performed.

118.    In every contract there is an implied covenant of good faith and fair dealing not to do anything which will deprive the other parties of the benefit of the contract. The covenant imposes on TA Partners the duty to do everything the Operating Agreement presupposes that it will do to

17

COMPLAINT

accomplish its purpose and refrain from doing anything that would render performance of the Operating Agreement impossible or otherwise deprive Plaintiff of the benefit of its bargain.

119.    TA Partners breached such implied covenant by its actions and failures set forth above and, by doing so, did not act fairly and in good faith.

120.    As a proximate result of TA Partners' breaches, Plaintiff has incurred damages in an amount to be proven at trial.

121.    Upon information and belief, TA Partners, ALFA IDG LLC, Johnny Lu, and Thriving Future LLC, and/or Larry Liu are alter egos of one another and/or have commingled their affairs to such a manner that they can and should be held jointly liable for any breach by TA Partners.

**EIGHTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty against TA Partners, ALFA IDG LLC,**
**Johnny Lu, Thriving Future LLC, and Larry Liu)**

122.    Plaintiff hereby realleges every allegation set forth in the preceding paragraphs and incorporates them by reference as though set forth fully herein.

123.    As the managing member of TA Fund II and pursuant to California Corporations Code Sections 17704.09(b) and 17704.09(f), TA Partners owed to TA Fund II and the other members of TA Fund II a duty of loyalty.

124.    Specifically, TA Partners was obligated to account to TA Fund II and its other members, and hold as trustee for TA Fund II, any property, profit, or benefit derived to it in the conduct of the activities of TA Fund II, to refrain from dealing with TA Fund II as or on behalf of a person having an interest adverse to TA Fund II, and to refrain from competing with TA Fund II.

125.    Further, as the managing member of TA Fund II and pursuant to California Corporations Code sections 17704.09(b) and 17704.09(f), TA Partners owed to TA Fund II and the other members of TA Fund II a duty of care.

126.    Specifically, TA Partners was obligated to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

127.    TA Partners breached its fiduciary duties to TA Fund II and to other members of TA Fund II by diverting capital and other project funds to itself and third parties with no cognizable benefit to TA Fund II or to the development of the Property, entering into a loan transaction with Hankey

Capital without notice or sufficient disclosure to TA Fund II and its other members, purporting to encumber the Property with a security interest in favor of Hankey Capital as collateral for Hankey Capital's loan, and by concealing and continuing to conceal material financial and other information from Plaintiff in an effort to protect TA Partners, ALFA IDG LLC, Johnny Lu, and Thriving Future LLC, and/or Larry Liu from liability for their wrongful acts.

128.    In breaching its fiduciary duties, TA Partners acted willfully and with the intent to cause injury to TA Fund II and Plaintiff.  TA Partners is, therefore, guilty of acting with malice in conscious disregard of TA Fund II's and Plaintiff's rights, thereby warranting an assessment of punitive damages in an amount appropriate to punish TA Partners and deter others from engaging in similar misconduct.

129.    As a result of TA Partners' breaches, TA Fund II and Plaintiff have incurred damages in an amount to be proven at trial.

130.    Upon information and belief, TA Partners, ALFA IDG LLC, Johnny Lu, and Thriving Future LLC, and/or Larry Liu are alter egos of one another and/or have commingled their affairs to such a manner that they can and should be held jointly liable for any breach of fiduciary duty by TA Partners.

**NINTH CAUSE OF ACTION**
**(Aiding and Abetting Breach of Fiduciary Duty against**
**ALFA IDG LLC, Thriving Future LLC, Johnny Lu, and Larry Liu)**

131.    Plaintiff hereby realleges every allegation set forth in the preceding paragraphs and incorporates them by reference as though set forth fully herein.

132.    As set forth above, TA Partners breached its fiduciary duties of loyalty and care owed to TA Fund II and Plaintiff.

133.    Upon information and belief, ALFA IDG LLC, Johnny Lu, and Thriving Future LLC, and/or Larry Liu knew that TA Partners' actions constituted breaches of its fiduciary duties.

134.    Upon information and belief, ALFA IDG LLC, Johnny Lu, and Thriving Future LLC, and/or Larry Liu gave substantial assistance or encouragement to TA Partners.  Alternatively, ALFA IDG LLC, Johnny Lu, and Thriving Future LLC, and/or Larry Liu specifically directed TA Partners to engage in conduct that constituted breaches of its fiduciary duties.

135.    ALFA IDG LLC, Johnny Lu, and Thriving Future LLC, and/or Larry Liu's conduct was a substantial factor in causing harm to Plaintiff.

19

COMPLAINT

136.     As a proximate result of ALFA IDG LLC, Johnny Lu, and Thriving Future LLC, and/or Larry Liu's aiding and abetting TA Partners' breaches of its fiduciary duties, TA Fund II and Plaintiff have incurred damages in an amount to be proven at trial.

### TENTH CAUSE OF ACTION
**(Accounting and Inspection against TA Fund II and TA Partners)**

137.     Plaintiff hereby realleges every allegation set forth in the preceding paragraphs and incorporates them by reference as though set forth fully herein.

138.     A fiduciary relationship exists between TA Partners and Plaintiff.

139.     Pursuant to TA Partners' fiduciary obligations and the Operating Agreement, TA Partners has a duty and contractual obligation to provide an accounting of the expenses and costs associated with the purchase and development of the Property.

140.     Additionally, pursuant to California Corporations Code Section 17701.13(d), TA Partners, on behalf of TA Fund II, is required to "maintain in writing" various information, including copies of TA Fund II's federal, state, and local income tax returns for the six most recent fiscal years, copies of TA Fund II's financial statement for the six most recent fiscal years, and "[t]he books and records of the limited liability company as they relate to the internal affairs of the limited liability company for at least the current and past four fiscal years."

141.     Thus, Plaintiff is entitled to a complete and accurate accounting of all of the expenses and costs associated with the purchase and development of the Property and TA Fund II's operations.

142.     TA Partners, on behalf of TA Fund II, is obligated pursuant to California Corporations Code Section 17701.10 to provide promptly to Plaintiff, upon written request, a copy of the information required to be maintained under Section 17701.13 and also to permit, upon Plaintiff's reasonable request, Plaintiff to inspect and copy such records.

143.     Pursuant to California Corporations Code Section 17704.10(g), Plaintiff is entitled to recover its fees and expenses, including reasonable attorneys' fees, incurred in bringing this cause of action to compel an accounting and the production of and ability to inspect TA Fund II's books and records.

COMPLAINT

**ELEVENTH CAUSE OF ACTION**
**(Judicial Order to Expel Manager against TA Partners)**

144.    Plaintiff hereby realleges every allegation set forth in the preceding paragraphs and incorporates them by reference as though set forth fully herein.

145.    Plaintiff brings this cause of action on behalf of TA Fund II pursuant to California Corporations Code Section 17709.02.

146.    Plaintiff, on behalf of TA Fund II, seeks a judicial order expelling TA Partners as a member and managing member of TA Fund II and declaring Plaintiff as the managing member of TA Fund II.

147.    As alleged herein, TA Partners and its controlling principals have engaged in wrongful conduct that has materially and adversely affected TA Fund II and have willfully committed breaches of contract and of their fiduciary duties.

148.    Accordingly, a judicial order expelling TA Partners as a member and managing member of TA Fund II is proper and warranted.

**TWELFTH CAUSE OF ACTION**
**(Declaratory Judgment against the Varde Parties)**

149.    Plaintiff hereby realleges every allegation set forth in the preceding paragraphs and incorporates them by reference as though set forth fully herein.

150.    Pursuant to California Civil Code Section 3412, "[a] written instrument, in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon his application, be so adjudged."

151.    The Forged Resolution and the Forged Pledge bear signatures forged by Larry Liu and Johnny Lu with respect to Plaintiff (and the other members of TA Fund II not under the control and direction of Larry Liu and Johnny Lu).

152.    The purported grant of a security interest in Plaintiff's membership interest in TA Fund II in favor of the Varde Parties and as security for a loan unrelated to Plaintiff and TA Fund II may cause serious injury to Plaintiff if left outstanding.

COMPLAINT

153.    As set forth above, Larry Liu has openly admitted that many of the signatures on the Forged Resolution and the Forged Pledge are illegitimate and that Johnny Lu and he forged such signatures.

154.    Accordingly, Plaintiff is entitled to a declaration that the Forged Resolution and the Forged Pledge are void.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

1.    Judgment in favor of Plaintiff and against Defendants;

2.    A stay, temporary restraining order, preliminary injunction, and permanent injunction enjoining Hankey Capital and other Defendants from enforcing any purported security interest against, foreclosing on, and/or otherwise exercising any rights or remedies with respect to the Property;

3.    An award of damages in an amount to be proven at trial on account of TA Partners', Johnny Lu's, Larry Liu's, and other Defendants' fraudulent inducement, breaches of contract, breaches of the implied covenant of good faith and fair dealing, and breaches of fiduciary duties;

4.    An award of punitive damages in an amount to be proven at trial on account of TA Partners', Johnny Lu's, Larry Liu's, and other Defendants' willful and malicious breaches of fiduciary duties;

5.    An award of damages in an amount to be proven at trial on account of TA Partners', Johnny Lu's, Larry Liu's, ALFA IDG LLC's, and Thriving Future LLC's, and other Defendants' aiding and abetting breaches of fiduciary duties;

6.    An Order compelling a complete and accurate accounting with respect to TA Fund II's operations;

7.    An Order compelling a production to Plaintiff of a copy of the information required to be maintained by TA Partners, on behalf of TA Fund II, and access to Plaintiff to inspect and copy the books and records of TA Fund II;

8.    A judicial Order expelling TA Partners as managing member of TA Fund II and a judicial decree declaring Plaintiff as the managing member of TA Fund II;

COMPLAINT

9.    A judicial declaration invalidating and declaring as void the Forged Resolution and the Forged Pledge;

10.    An award of reasonable attorneys' fees and costs incurred by Plaintiff in connection with its enforcement of its rights and its prosecution of this action; and

11.    Such other and further relief as the Court may deem just and proper.

DATED:  March 13, 2024

                                        Respectfully submitted,

                                        SEYFARTH SHAW LLP

                                        By: _____
                                              M. Ryan Pinkston

                                        Attorneys for Plaintiff
                                        RUC14 PLAYA LLC

309536485v.3

COMPLAINT

# EXHIBIT A

**THE MEMBERSHIP INTERESTS REPRESENTED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE MEMBERSHIP INTERESTS IS PROHIBITED UNLESS SUCH SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE MEMBERSHIP INTERESTS ARE SET FORTH IN THIS OPERATING AGREEMENT.**

本协议规定的股东权益未曾依据 1933 年证券法或者任何州的证券法进行登记。出售或者任何形式的处置必须依照相关法律做出。其他的关于股东权益转让的规定将在本合同中具体规定。

**UPDATED AND RESTATED OPERATING AGREEMENT**
*of*
**TA PARTNERS APARTMENT FUND II LLC**

**更新及重述之 TA PARTNERS APARTMENT FUND II 有限公司**

**管理运营协议**

THIS UPDATED AND RESTATED OPERATING AGREEMENT OF TA PARTNERS APARTMENT FUND II LLC (this "***Agreement***") is adopted at Irvine, California, effective as of March 28, 2021 (the "***Effective Date***"), by and among TA PARTNERS LLC (the "***Manager***"), a California limited liability company, and the other members who have executed the signature pages to this Agreement (each a "***Member***" and collectively, the "***Members***", including the Manager).

TA PARTNERS APARTMENT FUND II LLC 有限公司的管理协议（下称本协议）于 2021 年 3 月 28 日（签约日）由 TA Partners LLC（一家位于加州的有限公司，下称"**管理人**"），及本协议签署页所附其它股东在美国加州尔湾签署并生效。管理人和其他普通股东统称"**股东**"，均为本协议签约方，统称协议各方。

**R E C I T A L S**

**前 言**

A.     The Members have formed (or hereby agrees to form) a limited liability company under the California Revised Uniform Limited Liability Company Act.

协议各方依据加州有限公司法案（修订版）已组建（或同意组建）一家有限公司。

B.      The Members enter into this Agreement to provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

协议各方签署本协议是为了规定公司的治理架构和商业行为准则，以及明确各个股东的相互权利和义务。

NOW, THEREFORE, in order to carry out the intentions expressed above and in consideration of the mutual agreements hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

所以，为达到上述目的，且考虑到协议各方相互达成的协议及其它善意并有价值的对价，各个股东达成协议如下：

# ARTICLE I
## 第一条

## DEFINITIONS
### 定义

Capitalized terms used in this Agreement have the meanings provided in this Article I unless defined elsewhere herein.

大写黑体的文字在在本协议中有本第一条规定的以下含义：

"*Act*" means the California Revised Uniform Limited Liability Company Act (Corporations Code Sections 17701.01-17713.13), including amendments from time to time.

法令：指加州修订版统一有限公司法案(17701.01-17713.13),及其以后修订内容。

"*Adjusted Capital Contribution*" is defined in Section 6.6(a).

调整后的股本出资：见第 6.6（a）条之规定。

"*Adjusted Capital Account Deficit*" is defined in Section 6.3(a).

调整后的股本账户亏损：见第 6.3（a）条之规定。

"*Affiliate*" of a Member means any Person directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and

policies of a Person, whether through membership, ownership of voting securities, by contract, or otherwise.

关联人：是指对于股东而言，任何直接或者非直接（通过一个或多个中间人）的控制股东、或受股东控制，或与股东受同一控制人控制的人。

"***Agreement***" means this Operating Agreement of the Company, as amended from time to time.

本协议：是指本公司的管理协议，以及不时做出的修订内容。

"***Articles of Organization***" is defined in Corporations Code Section 17701.02(b) as applied to the Company.

机构章程：是指法令 17701.02(b)条规定的适用于公司的规定。

"***Available Cash***" means all net revenues from the Company's operations, including net proceeds from all sales, refinancings, and other dispositions of Company property that the Manager deems in excess of the amount reasonably necessary for the operating requirements of the Company, including debt reduction and Reserves. In case of the Distribution, Available Cash shall also have the meaning of the cash available after the distribution of the previous tier(s).

可支配现金：是指所有公司运营所得的净收入，包括出售、重新贷款以及以其他形式处置公司资产所获得的且管理人认为本公司运营所需合理资金之部部分所产生的净收益，包括债务减免和准备金。在分配时，可支配现金也应当具有前一序列分配完之后可分配的现金的含义。

"***Book Adjustments***" means, for any item of Company property for a given fiscal year, adjustments with respect to Book Value for depreciation, cost recovery, or other amortization deduction or gain or loss computed in accordance with Treasury Regulation Section 1.704–1(b)(2)(iv)(g), including Book Depreciation.

账面调整：是指就公司财产的任何项目在规定的财政年度，因资产折旧、成本回收或其它摊销扣减，或依据会计规定 1.704–1(b)(2)(iv)(g)款之规定计算得出的盈利或亏损，对账面价值进行的调整。包括账面折旧。

"***Book Value***" means with respect to any asset, the adjusted basis of the asset for federal income tax purposes.

账面价值：是指就资产而言，经过调整的联邦收入所得税的纳税基数。

"***Book Depreciation***" means, for any item of Company property for a given fiscal year, a percentage of depreciation or other cost recovery deduction allowable for federal income tax purposes for that item during that fiscal year equal to the result (expressed as a percentage) obtained by dividing (1) the Gross Asset Value of that item at the beginning of the fiscal year (or the acquisition date during the fiscal year) by (2) the federal adjusted tax basis of the item at the

beginning of the fiscal year (or the acquisition date during the fiscal year). If the adjusted tax basis of an item is zero, the Manager may determine Book Depreciation, provided that he or she does so in a reasonable and consistent manner.

账面减值：是指公司财产的任何部分在规定财政年度，因贬值或在该财政年度内因联邦收入所得税扣减而造成的其它成本回收的百分比值，该百分比等于上述结果除以 1）该部分财产在该财政年度年初（或其购买之日）的资产总价值；2）调整后的联邦税法规定的该部分财产在该财政年年初（或其购买之日）的纳税基数。如果调整后纳税基数是零，则管理人可以在其认为合理的范围内确定账面减值。

"*Business Day*" means any day other than Saturday, Sunday, or any other day on which national banking associations in the State of California generally are closed for commercial banking business.

营业日：是指任何除周六日以及加州银行业协会规定的关门日之外的日子。

"*Capital Account*" means the account maintained for each Member, consisting of the Member's initial Capital Contribution and adjusted in accordance with Section 5.5.

股本账户：是指为每个股东管理的账户，该账户包括每个股东的原始出资以及根据 5.5 条所做出的相应调整。

"*Capital Contribution*" means the amount of money, or services rendered or to be rendered, and the fair market value of any property (including the value of any personal guaranty) contributed to the Company by a Member (net of liabilities secured by the contributed property that the Company is considered to assume or take "subject to" under Internal Revenue Code Section 752) in consideration of a Percentage Interest held by that Member. A Capital Contribution shall not be deemed a loan. The Manager may instruct a Member to make Capital Contribution in currency of People's Republic of China ("RMB") to a designated RMB account, in which case, the exchange rate between RMB and US Dollar shall be the 10-day-average Medium Exchange Rates of the Buying and Selling Price as published by the Bank of China in the following link: http://www.boc.cn/sourcedb/whpj/ before the Capital Contribution in RMB is made.

资本出资：是指股东按其收益比例以一定金额的现金或者按照合理市场价值计算的资产或者服务作价的（包括任何个人担保的价值）对公司的出资（扣除该公司根据国内收入准则 752 条的规定对该部分资产所应承担的债务）。出资不得被视作一个对公司的贷款。管理人可以指定股东以人民币出资到一个特定人民币账户，在该情况下，人民币兑美元汇率应当按照支付人民币之前中国银行公布的买入和卖出均价的十日平均价格计算。中国银行的汇率在以下链接公布：http://www.boc.cn/sourcedb/whpj/.

"*Capital Event*" means a sale or disposition of any of the Company's capital assets, the receipt of insurance and other proceeds on account of an involuntary conversion of Company property, the receipt of proceeds from a refinancing of Company property, or a similar event with respect to Company property or assets.

资本活动：是指公司出售或者处置公司的任何资本资产、保险收入或者公司资产被动转换所产生的其他收益，及公司财产而获得的收益的行为，或者针对公司财产或资产的类似情形。

"*Company*" means TA PARTNERS APARTMENT FUND II LLC, a California limited liability company.

公司：指 TA PARTNERS APARTMENT FUND II LLC，一家在加州成立的有限公司。

"*Company Minimum Gain*" is defined in Section 6.3(b).

公司最低盈利：见第 6.3（b）条之规定。

"*Company's Business*" is defined in Section 2.2.

公司业务：见第 2.2 条之规定。

"*Confidential Information*" is defined in Section 11.1.

保密信息：见第 11.1 条之规定。

"*Corporations Code*" means the California Corporations Code.

公司条例：指加州公司条例。

"*Encumber*"，"*Encumbrance*"  means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

权利限制：指设置或者拟设置相关权利限制的行为，无论是否已根据相关法律完善。

"*Governmental Authority*" means any federal, state, local, foreign, or other governmental or quasi-governmental authority and any governmental, quasi-governmental, or other department, commission, body, board, bureau, agency, association, subdivision, court, tribunal, or other instrumentality exercising any executive, judicial, legislative, regulatory or administrative function.

政府机关：是指联邦、州、本地、外国或者其他任何的政府或者准政府机构，或者其他行使任何执行、司法、立法、监管或行政职能的政府或准政府部门、委员会、机关、委员会、办公室、代理机构、协会、分支机构、法院、审理委员会或其它实体，如行政、司法、立法、管理等职能的机构。

"*Gross Asset Value*" means, for any item of property of the Company, the item's adjusted basis for federal income tax purposes.

总资产价值：是指就任何公司资产而言，该资产经过调整的纳税申报基数。

5

"*Initial Members*" means those Persons whose names are set forth in <u>Exhibit A</u> to this Agreement.

初始股东：是指本合同附件 A 规定的股东。

"*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended, and any successor provision.

国内收入准则：是指 1986 国内收入准则以及其后不时所做的修订内容。

"*Losses*" is defined in Section 6.2.

亏损：见第 6.2 条之规定。

"*Management Fee*" shall have the meaning set forth in Section 2.6.

"*Majority of Members*" means a Member or Members whose Percentage Interests represent more than fifty percent (50%) of the Percentage Interests of all the Members.

多数股东：是指其持股比例超过全部股东持股比例 50%的一个或者多个股东。

"*Member*" means an Initial Member or a Person who otherwise acquires a Membership Interest, as permitted under this Agreement, and who has not ceased to be a Member under Article IX or for any other reason.

股东：是指初始股东或者根据本协议获得股东身份的其它人，但后者不得因第九条规定或其它原因中断其股东身份。

"*Member Nonrecourse Debt*" is defined in Section 6.3(c).

股东不可追索债务：见第 6.3（C）条之规定。

"*Member Nonrecourse Debt Minimum Gain*" is defined in Section 6.3(d).

股东不可追索债务最低回报：见第 6.3（d）条之规定。

"*Member Nonrecourse Deductions*" is defined in Section 6.3(e).

股东不可追索减值：见第 6.3（e）条之规定。

"*Membership Interest*" means a Member's entire interest and rights in the Company, collectively, including the Member's Transferable Interest, any right to Vote or participate in management, and the right to information concerning the business and affairs of the Company.

股权权益：是指股东在本公司全部权利和利益的统称，包括股东的可转让权益，对公司业务或事务的投票权，参与管理权和信息知情权等

"*Nonrecourse Deductions*" is defined in Section 6.3(f).

6

不可追索减值：见第 6.3（f）条之规定

"***Nonrecourse Liability***" is defined in Section 6.3(g).

不可追索债务：见第 6.3（g）条之规定。

"***Notice***" means a Written notice required or permitted under this Agreement

通知：指本合同要求或者允许的书面通知。

 "***Organizer***" is defined in Section 2.1.

组织人：见第 2.1 条之规定。

"***Percentage Interest***" means a fraction, expressed as a percentage, the numerator of which is the total of a Member's Capital Account and the denominator of which is the total of all Capital Accounts of all Members.

权益比例：是指一个以百分比表达的代表股东股本账户所占全部股东股本账户价值的比例。

"***Person***" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

自然人：是指个人、合伙人、有限合伙人、信托公司、不动产公司、协会、法人、有限公司或其它实体，无论是境内还是境外。

"***Preferred Return***" means, for each Member, an amount equal to an annual return of 8% per annum on the amount of Member's Capital Contribution from the date of purchase of the Property to the sale of the Property or return of Member's Capital Contribution with proceeds out of certain refinancing, whichever is earlier. If part of Capital Contribution is made, the Preferred Return shall be calculated for each repayment of Capital Contribution.

优先回报：是指就股东而言，股东资本出资每年 8.00%的回报，期限为自购买资产至出售资产,或者经过再贷款获得资金并退回股本出资。如果退回部分股本出资，则每一部分股本出资的优先回报都应当单独计算。

"***Prime Rate***" means, for a particular date, the prime rate of interest as published on that date in the money rates section of the *Wall Street Journal*.

基准利率：是指就特定某一天而言，华尔街日报公布的基准利率。

"***Profits***" and "***Losses***" are defined in Section 6.2.

利润和亏损：见第 6.2 条之规定。

"***Project***" means the overall planning, coordination, control, and development of the Property as a for-lease apartment project.

项目：是指公司物业作为一个出租型公寓地产投资而进行整体规划、协调、管理和开发的活动。

"***Property***" means that certain real property of a potential apartment or office development site at 6055 W Center Drive, Los Angeles, CA90045, together with any improvement constructions thereon, if any.

公司物业：指位于加州洛杉矶 6055 Center Drive, 洛杉矶，CA90045 的一个可被用于开发公寓的住宅的土地，以及任何地上建筑物。

"***Property Appraisal Value***" is defined in Section 7.4.

物业评估价值：见第 7.4 条之规定。

"***Property Equity Value***" is defined in Section 7.5.

物业权益价值：见第 7.5 条之规定。

"***New Capital Contribution***" is defined in Section 7.5.

新股东出资：见第 7.5 条之规定。

"***Proxy***" means a written authorization signed or an electronic transmission authorized by a Member or the Member's attorney-in-fact giving another Person the power to exercise the voting rights of that Member. A Proxy may not be transmitted orally.

代理：是指经股东或股东代理人签署的一个书面或者电子的授权，给予其它人行使股东投票权的权力。代理不得以口头形式行使。

"***Return***" means the annualized ratio of the Net Profit After Tax over the Capital Account balance of the Members.

回报：是指年化的税后净利润除以股东股本账户余额的比例。

"***Treasury Regulations***" or "***Regulations***" means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the Internal Revenue Code, as those Treasury Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

财务准则，或准则：是指美国财政部公布或联邦公报发布的解释和适用国内收入准则的所得税准则，及其不时所做修订或者相关的或者后继的法规规定。

"***Representative***" is defined in Section 4.5.

8

代表：见第 4.5 条之规定。

"***Reserves***" means the reserves that the Manager, in the Manager's sole discretion, deems reasonably necessary to meet accrued or contingent liabilities of the Company, reasonably anticipated operating expenses, and working capital requirements.

准备金：是指股东自行决定用于应付公司已有或偶发债务、合理预期运营成本和流动资本要求所需的合理资金。

"***Substitute Representative***" is defined in Section 4.5.

替补代表：见第 4.5 条之规定。

"***Substituted Member***" means any Person who is admitted as a Member in the manner provided in Section 9.9.

替补股东：是指按第 9.9 条之规定获得股东身份的自然人。

"***Tax Item***" means each item of income, gain, loss, deduction, or credit of the Company.

税项：是指公司收入、盈利、亏损、扣减或欠账明细。

"***Tax Matters Partner***" means the Person designated under Section 8.7.

税务合伙人：见第 8.6 条之规定。

"***Tier 1 Split***" means the distribution of all the Return to Member ALFA IDG LLC and Thriving Future LLC each at the amount of Four Million and Seven Hundred Thousand Dollars as early investment preferred return. This Tier distribution will be made after the exit of the Project.

"一级分配"：是指因为其更早时间投资本项目，而对股东 ALFA IDG LLC 和 Thriving Future LLC 分别给予金额为四百七十万美元优先回报。本级别分配在项目退出之后做出。

"***Tier 2 Split***" means the distribution of all the Return after Tier 1 Split (same for other Tiers) to all Members pro rata to their investment if the Return is between 0% and 8% per annum. This Tier distribution will be made after the exit of the Project.

"二级分配"：是指一级分配之后(下同)，年度回报率在 0%和 8%之间的部分，全部按照股东的投资比例分配给股东。本级别分配在项目退出之后做出。

"***Tier 3 Split***" means the distribution of the Return from 8% to 10% per annum in the following manner: 100% to Managers. This Tier distribution will be made after the exit of the Project.

三级分配：年度回报率 8%-10%的部分，分配方式如下：100%分配给管理人。本级别分配在项目退出之后做出。

"***Tier 4 Split***" means the distribution of the Return from 10% to 15% per annum in the following manner: (i) 70% to Members pro rata to their investment; and (ii) 30% to Manager. This Tier distribution will be made after the exit of the Project.

四级分配：年度回报率10%-15%的部分，分配方式如下：70%按照投资比例分配给股东，30%给管理人。本级别分配在项目退出之后做出。

"***Tier 5 Split***" means the distribution of the Return from 15% to 20% per annum in the following manner: (i) 60% to Members pro rata to their investment; and (ii) 40% to Manager. This Tier distribution will be made after the exit of the Project.

五级分配：年度回报率15%-20%的部分，分配方式如下：60%按照投资比例分配给股东，40%给管理人。本级别分配在项目退出之后做出。

"***Tier 6 Split***" means the distribution of the Return after Tier 1 Split to Tier 5 Split. All the Return in this Tier will be distributed in the following manner: (i) 50% to Members pro rata to their investment; and (ii) 50% to Manager. This Tier distribution will be made after the exit of the Project.

六级分配：完成一级到五级分配之后所有剩余回报为六级分配。本级分配方式如下：50%按照投资比例分配给股东，50%给管理人。本级别分配在项目退出之后做出。

"***Transfer***" means any sale, assignment, gift, Encumbrance, or other disposition of a Membership Interest or any part of a Membership Interest, directly or indirectly, including by operation of law, under court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors, but excluding an Encumbrance that is expressly permitted under this Agreement.

转让：任何出售、分配、馈赠、留置或以其它方式直接或间接处置股东权益或部分股东权益的行为，包括按照法律、法院裁定 的转让行为、法院拍卖担保物权、执行法院判决或其它法律程序，或以其它方式发生的转让行为，包括为了债权人利益向（自）破产的信托公司、接收人或受让人的拟转让行为，但不包括本协议明确允许的债务负担。

"***Transferable Interest***" means the right, as originally associated with a Person's capacity as a Member, to receive distributions from the Company in accordance with the terms of this Agreement, whether or not the Person remains a Member, and the right to information with respect to the Company as provided to a "transferee" under Corporations Code Section 17704.10.

可转让权益：是指与作为股东的自然人能力相关的权利，即根据本合同规定从公司收取现金分配的权利，无论该自然人是否保持股东身份，以及公司根据《公司法》第 17704.10 条规定给予"受让人"的信息知情权。

10

"*Transferee*" means a Person who has acquired all or part of a Member's Transferable Interest in the Company, by a Transfer in accordance with the terms of this Agreement, but who has not become a Member.

受让人：是指根据本合同规定通过转让活动取得股东在该公司全部或部分可转让权益，但尚未成为股东的自然人。

"*Transferring Member*" means a Member who by a Transfer has transferred a Transferable Interest in the Company to a Transferee.

转让股东：是指通过转让活动将其在公司的可转让权益转让给受让人的股东。

"*Triggering Event*" is defined in Section 9.4.

触发事件：见第 9.4 条之规定。

"*Undistributed Capital Contribution Account*" means, for each Member, the amount in a special record-keeping account maintained by the Company for such Member, equal to (a) the aggregate amount of the Capital Contributions contributed by such Member to the Company (including without limitation any Additional Capital Contributions), reduced (but not below zero) by (b) the aggregate amount of cash distributed to such Member.

未分配股本账户：是指对于每个股东而言，公司专门为其设立的记录账户中的款项，等于 a)上述股东出资资本总额 （包括追加出资），减去（但不得为负数）上述股东的已分配给该股东的资金总额。

"*Undistributed Preferred Return Account*" means, for each Member, the amount in a special record-keeping account maintained by the Company for such Member, equal to (a) such Member's accrued Preferred Return, reduced (but not below zero) by (b) all amounts distributed by the Company to such Member.

未分配优先回报账户：是指对于股东而言，公司为其设立的专门记录账户中的款项，等于 a)上述股东获得的优先回报，减去（但不得为负数）b)公司分配给上述股东的全部款项。

"*Vote*" means a written consent, a ballot cast, a voice vote at a meeting, or consent given by electronic transmission to the Company.

投票：是指向书面同意书，抽签式投票、会议表决或向公司发送的电子形式的同意书。

"*Voting Interest*" means, with respect to a Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company provided under the Act, except as limited by the provisions of this Agreement. A Member's Voting Interest shall be directly proportional to that Member's Percentage Interest.

投票权益：是指股东根据公司法对公司相关业务和事务的投票权、参与管理权和信息知情权，但本协议规定禁止的行为除外。股东的投票权益与股东的出资额成正比。

"*Writing*," whether capitalized or not, includes any form of recorded message capable of comprehension by ordinary visual means, and when used to describe communications between the Company and its Members, "writing" shall include electronic transmissions by and to the Company as defined in Corporations Code Section 17701.02(i).

文字：无论是否大写，包括能够通过普通可视方式理解的记录信息，当指公司与股东间的沟通材料时，应包括《公司法》第 Section 17701.02(i)条规定之公司接受或发送的电子信息。

"*Written*" or "*in writing*," whether capitalized or not, includes facsimile and other electronic communication authorized by the Corporations Code.

书面材料：无论是否大写，包括传真和公司法规定的其它电子材料。

## ARTICLE II

### 第二条

## GENERAL MATTERS

### 一般规定

**2.1** FORMATION OF THE COMPANY. The Company has been organized as a limited liability company by filing the Articles of Organization (LLC-1) in the office of the Secretary of State of the State of California under and pursuant to the provisions of the Act. The rights and liabilities of the Members shall be as provided in the Act, except as varied in accordance with the Act by the express provisions of this Agreement. Not in limitation of the foregoing, to the extent permitted by law, the provisions of this Agreement shall govern over all provisions of the Act that would apply but for (and inconsistently with) this Agreement. For each question (a) with respect to which the Act provides a rule (a "*default rule*") but permits a limited liability company's operating agreement, or written operating agreement, to provide a different rule and (b) which is addressed by this Agreement, the default rule shall not apply to the Company. The Manager shall have authority to cause the Company to be qualified, formed, reformed or registered in any jurisdiction in which the Company transacts business if such qualification, formation, reformation or registration is necessary or desirable in order to protect the limited liability of the Members or to permit the Company lawfully to transact business in such jurisdiction, including under any assumed or fictitious name statutes or similar laws in any such jurisdiction. The Members hereby acknowledge their authorization and approval of the Manager, as the "*Organizer*" taking, and otherwise ratify, that action to form the Company under the Act. Other than actions relative to its formation, the Company heretofore has not engaged in any business or conducted any other activities.

公司设立。公司是根据公司法规定，向加州州秘书处办公室递交公司章程（LLC-1）后成立的一家有限公司。股东的权利和义务由公司法规定，但本合同明确规定与公司法不同的除外。在法律许可范围内，属于上述权利和义务范围之外的，若本协议条款与公司法相关规定有冲突的，适用本协议规定。对于任何问题，若公司法有相关规定（法律规定）且允许有限公司制订的管理合同有不同规定的，则上述法律规定不适用于本公司。管理人有权在公司进行商业交易的管辖范围内，对该公司进行资质审查、组建、改组或注册，但上述审查、组建、改组和注册行为须为保护股东有限责任或使公司在上述管辖范围内进行合法商业交易所必须或有利的。包括在上述管辖地区以假设性名称规约或类似法律所进行的活动。公司各股东承认其授权并批准管理人以"组织者"的名义，根据公司法组建上述公司。除与公司组建相关的活动外，上述公司不得参与任何商业活动或开展任何其它活动。

       **2.2**    COMPANY'S PURPOSE. The purpose of the Company is to carry on the business of purchasing, owning, repositioning, operating, managing, improving, repairing, renting, mortgaging, refinancing, selling, conveying and otherwise dealing with the Property directly or through Affiliates and all the activities of the Project reasonably related thereto including, without limitation, making all decisions with respect to the real estate operations of the Property (the "*Company's Business*"). Except as permitted by this Section 2.2, the Company shall not engage in any other business. The Company is authorized to take any legal measures which will assist it in accomplishing its purpose or benefit the Company. The Company will be the sole owner of the Property.

公司目的：设立公司的目的在于开展购买、支配、重新定位、经营、管理、改善、维修、出租、质押、融资、销售、转让或以其它方式直接或通过关联人处置公司物业的商业活动，以及与之相关的所有项目活动，包括但不限于针对公司物业的不动产经营（公司业务）做出的 所有决策。除本协议第 2.2 条规定的之外，公司不得参与其它任何商业活动。公司有 100%持有前文定义的物业所有权。

       **2.3**    PRINCIPAL OFFICE AND REGISTERED AGENT.

**2**.3、公司总部及注册代理机构

       (a)    The principal office of the Company is located at 16800 Aston St, Ste 275, Irvine, CA 92606. The Manager may change the principal office of the Company from time to time upon giving written notice of any such change to all of the other Members.

公司总部位于加州尔湾 16800 Aston 大街 275 室（邮编 CA92606）。管理人有权改变公司的总部地址，但应书面通知其它股东。

       (b)    The initial registered office and registered agent of the Company in the State of California are as set forth in the Articles of Organization of the Company. The Manager may change the registered office and registered agent of the Company from time to time in the manner provided in the Act upon giving written notice of any such change to all of the other Members.

公司的按其机构章程之规定在加州注册原始的办事处和代理机构，管理人有权按照公司法规定之方式，随时改变上述办事处和代理机构的地址，但应书面通知其它股东。

**2.4** **FREEDOM TO ENGAGE IN OTHER BUSINESS VENTURES AND ACTIVITIES**. The Manager and each Member (and their Affiliates) may engage, or acquire and retain an interest, in any other business ventures (including future ventures), transactions, or other opportunities of any kind, nature, or description (independently or with others), regardless of whether those ventures, transactions, or other opportunities are competitive with the Company's Business or whether any of the operations or properties of those ventures are transacted or located in the vicinity or market area of the Property or any other real property owned or leased by the Company, without having any fiduciary duty or other obligation: (a) to notify the Company or the Members of any aspect of those opportunities; (b) to pursue or undertake those opportunities on behalf of the Company or the Members; (c) to offer (or otherwise make available to) the Company or the Members any interest in those opportunities; or (d) to share with the Company or the Members any of the income, profits or rewards derived by that Member, Manager or other Person from those opportunities. The fact that the Manager or a Member (or any of their Affiliates) takes advantage of any opportunity described in the preceding sentence, either alone or with other Persons (including Entities in which the Manager or that Member has an interest), and does not offer that opportunity to the Company or the Members, will not cause the Manager or that Member to become liable to the Company or to the Members for any lost opportunity of the Company.

从事其他商业企业和商业活动的自由：所有股东、管理人都可以从任何类型、任何性质的其它任何商业企业（包括未来的企业）、交易或机会获取利益（无论是独立进行还是与其它人合作），也不论企业、交易或其它机会是否与该公司的业务存在竞争关系与否，亦不论上述企业的经营或物业交易是否位于公司物业附近或位于同一市场范围，也不论其它不动产物业是否为该公司所有或由其出租，上述人员的上述活动均不承担诚信义务或其它义务：a)向公司或其股东通报上述机会 的 任何情况 ；b)代表公司或股东获得上述机会；c）向公司或其股东提供在上述机会中获取的权益；或d)与公司或股东分享从上述机会中得到的收入、盈利或回报。事实上，管理人或股东（或其任何关联人员）单独与其它人（包括与管理人或股东有利益关系的实体）合作利用上述任何机会，且未将上述机会提供给公司或及股东的，不会因公司丧失上述机会而导致管理人或股东向公司或其股东承担责任。

**2.5** **COMPENSATION**. The Company will not pay the Members any fees or other compensation for their services for any costs or expenses.   Except as expressly set forth in this Agreement, the Manager will only be compensated according to Article 2.6 and Article 7.2 and other written agreement signed from time to time.

薪酬。公司不向股东支付任何费用以补偿其服务或成本。管理人仅可以依据本协议2.6 和 7.2 条和其他不时签署的书面协议获得分配。

**2.6** **MANAGEMENT FEE.** A management fee at 3.1% of the total projected cost will be paid to Manager on an equally monthly fee from the date of this Agreement for a period of 54 months. The Management Fee will be used to support the personnel and expenses of the

development team, and the Project itself shall not have any expenses for personnel or other office expenses by Manager related thereto.

管理费：自本协议签署后管理人有权收取项目总投资额 3.1%的管理费，管理费按 54 个月平均支付。管理费中，用以支付管理团队的人员和办公费用，而项目本身不再产生任何管理人人员和相关办公费用。

# ARTICLE III
## 第三条
## MANAGEMENT OF THE COMPANY

## 公司的管理

**3.1**    **VESTED SOLELY IN MANAGER**. Except as otherwise expressly set forth herein, management and control of the Company business shall be exercised, and all decisions to be made by the Company shall, in all cases be made by the Manager of the Company.

公司的开发管理全权委托管理人行使。除本合同明确规定外，应由管理人管理公司所有经营业务，做出管理决策。

**3.2**    **SPECIFIC RIGHTS AND POWERS OF THE MANAGER**. The Manager shall control the overall management, conduct and operations of the Company in all respects and shall have the authority to act on behalf of the Company in all matters respecting the Company, its business and its Property. In addition to any other rights and powers that it may possess pursuant to applicable law, and, without limiting in any manner the foregoing, the Manager shall have the authority to:

管理人的具体职权：管理人有权管理公司所有日常运营的各个方面，有权代表公司对与公司、公司业务及公司物业相关的所有事务开展活动。除相关法律规定的其它职权外，管理人还有权：

(a)    Deal in any Company assets whether interests in the Property, personal property and other assets, including, but not by way of limitation, exercise of the right to purchase, sell, exchange or convey title to, and to grant options for sale of, all or any portion of any property interest or any other interest in realty or personally, which may be acquired by the Company; borrow money and as security therefor encumber all or any part of the Property or any other interest in realty or personalty, or repay same in whole or in part; increase, modify, consolidate or extend any borrowing of the Company; obtain additional capital (whether within the Company or from outside sources); and act in any manner it deems in the best interest of the Company; and

处置与公司物业、个人财产和其它资产存在利益关系的公司资产，包括但不限于购买、出售、更换公司获得的任何财物权益或其它不动产权益或个人权益部分或全部，借款，对公司物业或其它不动产权益或个人权益的部分或全部设置抵押，还款，修订借款的条款，获得额外资本金（无论来自公司内部还是外部）投入，及转让上述购买、销售和更换权和给予销售期权，以及其他为公司利益考量而做的事情。

15

(b)    Execute, acknowledge and deliver any and all instruments and take such other steps as are necessary to effectuate the foregoing.

签署、确认并递交各种法律文件，以及开展上述文件生效所需的其它措施。

Notwithstanding the foregoing, the Manager may, in its sole discretion, sell the Property only if the Property is generating positive cash flow and is profitable. The Manager may not sell or dispose of the Property if the Property is generating negative cash flow or is operating at a loss unless the Manager obtains the Majority Vote of all Members.

尽管有上述规定，在出售项目的时候，管理人只有在出售能够为公司产生净收益的前提下自主决定出售；如果在出售时不能够为公司带来净收益，则该等出售必须经过所有股东的过半数投票同意方可执行。

**3.3    EXPENSE REIMBURSEMENT AND COMPENSATION**. The Manager and its Affiliates shall be entitled to reimbursement from the Company for all reasonable out-of-pocket expenses incurred by them, on behalf of the Company and the Project, in managing the business and affairs of the Company and the Project, and in the formation of the Company, including, but not limited to, the Manager's expenses in preparation of this and related agreements, legal, accounting, architectural and engineering expenses incurred on behalf of the Company and the Project.

费用报销与补偿：管理人和其关联方因公司事务或项目产生的、管理业务和与公司和项目相关的事务过程中产生的及在组建公司过程中产生的合理费用应给予报销，包括但不限于管理人为上述活动所做准备过程中产生的费用、会计、律师、设计师等费用。

**3.4    RIGHT TO RELY ON THE MANAGER**. Any Person dealing with the Company may rely upon a certificate signed by the Manager as to:

依赖管理人的权利：任何人和公司进行任何交易均可依赖管理人签署的文件，证明：

(a)    the identity of the Manager and the Members;

管理人和股东的身份；

(b)    the existence or nonexistence of any fact or facts, which constitute a condition precedent to acts by the Manager or which are in any other manner germane to the affairs of the Company;

是否存在管理人开展活动的前提条件或与公司事务存在关联；

(c)    the Persons who are authorized to execute and deliver any instrument or document of the Company; or

该人经授权签署和递交相关法律文件或公司文件；或

(d)      any act or failure to act by the Company or any other matter whatsoever involving the Company or any Member.

公司的任何作为或不作为或涉及到公司或股东的任何性质的事务。

**3.5    DUTIES AND OBLIGATIONS OF THE MANAGER.**

管理人的责任和义务

(a)      The Manager shall take all actions which may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the laws of the State of California (and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Members or to enable the Company to conduct the business in which it is engaged), and (ii) for the acquisition, development, maintenance, preservation and operation of the Project in accordance with the provisions of this Agreement and applicable laws and regulations.

管理人应当采取一切必要或适当措施：1）尽最大努力维持公司按照加州相关法律（以及为保护股东的有限责任或公司开展商业活动应遵守的其它管辖区法律）正常设立运营，2）并依据本协议规定和相关法律法规，从事与该项目相关的购买、开发、维护、保存和经营活动。

(b)      The Manager shall have the duty for the safekeeping and use of all of Company assets, whether or not in the immediate possession or control of the Manager, and shall not employ or permit another to employ Company assets in any manner except for the exclusive benefit of the Company.

管理人有责任保卫和使用公司的全部资产（无论上述资产当前是否在管理人的控制之下），并不得准许任何第三方利用公司资产，除非完全是为公司利益出发。

**3.6    OTHER DUTIES AND OBLIGATIONS OF THE MANAGER.**

管理人的其他责任和义务

The Manager shall perform all of the following duties and obligations:
管理人应履行如下义务和职责：

(a)      Selecting qualified designing and construction professional teams through bidding process;

通过竞标程序筛选合格的设计师事务所和建筑专业团队；

(b)      Liaising with government to obtain necessary permits throughout the whole construction period for necessary inspections and approvals;

和政府保持顺畅沟通以确保在整个建设阶段的每一个检查及许可均获得必要的许可；

   (c) Obtaining adequate funds for the Project from banks, private funds, and other qualified financial institutions, and provide personal guarantee with common market practice compensation and terms, if needed;

   从银行、基金及其他合格融资机构为项目获得足够资金，并在需要的情况下按照通常市场补偿和条件提供必要的个人担保；

   (d) Selecting qualified property management team;

   筛选合格的物业管理公司；

   (e) Other matters as necessary for the purpose of the business of the Company.

   其他必要的公司经营目的所需的工作。

## ARTICLE IV
## 第四条
## VOTING RIGHTS OF MEMBERS

## 股东投票权

  **4.1** **NO RIGHT OF CONTROL OR RIGHT TO BIND THE COMPANY**. Except to the extent otherwise provided herein, only the Manager has the authority to bind or transact business on behalf of the Company. No Member may (a) take part in, or interfere in any manner with, the management, conduct, or control of the business or affairs of the Company other than, in the case of a Member, granting or withholding that Member's approval with respect to any action to be taken by the Manager hereunder or (b) take any action to bind or otherwise act for or on behalf of the Company. Any act of a Member in contravention of this Section 4.1 will be null and void and without force or effect. Each Member shall indemnify the Company and hold it harmless from any Losses incurred by the Company that are caused by that Member's unauthorized actions on behalf of the Company.

  无权控制或约束公司：除本合同明确规定之外，只有管理人有权代表公司从事商业交易。除管理人之外，任何股东成员不得1)以任何方式参与或干涉公司业务或公司事务的管理或控制，但该股东给予或收回与该股东开展任何行为相关的批准除外，2）采取任何措施限制公司行为并代表公司。违背本规定的行为都将被宣布无效。任何股东未经授权代表公司开展的行为，如给公司造成损失的，须对公司进行赔偿并保证公司不受损害。

  **4.2** **VOTING RIGHTS**.

   (a) Each Member (including any Member who also is the Manager) may Vote on any matter submitted to a Vote of the Members in accordance with this Agreement.

18

投票权：每一股东（包括管理人作为股东的角色）都有权在本合同规定的交由股东表决的事项上投票

(b)    Notwithstanding the foregoing, to the fullest extent permitted under applicable law, the Members hereby cede and otherwise relinquish all management rights that they might otherwise have to the Manager.

尽管有此规定，在法律允许范围内，股东放弃所有管理权并将其交给管理人。

(c)    Except as otherwise provided in Section 4.3 this Agreement, all decisions and actions to be made or taken by the Members are to be made or taken as approved by a Vote of Majority of Voting Interest.

除非第 4.3 项有另外规定，所有需要股东表决的事项均可经持有多数投票权的股东表决通过。

**4.3    LIMITATIONS ON MANAGER'S AUTHORITY.**  Notwithstanding anything to the contrary contained herein, Manager shall have no power or authority to take any of the following actions without the prior written consent of each and every Member which owns 20% or more Member Interests: 尽管有上述规定，管理人在获得公司每一个持有 20%或以上股权的股东书面同意之前，不得作出下述决定：

(a)    File bankruptcy for the Company; or

申请公司破产；

(b)    Dissolution or winding up of the Company; or

公司清算或者解散；

(c)    Cause the Company to be a party to a merger, or an exchange or acquisition of the type; or

导致公司成为并购或者换股或者类似交易的一方；

(d)    Dispose of the Company or the Property of the Company which will cause any loss for any Member's Interest.

处置公司或者公司物业并导致任何股东的股东权益产生损失。

Should the Manager desire to take any of the above-described actions, the Manager shall notify each of the Members of such fact in writing in accordance with the notice provisions set forth herein and then hold a Meeting to obtain each and every Member which owns 20% or more Member Interests per the process provided in the following Section 4.4 .

如管理人需要做出上述决定，则应当书面通知所有股东，并根据下述 4.4 条的规定召开股东会议并获得每一个持有 20%或以上股权的股东批准后方可作出。

**4.4**    Meetings.

会议

(a)    The Manager may call for a meeting by delivering Notice thereof to all of the Members. A meeting notice must state the time, date, and purpose or purposes of the proposed meeting and is to be delivered to the Members no later than ten (10) Business Days, and no earlier than five (5) calendar days, before the meeting.

管理人有权向所有股东发出通知，召集会议，会议通知应说明时间、日期开会目的，并在拟定会议的前 5-10 个工作日发出，通知召开股东会议。

(b)    Any Notice of a meeting of the Members required to be delivered to any Member under this Agreement or the Act may be waived in writing by that Member (whether before, during, or after that meeting). A Member's attendance at a meeting also will constitute a waiver of any required notice of the meeting, unless that Member at the beginning of the meeting objects to holding the meeting or transacting particular business at the meeting.

根据本合同或公司法的规定，向所有股东发出的会议通知，可由股东大会会议前、会议中和会议后书面宣布放弃接收。参加会议的股东也可放弃所需的会议通知，但股东在会议开始前反对召开会议或在会议上开展具体业务的除外。

(c)    All meetings of the Members are to be held at the principal office of the Company unless the Manager designates another reasonable place for the meeting. The presence of persons representing Majority of Members, in person or by Proxy, is required to have a quorum at a meeting of the Members. The Manager either will preside, or designate the Person who is to preside, over the meeting. If the Manager fails to chair (or designate another Person to chair) a meeting of the Members, the Members may select the Person who is to preside over the meeting. The costs of holding meetings of the Members are to be paid by the Company.

所有的股东会议应在公司总部召开，但股东同意在其它合理地点召开的除外。出席会议（亲自出席或由代理人出席）的人数须达到股东会议的法定人数。管理人可主持会议或指定专人主持会议，如果管理人无法主持股东会议（或无法指定专人主持会议），股东可选择其它人主持会议。主持股东会议所产生的费用应由公司承担。

(d)    At all meetings of the Members and written consents executed in lieu thereof in accordance with Section 4.4(f), a Member may vote in person or by proxy (executed in writing by that Member and exercised by that Member's duly authorized representative). To vote by proxy, a Member must deliver a voting proxy to the Manager before or at the time of the applicable meeting or the execution of the applicable written consent. No voting proxy will be valid after twelve (12) months from the date of its execution, unless otherwise validly provided in the proxy. Voting on all matters by the Members, unless otherwise provided herein, requires the requisite level of approval of all of the Members provided under this Agreement and not merely

20

the corresponding percentage of the votes of the Members establishing the meeting's quorum. Action at a meeting of the Members may be taken by a voice vote or by a show of hands.

在所有的股东会议上及根据第 4.4(f)款规定签署书面同意书时，股东可亲自或委托代理人进行投票（由该股东或该股东适当授权的代理人行使）。由代理人行使投票权时，该股东必须在相关会议开始前向管理人推荐投票代理人，并签署相关的书面同意书。除另行规定外，投票代理人在投资本签署授权书十二个月后失效。由股东投票的所有事务，除另有规定外，本合同要求所有股东达成一定成度的一致性，而不仅仅是达到股东投票所确定的出席会议股东的法定人数比例。股东会议上的各项投票活动可以口头表决或举手表决。

(e)     Any one or more Members may participate in a meeting of the Members by means of a conference telephone or similar communication device that allows all Persons participating in the meeting to simultaneously hear each other during the meeting. Participation in the meeting in the manner provided in the preceding sentence is the equivalent of being present in person at that meeting.

任何一名或多名股东可通过电话会议或可使所有参会人员同时听到彼此的类似交流工具参加股东会议。按照前述方式参加股东会议与本人亲自参加股东会议是等效的。

(f)     Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting if a proposed written consent, setting forth the action so taken or to be taken, (i) is sent to all of the Members, (ii) is signed by those Members (or the duly authorized representative or representatives thereof as provided by Section 4.4(d)) owning the voting interest required hereunder to approve or adopt that action, and (iii) is delivered to the Manager to be included in the Company's permanent records. Unless the written consent specifies that it is effective as of an earlier or later date, action taken under this Section 4.4(f) will be effective when all of the Members (or the duly authorized representatives thereof) have been provided a copy of the proposed written consent in the manner provided in Section 4.4(a), and the Members required to approve the action have signed the proposed written consent or counterpart thereof. The written consent (which may be signed in one or more counterparts) of the Members under this Section 4.4(f) on any matter has the same force and effect as if that matter were voted on at a duly called and constituted meeting of the Members and may be described as such in any document or instrument.

需要在股东会议上投票进行的所有活动，如果书面同意书中规定上述活动可不经过股东会议进行表决，则可不召开股东会议，但：1）上述书面同意书应当发放给所有股东；2）由上述股东（或由 4.4(d)条中规定的拥有投票权益的合法授权代表或代表们）签署，批准不经股东会议而采取上述措施；3）上述已签署的同意书交给管理人，放入公司的永久记录中。除非书面同意书中明确规定了生效日期，否则第 4.4(f)中规定的上述活动应当在按第 4.4(a)条中规定的方式将书面同意书副本提供给所有股东（或其合法授权代表）且上述股东签署该书面同意书或其副本后生效。经股东签署第 4.4(a)条中规定的书面同意书（可签署一份或多份副本）所采取的措施与该措施在股东会议上由股东投票具有同等效力，且可以记入任何文件。

**4.5    REPRESENTATIVES AND SUBSTITUTE REPRESENTATIVES**. The Manager and each Member may designate a natural person (who, in the case of a Manager or Member, is a natural person, may be that individual Manager or Member) to represent that its interests in, and exercise all of its rights and powers under this Agreement and applicable law with respect to the Company (a "*Representative*"). The Manager and each Member also may designate one or more other natural persons to be its "*Substitute Representative(s)*" to serve as the Manager's or that Member's Representative in the event its Representative is not available. The name and address of both the Representative and Substitute Representative(s) of the Manager and each Member are to be provided to the Manager and, in the case of the Manager, to each of the Members.

代表及替补代表：管理人或每名股东可指定一个自然人（就管理人或股东而言，该自然人也可以是管理人或股东个人）代表上述权益并根据本协议规定或与该公司相关的法律行使上述全部权益（下称代表人）。在无法找到代表人的情况下，管理人和每名股东也可以指定一名或多名其它的自然人作为"替补代表"，代表管理人或股东代表行使职权。管理人或股东代表和替补代表的名称和住址提交给管理人，而管理人的代表和替补代表的姓名和住址应提交给所有股东。

## ARTICLE V
## 第五条
## CAPITAL AND CAPITAL CONTRIBUTIONS

### 股本和股东出资

**5.1    CAPITAL CONTRIBUTIONS**. Each Member shall contribute capital to the Company in the form of money or property (or services), as forth in Schedule A5.1, which shall thereafter be deemed the Member's initial Capital Contribution. The initial Fair Market Value of each item of contributed property (net of liabilities secured by that property), which the Company is considered to assume or to take "subject to" under Internal Revenue Code Section 752, is also set forth in Schedule 5.1, together with the description and amount of these liabilities.

股东出资：每个股东均应依据附件 A 之规定，以货币或财物（或服务）的形式完成出资。上述出资应视为股东的原始出资额。以财物出资的，应当按照公平的市场价格对上述财物进行作价（应扣除利用上述财务所担保的债务），根据国内收入法案第 752 条规定，应由公司承担的债务见附件 5.1 之规定，该附件中规定了公司应承担债务的详情和额度。

**5.2    NO WITHDRAWALS**. The capital of the Company shall not be withdrawn, except as hereinafter expressly stipulated or approved by the Manager.

不得撤资：除非另有明确规定或者经管理人批准，出资之后股东不得要求撤出出资。

**5.3    ADDITIONAL CONTRIBUTIONS**. The Manager may, in sole discretion, determine from time to time that further Capital Contributions in addition to the Members' initial Capital Contributions are needed to enable the Company or any of its Affiliates to conduct its business

and/or further develop the Project. On making such a determination, the Manager shall give notice to all Members in writing at least 45 days before the date on which the additional Capital Contribution is due. The Notice shall set forth the amount of additional Capital Contribution needed, the purpose for which it is needed, and the date by which the Members shall contribute. Each Member shall be required to make an additional Capital Contribution in an amount that bears the same proportion to the total additional Capital Contribution that the Member's Capital Account balance bears to the total Capital Account balances of all Members. No Member may voluntarily make any additional Capital Contribution.

追加出资：管理人有权根据项目需要决定在初始股本出资之外增加额外股本出资，从而使该公司或其任何关联方开展业务和/或进一步开发项目。在做出上述决定时，管理人应当在进行上述追加出资之前至少 45 天书面通知所有股东。上述通知应当规定所需追加出资的额度、目的及股东进行追加出资的日期。每名股东有权根据该股东的股本账户余额占所有股东股本账户全部余额的比例，进行追加出资。任何股东不得随意追加出资。

**5.4    DILUTION**. If a Member fails or refuses to make an additional Capital Contribution required under Section 5.3 of this Agreement within 30 days after it is required to be made (a "***Defaulting Member***"), the Manager shall within five (5) days after that failure notify each other Member (a "***Nondefaulting Member***") in writing of the total amount of Defaulting Member Capital Contributions not made (the "***Additional Capital Shortfall***"), and shall specify a number of days within which each Nondefaulting Member may make an additional Capital Contribution, which shall not be less than an amount bearing the same ratio to the amount of Additional Capital Shortfall as the Nondefaulting Member's Capital Account balance bears to the total Capital Accounts of all Nondefaulting Members. If the total amount of Additional Capital Shortfall is not so contributed, the Manager may use any reasonable method to provide Members the opportunity to make additional Capital Contributions or solicit outside funding or loans, until the Additional Capital Shortfall is as fully contributed as possible. After obtaining the additional Capital Contributions, each Member's Percentage Interest shall be adjusted to reflect the ratio that the Member's Capital Account bears to the total Capital Accounts of all Members.

权益稀释：如果某一股东无法或拒绝按照本协议第 5.3 条规定，在要求进行追加出资后三十天内进行追加出资（下称反对股东），管理人应当在股东拒绝出资后五天内书面通知其它所有股东（下称同意股东）该反对股东未追加出资的总额度（下称追加资本缺口），并规定同意股东可以进行追加出资的期限，但同意股东所追加的资本额度所占追加资本缺口的比例，不得低于该股东股本账户余额所占所有同意股东股本账户总额的比例。如果追加资本达不到追加资本缺口的额度，则管理人应当利用合理方式向股东提供进行追加资本的机会或寻求外部基金或贷款的机会，直到追加出资补上上述追加出资缺口。在获得追加资本后，每名股东的权益比例应当进行调整，以反映出股东的资本占所有股东资本的比例。而不出资的股东的股权比例将会被相应稀释。

**5.5**    CAPITAL ACCOUNTS. An individual Capital Account for each Member shall be maintained in accordance with the requirements of Treasury Regulation Section 1.704–1(b)(2)(iv) and adjusted in accordance with the following provisions:

股本账户：每一个股东的出资将会根据税法第 1.704–1(b)(2)(iv)条规定作为一个股本账户进行管理，并根据下列规定进行调整：

(a)    A Member's Capital Account shall be increased by that Member's Capital Contributions, that Member's share of Profits, and any items in the nature of income or gain that are specially allocated to that Member under Article VI.

股东股本账户应加上该股东的出资资本、利润比例按照第六条规定分配给该股东所有性质的收入或盈利。

(b)    A Member's Capital Account shall be increased by the amount of any Company liabilities assumed by that Member subject to and in accordance with the provisions of Treasury Regulation Section 1.704–1(b)(2)(iv)(c).

股东股本账户应加上应根据该股东按照税法第 1.704–1(b)(2)(iv)(c)条之规定承担的公司债务的额度。

(c)    A Member's Capital Account shall be decreased by (i) the amount of cash distributed to that Member; (ii) the Fair Market Value of any property of the Company so distributed, net of liabilities secured by the distributed property that the distributee Member is considered to assume or to be subject to under Internal Revenue Code Section 752; and (iii) the amount of any items in the nature of expenses or losses that are specially allocated to that Member under Article VI.

股东股本账户应减去以下款项：1）分配给该股东的现金额；2)分配给上述股东的经公平市场价值作价的资产价值、并扣除该股东根据国内收入法第 752 条规定应当承担的该分配财务所担保的债务；3）按照第六条规定分配给该股东任何性质的花费或亏损额度。

(d)    A Member's Capital Account shall be reduced by the Member's share of any expenditures of the Company described in Internal Revenue Code Section 705(a)(2)(B) or that are treated as section 705(a)(2)(B) expenditures under Treasury Regulation Section 1.704–1(b)(2)(iv)(i) (including syndication expenses and losses nondeductible under Internal Revenue Code Section 267(a)(1) or Section 707(b)).

股东股本账户应减去该股东根据国内收入法第 705(a)(2)(B)之规定或税法第 1.704–1(b)(2)(iv)(i)条的类似规定应当承担的公司费用比例（包括国内收入法第 267(a)(1) 条或第 707(b)条规定的无法扣减的联合费用和亏损）。

(e)    If any Transferable Interest (or portion thereof) is transferred, the transferee of the Transferable Interest or portion shall succeed to the transferor's Capital Account corresponding to the interest or portion.

如果股东的可转让权益（部分）已发生转让，受让人应当继承转让人股本账户中相应部分的权益。

(f)    The principal amount of a promissory note that is not readily traded on an established securities market and that is contributed to the Company by the maker of the note shall not be included in the Capital Account of any Person until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Treasury Regulation Section 1.704–1(b)(2)(iv)(d)(2).

在已有证券市场无法进行交易的汇票本金，如上述票据持有人以此种形式进行出资，则在公司根据税法第 1.704–1(b)(2)(iv)(d)(2)条规定，完成上述票据的税务处置前或在该票据之本金偿付之前，不得计入任何人的股本账户。

(g)    Each Member's Capital Account shall be increased or decreased as necessary to reflect a revaluation of the Company's property assets in accordance with the requirements of Treasury Regulations Sections 1.704–1(b)(2)(iv)(f) and 1.704–1(b)(2)(iv)(g), including the special rules under Treasury Regulation Section 1.701–1(b)(4), as applicable. The provisions of this Agreement respecting the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704–1(b) and shall be interpreted and applied in a manner consistent with those Regulations.

每个股东的股本账户应根据需要进行增减，以反映公司物业根据税法第 1.704–1(b)(2)(iv)(f)和 1.704–1(b)(2)(iv)(g)条（包括税法第 1.701–1(b)(4)条）规定进行重新评估情况。本协议关于股本账户维护之规定，旨在遵守税法第 1.704–1(b)条之规定，且应根据上述法规规定的方式进行解释和适用。

**5.6    NO RETURN OF CAPITAL CONTRIBUTION.** A Member shall not be entitled to a return of any part of the Member's Capital Contribution or to receive any distributions, whether of money or property, from the Company except as provided in this Agreement.

股东出资不得返还：股东无权在本合同规定的权利范围之外要求返还其出资的任何部分或者对货币或财物进行分配。

**5.7    INTEREST.** No interest shall be paid on Capital Contributions or on the balance of a Member's Capital Account.

利息：股本出资或股东股本账户内的余额不应计算利息。

**5.8    LIMITED LIABILITY.** A Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in the Act or to the extent of its Membership Interest in the Company.

有限责任：股东出资为有限责任，仅就其出资范围内资金承担责任，除公司法另有规定外，股东不承担公司的任何费用、债务或义务。

25

**5.9    NO PRIORITY OF TREATMENT**. Except as otherwise expressly provided in this Agreement, no Member shall have priority over any other Member with respect to the return of a Capital Contribution or distributions or allocations of income, gain, losses, deductions, credits, or items thereof.

没有优先待遇：除本协议另行明确规定外，任何股东在资本返还、收入、盈利、亏损、减扣、信贷等各项分配中不得有优先于其它任何股东的权利。所有股东在分配、收益、亏损等各方面一律平等。

**5.10    WITHHOLDING OF TAXES; POWER OF ATTORNEY**.

预提所得税，授权

(a)    The Manager may cause the Company to pay to the applicable Governmental Authority any taxes that the Company is required to withhold and remit with respect to a Member (the "***Nonresident Member***"). The payment of those taxes by the Company will be treated as a distribution to the Nonresident Member; and therefore, it will reduce, by an equal amount, the distributions that the Company would otherwise make to the Nonresident Member. The Manager may, by delivering a written demand to the Nonresident Member, require the Nonresident Member to make a Capital Contribution of immediately available funds of any amount that the Manager, by written demand to the Nonresident Member, determines is needed by the Company to discharge its withholding liability with respect to the Nonresident Member. The Nonresident Member must make that Capital Contribution as instructed in the Manager's written demand, but the Manager must allow the Nonresident Member at least ten (10) days to make that Capital Contribution. If the Nonresident Member refuses or fails to timely make the full amount of the Capital Contribution, the Nonresident Member will be in breach of this Agreement and must indemnify and hold the Company, the Manager and the other Members harmless against any costs, penalties, payments, or damages incurred by the Company, the Manager or the other Members as a result of that refusal or failure. In addition to the other remedies that the Company may have, the Nonresident Member shall pay the Company interest at the lower of the Prime Rate of the date of breach plus two percentage points, per annum, compounded monthly, or the highest rate of interest allowed by applicable law, on the amount under this Section 5.10 that the Nonresident Member fails to timely pay to the Company.

管理人可以敦促公司支付应当由公司为股东（下称非居民股东）代扣代缴的各项政府机关征收的税费。由公司支付的上述税费应视为向该非居民股东分配的盈利，因此，应从公司以其它方式向上述非居民股东分配收入中减去上述代扣代缴的额度。管理人可以向非居民股东送达书面请求，要求非居民股东进行出资，出资额度由管理人书面通知非居民股东，并满足公司为非居民股东进行税费代扣代缴的需要。非居民股东应当根据管理人的书面要求进行出资，但管理人应当允许非居民股东具有至少十天的准备出资时间。如果非居民股东拒绝或无法按照通知足额出资，非居民股东就违反了本协议规定，应当向公司提供补偿并保证后者、管理人和其它股东不受损失。若非居民股东未能及时向公司支付第5.10条规定的款项，公司除采取上述补救措施外，非居民股东应当每月向公司支付利息，利率按违约日的基准年利率加两个点计算，复利计算，或按照相关法律规定的最高利率计算。

(b)    In addition to the rights vested in the Manager under Section 5.10(a), each Member, by the execution of this Agreement or otherwise becoming a Member, does hereby constitute and appoint the Manager as that Member's true and lawful representative and attorney-in-fact with full power and authority to act in that Member's name, place, and stead in respect of that Member's Membership Interest, as the Manager determines to be consistent with the Member's rights under this Agreement and is necessary, appropriate, or expedient to eliminate or minimize any withholding obligation or responsibility that the Company or the Manager might otherwise have with respect to that Member's tax liabilities and other responsibilities to any taxing jurisdiction, including the power and authority to execute, acknowledge, and file any agreement or statement or other document, return, or form, with any taxing or other Governmental Authority in which the Member is not a resident (i) allowing the Company (as, and to the extent that, the Manager determines to be appropriate) to include that Member in any composite or similar return filed by the Company with that taxing jurisdiction, or (ii) subjecting that Member to the jurisdiction and authority of that taxing jurisdiction for the purpose of the collection of any unpaid tax, together with related interest and penalties, that may be owed by that Member to that taxing jurisdiction. The power of attorney granted under this Section 5.10(b) is a special power of attorney, coupled with an interest, and is irrevocable and will (A) survive and not be affected by the death, incapacity, dissolution, termination, or Bankruptcy of the Member granting this power of attorney or the Transfer of all or any portion of that Member's Membership Interest and (B) extend to that Member's successors, assigns, and legal representatives. The Manager shall give written notice to a Member before exercising the power of attorney granted by that Member under this Section 5.10(b) and that Member shall cooperate fully with the Manager's exercise thereof.

除本协议第 5.1（a）赋予管理人的各项权利权外，每名股东在签署本协议时或以其它方式成为股东时，应指定管理人为其真正合法的代表，并尊重管理人的权益，如果管理人确定维护本协议规定的股东权利，且管理人必须或忙消除或最大限度减少公司或管理人关于股东税费债务的代扣义务与责任及向税务管辖机关代缴税费的职责，包括与上述股东的非居住地税务机关签署、确认、归还或提交任何协议/声明或其它文件的权利：1）允许公司在管理人认为合适的范围内，囊括公司向税务管辖机关申报的该股东的综合性收入或类似回报；或 2）确定该股东应向税务管辖机关交纳而未交纳的税费及相关利息和该股东欠税务管辖机关的罚金。根据本协议第 5.10(b)条规定所做的授权书是一种特别授权，附加相关权益且不可撤消，而且 A）其持续时间不受出具授权书或转让全部或部分股东权益的股东的残废、丧失能力、解散、终止或破产的影响；及 B）并延伸至该股东的继任者、受让人和合法代表。管理人在行使本协议第 5.10(b)条所规定的授权时，应当向股东发送书面通知，且股东应当全力协助管理人行使上述权利。

# ARTICLE VI
# 第六条
# ALLOCATIONS

## 权益分配

**6.1**    GENERAL. The Profits and Losses of the Company and all items of Company income, gain, loss, deduction, or credit shall be allocated, for Company book purposes and for tax purposes, to each Member in accordance with that Member's Percentage Interest.

一般规定：公司的全部收益或损失及公司收入、盈利、损失、扣减或债务等都将按照本合同的规定以及股东的出资的比例进行分配，以满足公司记账和税收上的目的。

**6.2**    PROFITS AND LOSSES. As used in this Agreement, "***Profits and Losses***" means, for each fiscal year or other period specified in this Agreement, an amount equal to the Company's taxable income or loss for that year or period, determined in accordance with Internal Revenue Code Section 703(a), including all Tax Items required to be stated separately under Internal Revenue Code Section 703(a)(1), with the following adjustments:

利润和亏损：本协议中的利润和亏是指每个财政年度或本协议规定的其它时间内的利润或亏损，等于公司在该年度或该阶段的应纳税收入或亏损，根据国内收入法第 703（a）条规定的申报的利润和亏损，包括根据国内收入法第 703(a)(1)条规定应当单独申报的所有税费。但可做以下调整：

(a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to taxable income or loss;

免交联邦所得税的公司全部收入，或损益表中未计入的应计应税收入或亏损；

(b)    Any expenditures of the Company described in Internal Revenue Code Section 705(a)(2)(B) or treated as Internal Revenue Code Section 705(a)(2)(B) expenditures under Treasury Regulation Section 1.704–1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses shall be subtracted from taxable income or shall increase that loss; and

国内收入法第 705(a)(2)(B)规定的公司支出，或根据税法第 1.704–1(b)(2)(iv)(i)条规定的应视为国内收入法第 705(a)(2)(B)规定的公司支出，或损益表中未计入但应从应税收入中扣除或应增加的亏损；及

(c)    Notwithstanding the foregoing provisions of this Section 6.2, any items of income, gain, loss, or deduction that are specially allocated shall not be taken into account in computing Profits or Losses under Section 6.1.

尽管在本协议第 6.2 条有上述规定，应进行特殊分配的所有收入、盈利、亏损或扣减项目，不得计入第 6.1 条规定的损益表中。

**6.3**    SPECIAL ALLOCATIONS. The following definitions shall apply for purposes of this Article VI.

关于特殊分配的相关定义：以下定义适用本协议第六条之规定目的：

(a)    "***Adjusted Capital Account Deficit***" means, with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of the relevant fiscal year of the Company, after the Member's Capital Account has been adjusted as follows: (i) increased by the amount of the Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, and (ii) decreased by the amount of the items described in Treasury Regulation Section 1.704–1(b)(2)(ii)(d)(4)–(6).

调整后的股本账户赤字：是指就股东而言，股东股本账户经如下调整后，在公司相关财政年度末期股东股本账户内的赤字余额：1）加上公司最低盈利和股东不可追索债务最小增益中股东所占份额；和 2）减去税法第 1.704–1(b)(2)(ii)(d)(4)–(6)条规定的项目。

This definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulation Section 1.704–1(b)(2)(ii)(d) and shall be interpreted consistently with that Regulation.

调整后股本账户赤字的定义由税法第 1.704–1(b)(2)(ii)(d)条规定，并由该法进行解释。

(b)    "***Company Minimum Gain***" has the meaning set forth in Treasury Regulation Section 1.704–2(d)(1).

公司最低盈利：见税法第 1.704–2(d)(1)条之规定。

(c)    "***Member Nonrecourse Debt***" is defined in Treasury Regulation Section 1.704–2(b)(4).

股东不可追索债务：见税法第 1.704–2(b)(4)条之规定。

(d)    "***Member Nonrecourse Debt Minimum Gain***" for a fiscal year of the Company means the net increase in Minimum Gain attributable to Member Nonrecourse Debt, determined as set forth in Treasury Regulation Section 1.704–2(i)(2).

公司财政年度内的股东不可追索债务最小增益是指税法第 1.704–2(i)(2)规定的，应属于股东不可追索债务的最小增益的净增加值。

(e)    "***Member Nonrecourse Deductions***" has the meaning set forth in Treasury Regulation Section 1.704–2(i)(2). For any Company fiscal year, the amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt equals the net increase during that fiscal year in Member Nonrecourse Debt Minimum Gain attributable to that Member Nonrecourse Debt during that fiscal year, reduced (but not below zero) by the amount of any distributions during that year to the Member bearing the economic risk of loss for Member Nonrecourse Debt if the distributions are both from the proceeds of the Member Nonrecourse Debt and are allocable to an increase in Member Nonrecourse Debt Minimum Gain attributable to the Member Nonrecourse Debt, all as determined according to the provisions of Treasury Regulation

Section 1.704–2(i)(2). In determining Member Nonrecourse Deductions, the ordering rules of Treasury Regulation Section 1.704–2(j) shall be followed.

股东不可追索扣减项：见税法第 1.704–2(i)(2)之规定。对于公司的任何一个财政年度来说，与股东不可追索债务相关的股东不可追索扣减项数额行于该财年内，属于股东不可追索债务性质的股东不可追索债务最小增益的净增加值，减去（但不得为负数）该财年内股东因承担股东不可追索债务亏损的经济风险而获得的分配，但上述分配须源自股东不可追索债务所产生的收益，且具有可分配性。详细规定参见税法第 1.704–2(i)(2)条之规定。在确定股东不可追索扣减项时，应遵守税法第 1.704–2(j)条的各项规则。

(f)    "**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulation Section 1.704–2(c). The amount of Nonrecourse Deductions for a Company fiscal year equals the net increase in the amount of Company Minimum Gain during that fiscal year, reduced (but not below zero) by the aggregate amount of any distributions during that fiscal year of proceeds of a Nonrecourse Liability that are allocable to an increase in Company Minimum Gain.

不可追索扣减项：见税法第 1.704–2(c)条之规定。公司某个财年内不可追索扣减项的额度，等于该财年内公司最低盈利的净增加值，减去（但不得为零）该财年不可追索债务的收益分配到公司最低盈利部分的总增加额。

(g)    "**Nonrecourse Liability**" has the meaning set forth in Treasury Regulation Section 1.752–1(a)(2).

不可追索债务：见税法第 1.752–1(a)(2)条之规定。

**6.4**    C**ERTAIN** S**PECIAL** A**LLOCATIONS**. The following special allocations shall be made in the following order:

某些特殊分配：以下为特殊分配应当遵守的顺序：

(a)    *Company Minimum Gain Chargeback*. If there is a net decrease in Company Minimum Gain during a fiscal year, each Member shall be allocated, before any other allocation under this Section, items of Company income and gain for the fiscal year equal to that Member's share of the net decrease in Company Minimum Gain as determined in accordance with Treasury Regulation Section 1.704–2(g)(2).

公司最低盈利退款：如果在某一财年内公司最低盈利出现净减少，在根据本条规定进行其它项目分配之前，应向每名股东分配该财年公司收入和盈利部分的所有项目，等于税法第 1.704–2(g)(2)条规定的公司最低盈利净减少额中该股东所占的比例。

(b)    *Member Nonrecourse Debt Minimum Gain Chargeback.* If there is a net decrease in Member Nonrecourse Debt Minimum Gain during a fiscal year (as defined in the Treasury Regulations), any Member with a share of the Member Nonrecourse Debt Minimum Gain attributable to that Member's Nonrecourse Debt as of the beginning of the fiscal year should be allocated items of Company income and gain for that year (and, if necessary, subsequent years)

equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. A Member's share of net decrease in Member Nonrecourse Debt Minimum Gain shall be determined under Treasury Regulation Section 1.704–2(g)(2). A Member shall not be subject to the foregoing chargeback to the extent permitted under Treasury Regulation Section 1.704–2(i)(4).

股东不可追索债务最小增益退款：如在某一财年内股东不可追索债务最小增益出现净减少（见税法相关规定），可计入股东不可追索债务的股东不可追索债务最小增益中股东所占份额，该份额从该财年分配公司收入和盈利开始计算（必要时从下一财年计算），行于股东不可追索债务最小增益的净减少值中股东所占份额。上述份额根据税法第 1.704–2(g)(2)确定。股东在税法第 1.704–2(i)(4)规定范围内不受上述退款的影响。

(c)    *Qualified Income Offset.* If any Member unexpectedly receives an adjustment, allocation, or distribution described in Treasury Regulation Section 1.704–1(b)(2)(ii)(d)(4), (d)(5), or (d)(6), that Member shall be allocated items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income and gain for that fiscal year) in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of that Member as quickly as possible; provided that an allocation under this Section 4.4(c) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Agreement have been made as if this Section 6.4(c) were not in the Agreement.

合格收入抵消：如股东在意料之外收到根据税法第 1.704–1(b)(2)(ii)(d)(4)、(d)(5)或(d)(6)规定的调整或分配款项，则应将公司收入与盈利（由公司收入各项按比例组成，包括该财年的总收入与部盈利）分配给股东，分配额度与分配方式应当在法律规定范围内，足以抵消该股东调整后的股本账户赤字；如果根据上述 4.4（c）所进行的分配，其范围且于在本协议第 6.4 款规定范围之外的其它分配完成后所形成的股东调整后的股本账户。

(d)    *Gross Income Allocation.* In the event any Member has a deficit Capital Account at the end of any Company fiscal year in excess of the sum of:

总收入分配：如果任何股东在公司任何一个财年末所具有股本账户赤字超过：

(i)    The amount the Member is obligated to restore under any provision of this Agreement, and

该股东根据本协议其它规定应归还的款额，及

(ii)    The amount the Member is deemed to be obligated to restore under Treasury Regulation Section 1.704–2(g)(1), (i)(5), each such Member shall be specially allocated items of Company income in the amount of the excess as quickly as possible; except that an allocation under this Section 6.4(d) shall be made only if and to the extent that the Member would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article VI have been made as if Section 6.4(c) and this Section 6.4(d) were not in the Agreement.

该股东根据税法第 1.704–2(g)(1), (i)(5)条规定应当归还的款额，应尽快向每名股东专门分配公司收入中的多余款项；但当其它所有分配已根据本协议第六条完成后（忽略本协议第 6.4(c)和 6.4(c)中规定的情况），该股东仍然具有股本账户赤字的情况除外。

(e)    *Member Nonrecourse Deductions.* Any Member Nonrecourse Deductions for any Company fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which those Member Nonrecourse Deductions are attributable in accordance with Treasury Regulation Section 1.704–2(i)(1).

股东不可追索减扣项：公司任一财年内的任何股东不可追索减扣项应立即分配给那些承担股东不可追索债务经济风险和损失的股东，上述股东不可追索减扣项应根据部法第 1.704–2(i)(1)条规定计入。

(f)    *Nonrecourse Deductions.* Nonrecourse Deductions for any fiscal year shall be specially allocated in proportion to their respective allocations of Profits for that fiscal year.

不可追索减损项：任一财年内的不可追索减扣项应根据该年度的利润分配比例进行分配。

(g)    *Section 754 Adjustments.* To the extent an adjustment to the adjusted tax basis of any Company asset under Internal Revenue Code Section 734(b) or Section 743(b) is required under Treasury Regulation Section 1.704–1(b)(2)(iv)(m)(2) or Section 1.704–1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of the Member's interest in the Company, the amount of the adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis), and the gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event that Treasury Regulation Section 1.704–1(b)(2)(iv)(m)(2) applies, or to the Partner to whom the distribution was made in the event that Treasury Regulation Section 1.704–1(b)(2)(iv)(m)(4) applies.

第 754 条规定的调整：调整后的公司资产纳税基数应根据国内收入法第 734(b)条规定进行调整，在税法第 1.704–1(b)(2)(iv)(m)(2)条或 1.704–1(b)(2)(iv)(m)(4)条规定中，上述第 734（b）款规定应当在确定股本账户时予以考虑，作为全部清理该股东在公司中所占权益的分配结果，股本账户的调整额度应当视为盈利（若上述调整增加了资产基数）或亏损（若上述调整减少了资产基数）项目，上述增损项目应当根据股东在该公司的权益专门分配给股东（适用税法第 1.704–1(b)(2)(iv)(m)(2)条规定）或合伙人（适用税法第 1.704–1(b)(2)(iv)(m)(4)条规定）。

**6.5**    ALLOCATIONS OF MEMBER NONRECOURSE DEDUCTIONS. Member Nonrecourse Deductions for any fiscal year of the Company shall be allocated to the Members in the same proportion as Profits are allocated under Section 6.1, provided that any Member Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Member who bears (or is deemed to bear) the economic risk of loss with respect to the Member Nonrecourse Debt to which

those Member Nonrecourse Deductions are attributable in accordance with Treasury Regulation Section 1.704–2(i)(2).

股东不可追索扣减项的分配：公司任一财年的股东不可追索扣减项应按照第 6.1 条规定之利润分配比例分配给股东，但前提是该财年或其它时间内的股东不可追索扣减项应当分配给承担（或被视为承担）股东不可追索债务相关经济风险或损失的股东，上述股东不可追索扣减项应根据税法第 1.704–2(i)(2)条列计。

     **6.6**    **ALLOCATION OF PROFITS FROM CAPITAL EVENTS**. Except as otherwise provided in this Agreement, in any fiscal year of the Company, Profits in excess of Losses of the Company resulting from a Capital Event in that fiscal year shall be allocated to the Members in the following order:

资本活动所得利润的分配：除本协议另有规定外，在公司的任一财年内，从该财年资本活动中所得的超过公司亏损额以外的利润应当以下列顺序分配给股东：

     (a)    To Members whose Adjusted Capital Contributions are in excess of their Capital Accounts, in proportion to those excesses, until all of those excesses have been eliminated. "***Adjusted Capital Contributions***" means, with respect to each Member, the excess of that Member's contribution to the capital of the Company over all prior distributions to the Member that have resulted from Capital Events.

调整后出资本超过其股本账户的股东，按超出额所占比例分配，直到超额部分分配完毕。"调整后的资本出资"是指相对于每个股东而言，股东出资超过以前分配过程中公司资本的部分应分配给从事上述资本活动的股东。

     (b)    Among the Members in the proportion that the Capital Contribution of each Member bears to the total Capital Contributions of all Members.

在股东中按每个股东的出资占全部股东出资总额的比例进行分配。

     **6.7**    **ALLOCATION OF LOSSES FROM CAPITAL EVENTS**. Except as otherwise provided in this Agreement, in any Company fiscal year, Losses in excess of Profits of the Company, resulting from a Capital Event in that fiscal year, shall be allocated to the Members with positive Capital Accounts, in proportion to their positive Capital Account balances, until no Member has a positive Capital Account. For this purpose, Capital Accounts shall be reduced by the adjustments set forth in Treasury Regulation Section 1.704–1(b)(2)(ii)(d)(4)–(6).

资本活动亏损的分配：除本协议另有规定外，在公司的任一财年内，因该财年内的资本活动造成公司利润超额部分的损失的，应当将上述损失分配给股本账户为正值的股东，分配比例与其股本账户内的正余额成比例，直到该股东获得正的股本账户余额。为此，股本账户应当减去税法第 1.704–1(b)(2)(ii)(d)(4)–(6)条规定的调整值。

     **6.8**    **ALLOCATIONS RESPECTING ASSET DISTRIBUTIONS**. Any unrealized appreciation or unrealized depreciation in the values of Company property distributed in kind to all the Members shall be treated in accordance with applicable law.

资产的分配：向所有股东分配公司物业未实现的增值或贬值部分应当根据相关法律规定进行。

**6.9    ALLOCATIONS RESPECTING CONTRIBUTED PROPERTY.** Any item of income, gain, loss, or deduction with respect to any property (other than cash) that has been contributed by a Member to the capital of the Company, or that has been revalued under the provisions of Section 5.5(g), and that is required or permitted to be allocated to the Member for income tax purposes under Internal Revenue Code Section 704(c) so as to take into account the variation between the tax basis of the property and its Fair Market Value at the time of its contribution, shall be allocated solely for income tax purposes in the manner required or permitted under Internal Revenue Code Section 704(c) using the "traditional" method described in Treasury Regulation Section 1.704–3(b), except that any other method allowable under applicable Regulations may be used for any contribution of property with respect to which there is agreement among the contributing Member and the Manager.

关于出资财产的分配：与股东作为资本向公司出资的、或根据本协议第 5.5(g)款规定重新进行估价的任何财产（现金除外）相关的收入、盈利、损失或扣减，如果根据税法第 704(c)款规定，要求或允许分配给股东以交纳收入所得税，从而考虑改变上述财产的纳税基数和出资时的公平市场价值的，应分配给股东，但仅用于交纳收入所得税，分配方式按照国内收入法第 704(c)款使用的传统方式（见税法第 1.704–3(b)款之规定），但根据相关法律使用其它方式以财产进行出资的，且出资股东与管理人达成一致意见的除外。

**6.10    ALLOCATIONS BETWEEN TRANSFEROR AND TRANSFEREE.** In the case of a Transfer of a Transferable Interest during any fiscal year of the Company, the Transferring Member and Transferee shall each be allocated Profits or Losses based on the number of days each of them held the Transferable Interest during that fiscal year. If the Transferring Member and Transferee agree to a different proration and advise the Manager of the agreed proration before the date of the Transfer, Profits or Losses from a Capital Event during that fiscal year shall be allocated to holder of the Transferable Interest on the day the Capital Event occurred. If a Transferee makes a subsequent Transfer, the Transferee shall be considered a "***Transferring Member***" with respect to the subsequent Transferee for purposes of these allocations.

转让人与受让人之间的分配：如果在公司某一财年内转让股东的可转让权益，则转让股东和受让人都应分得公司的利润或亏损，分配基础是根据该财年内双方持有可转让权益的天数。如果转让股东和受让人同意按不同比例进行分配时，且在上述权益转让之前告知管理人上述比例的，在该财年内从事资本活动所得的利润或损失应当在资本活动发生之日分配给可转让权益的持有人。如果受让人继续进行转让，则该受让人应被视为转让股东（相对于以后的受让人而言），并按规定进行上述分配。

**6.11    REVALUATION OF COMPANY ASSETS.** (a) The Gross Asset Value of all Company property shall be adjusted at the following times: (i) on the acquisition of an interest or additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) on the distribution of money or other property (other than a de minimis amount) by the Company to a Member as consideration for a Transferable Interest in the Company;

and (iii) on the liquidation of the Company within the meaning of Treasury Regulation Section 1.704–1(b)(2)(ii)(g); provided, however, that adjustments under clauses (i) and (ii) above shall be made only in the event of a revaluation of Company property under Section 5.5(g) in accordance with Treasury Regulation Section 1.704–1(b)(2)(iv)(f).

公司资产的重新评估：1）所有公司物业的总资产价值应在下述时间内调整：1）新股东和现有股东购买公司内的相关权益或附加权益，从而获得更多资本出资时；2）公司向股东分配货币或其它财产，且上述分配物被视为该公司可转让权益；及 3）按照税法第 1.704–1(b)(2)(ii)(g)条规定对公司进行清算时；然而，仅在本协议 5.5(g)所规定的公司财产在税法第 1.704–1(b)(2)(iv)(f)条规定进行前款调整时。

(b)    The Gross Asset Value of Company property shall be increased or decreased to reflect adjustments to the adjusted tax basis of the property under Internal Revenue Code Section 732, Section 733, or Section 743, subject to the limitations imposed by Internal Revenue Code Section 755 and Treasury Regulation Section 1.704–1(b)(2)(iv)(m).

公司物业的总资产价值应当有增有减，以反映根据国内收入法第 732 条、733 条和734 条对公司物业的调整后基数进行调整，但受国内收入法第 755 条规定和税法第1.704–1(b)(2)(iv)(m)条规定的限制措施的影响。

(c)    If the Gross Asset Value of an item of property has been determined or adjusted, the Gross Asset Value shall be adjusted by the Book Depreciation, if any, taken into account with respect to that property for purposes of computing Profits and Losses.

如果物业的某一项总资产价值被确定或调整时，上述总资产价值应当根据账面折旧进行调整，并考虑该物业应计算的盈利和亏损。

**6.12    COMPLIANCE WITH LAW AND REGULATIONS.** It is the intent of the Members that each Member's allocated share of Company Tax Items be determined in accordance with this Agreement to the fullest extent permitted by Internal Revenue Code Section 704(b)–(c). Notwithstanding anything to the contrary in this Agreement, if the Company is advised that, as a result of the adoption of new or amended regulations under Internal Revenue Code Section 704(b)–(c), or the issuance of authorized interpretations, the allocations provided in this Agreement are unlikely to be respected for federal income tax purposes, the Managers granted the power to amend the allocation provisions of this Agreement, on advice of accountants and legal counsel, to the minimum extent necessary for the allocation provisions to be respected for federal income tax purposes.

遵守法律法规：股东的意图是根据本协议规定，在国内收入法第 704(b)–(c)条规定的最大范围内确定每名股东应当承担的公司交税份额。尽管有不同于本协议的规定，如果公司根据国内收入法第 704(b)–(c)条规定，采用新的或修订后的法律法规，或权威部门发布的司法解释，本协议规定的分配方案不可能实现联邦收入所得税的目的，则管理人有权修订本协议规定的分配方式，但应当咨询相关的财务师和法律顾问，以最大限度地减小符合联邦收入所得税所需的相关规定。

## ARTICLE VII
## 第七条
## DISTRIBUTIONS

### 利润分配

**7.1**    **DISTRIBUTIONS**. The Manager shall distribute Available Cash to the Members at such times as the Manager shall determine in its sole discretion. Except upon liquidation of the Company, all distributions shall be in cash.

分配：管理人应当依据其判断合适的时间向股东分配可供分配的现金。除非在清算的情况下，所有的分红均当以现金做出。

**7.2**    **DISTRIBUTION PRIORITY**. Available Cash shall be distributed to the Members in the following order of priority:

**分配顺序：可供分配的现金应当按照以下优先顺序进行：**

"*Tier 1 Split*" means the distribution of all the Return to Member ALFA IDG LLC and Thriving Future LLC each the amount of Four Million and Seven Hundred Thousand Dollars as early investment preferred return. This Tier distribution will be made after the exit of the Project.

"一级分配"：是指因为其更早时间投资本项目，而对股东 ALFA IDG LLC 和 Thriving Future LLC 分别给予金额为四百七十万美元优先回报。本级别分配在项目退出之后做出。

"*Tier 2 Split*" means the distribution of all the Return after Tier 1 Split (same for other Tiers) to all Members pro rata to their investment if the Return is between 0% and 8% per annum. This Tier distribution will be made after the exit of the Project.

"二级分配"：是指一级分配之后(下同)，年度回报率在 0%和 8%之间的部分，全部按照股东的投资比例分配给股东。本级别分配在项目退出之后做出。

"*Tier 3 Split*" means the distribution of the Return from 8% to 10% per annum in the following manner: 100% to Managers. This Tier distribution will be made after the exit of the Project.

三级分配：年度回报率 8%-10%的部分，分配方式如下：100%分配给管理人。本级别分配在项目退出之后做出。

"*Tier 4 Split*" means the distribution of the Return from 10% to 15% per annum in the following manner: (i) 70% to Members pro rata to their investment; and (ii) 30% to Manager. This Tier distribution will be made after the exit of the Project.

四级分配：年度回报率10%-15%的部分，分配方式如下：70%按照投资比例分配给股东，30%给管理人。本级别分配在项目退出之后做出。

"***Tier 5 Split***" means the distribution of the Return from 15% to 20% per annum in the following manner: (i) 60% to Members pro rata to their investment; and (ii) 40% to Manager. This Tier distribution will be made after the exit of the Project.

五级分配：年度回报率15%-20%的部分，分配方式如下：60%按照投资比例分配给股东，40%给管理人。本级别分配在项目退出之后做出。

"***Tier 6 Split***" means the distribution of the Return after Tier 1 Split to Tier 5 Split. All the Return in this Tier will be distributed in the following manner: (i) 50% to Members pro rata to their investment; and (ii) 50% to Manager. This Tier distribution will be made after the exit of the Project.

六级分配：完成一级到五级分配之后所有剩余回报为六级分配。本级分配方式如下：50%按照投资比例分配给股东，50%给管理人。本级别分配在项目退出之后做出。

**7.3    NONCASH PROCEEDS**. If the proceeds from a sale or other disposition of an item of Company property consist of property other than cash, the value of that property shall be as determined by the Manager. If noncash proceeds are subsequently reduced to cash, that cash shall be taken into account by the Manager in determining Available Cash.

非现金所得：如果出售公司物业或以其它方式处置物业时所得的不是现金而是包含资产，则该资产的价值应当由管理人决定。如果非现金所得后来变为较低的现金金额，则现金金额应当由管理人在决定可分配现金时予以考量。

**7.4    SALE OF THE PROPERTY AFTER COMPLETION OF CONSTRUCTION.** All Members agree that as soon as the Property construction is completed and the permit of occupancy is obtained, and at least 80% of the units of the Property are leased and the preferred equity (if any) and construction loan are refinanced by a commercial loan, then the Manager shall consider whether to list the Property for sale. In this case, the Company shall retain two appraisal firms including CBRE to appraise the value and use the average result as the Property value (the "**Property Appraisal Value**").

所有股东同意，在项目建设完成，获得居住许可，项目至少有 80%的单位出租，Y 优先股（如有）和建设贷款已经重新融资以商业贷款替代，那么管理人应当考虑是否将项目挂牌销售。在这种情况下，公司应当聘请两家评估机构且其中一家为 CBRE 对项目价值进行评估，并以评估值的平均数作为项目的价值（简称"**物业评估价值**"）。

**7.5    LONG TERM HOLDING OF THE PROPERTY.** The Members agree that as soon as 80% of the units are leased and no offer to purchase has been accepted by the Manager, then the Manager shall calculate the distribution according to above Sections 7.2 and 7.3, as if the Property is sold at the price of the Property Appraisal Value and the Available Cash for distribution is Property Equity Value (***Property Equity Value*** means the value of Property Appraisal Value less

all outstanding loans and outstanding payables). After the distribution, each Member's distribution together with their original Capital Contribution shall be referred to as ***New Capital Contribution***. Member Interest shall be adjusted, and each Member's new Member Interests shall be New Capital Contribution divided by the Equity Value of Property. After the calculation of New Capital Contribution, all future distribution of Available Cash shall only be made according to the percentage of each Member's New Capital Contribution but not according to Section 7.2 and 7.3.

决定长期持有物业：所有股东同意在物业达到80%出租并且管理人未接受任何购买物业的报价，那么管理人应当假定按照物业以物业评估价值出售，并获得可分配现金金额等于物业权益价值（"**物业权益价值**"是指物业评估价值减去所有当时未付银行贷款本息和其他应付款的金额），之后按照上述 7.2 和 7.3 条进行分配。每个股东的分配所得和原始资本出资相加所得的金额为"**新股东出资**"。之后公司应当按照每个股东的新股东出资除以物业权益价值作为新的股东股权比例。在计算新股东出资之后，未来所有的可分配现金的分配均应当按照新股东出资的股权比例进行分配，而不再适用 7.2 条和 7.3 条的规定。

      **7.6**    **LIQUIDATING PROCEEDS**. Notwithstanding any other provisions of this Agreement to the contrary, when there is a distribution in connection with a liquidation of the Company, or when any Member's interest is liquidated, all items of income and loss first shall be allocated to the Members' Capital Accounts under this Article VI, and other credits and deductions to the Members' Capital Accounts shall be made before the final distribution is made. The final distribution to the Members shall be made as provided in Section 10.2(c) of this Agreement. The provisions of this Section 7.6 and Section 10.2(c), shall be construed in accordance with the requirements of Treasury Regulation Section 1.704–1(b)(2)(ii)(b)(2).

清算所得：尽管本协议有其它不同规定，当出现与公司清算相关的分配时，或对股东权益进行清算时，首次所得的所有收入与亏损应当根据本协议第六条规定分配给股东的股本账户，股东股本账户的其它债务和减扣项在最终分配完成之前进行分配。面向股东的最终分配应当根据本协议第 10.2(c)条规定进行。本协议第 7.6 条和第 10.2（c）条应被视为是税法第 1.704–1(b)(2)(ii)(b)(2)条对分配的要求。

## ARTICLE VIII
### 第八条

## ACCOUNTS AND ACCOUNTING
### 会计和核算

      **8.1**    **BOOKS OF ACCOUNTS**. Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at other locations that the Manager shall determine from time to time, and shall be open to inspection and copying on reasonable Notice by any Member or the Member's authorized representatives during normal business hours with a three business notice. The costs of inspection and copying shall be borne by the Member.

账簿：完整和准确录入各项公司交易的公司完整业务账簿，应保存在公司的主要行政办公室及管理人不时确定的其他地点，并应正常营业时间内，在由任何股东或该股东的授权代表合理通知后不晚于三个工作日内接受公开检查和复制。检查和复制的费用应由股东承担。

**8.2    ACCOUNTING.** Financial books and records of the Company shall be kept on the cash method of accounting. The financial statements of the Company shall be appropriate and adequate for the Company's business and for carrying out the provisions of this Agreement. The fiscal year of the Company shall be January 1 through December 31.

核算：公司的财务账簿和记录应按照现金核算法保存。公司的财务报表应适合公司业务，并适用于履行本协议的规定。公司财政年度应从 1 月 1 日起，到 12 月 31 日止。

**8.3    BANK ACCOUNT.** The Company shall open only one bank account unless approved by the Managers. The authorized person on the account shall be a representative designated by Manager.  The original authorized person shall be Yaojun Liu (the "***Authorized Account Signer***").

银行账户：公司应当仅开立一个银行账户，除非管理人批准另设账户。管理人应当指定一个代表作为账户授权签字人。最初授权代表为刘耀军（简称"**授权账户签字人**"）。

**8.4    RECORDS.** At all times during the term of existence of the Company, and beyond that term if the Manager deems it necessary, the Manager shall keep or cause to be kept the books of account referred to in Section 8.2, together with:

记录：在公司存续期限内，以及如果管理人认为需要的话，在此期限过后，管理人应保存或促使保存第 8.2 节中提及的账簿以及：

(a)    A current list of the full name and last known business or residence address of each Member and Transferee, together with the Capital Contribution and the share in Profits and Losses of each Member and Transferee;

各股东和受让人的全称和最后已知营业地址或住址的最新名单，以及各股东和受让人的出资额和在利润与亏损中所占的份额；

(b)    A current list of the full name and business or residence address of each Manager;

各管理人全称和营业地址或住址的最新名单；

(c)    A copy of the Articles of Organization, as amended;

经修订的组织大纲副本；

39

(d)     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent tax years;

最近六个税务年度公司联邦、州和地方所得税或信息申报表和报告（如有的话）的副本；

(e)     An original executed copy or counterparts of this Agreement, as amended;

经修订本协议已签字正本或副本；

(f)     Any powers of attorney under which the Articles of Organization or this Agreement or any amendments to the Articles of Organization or this Agreement were executed;

签署组织大纲或本协议、或组织大纲或本协议之任何修订本所依据的任何委托书；

(g)     Financial statements of the Company for the six most recent fiscal years; and

最近六个财政年度的公司财务报表；和

(h)     The books and Records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

当前财政年度及过去四个财政年度与公司内部事务有关的公司账簿和记录。

If the Manager deems that any of the foregoing items shall be kept beyond the term of existence of the Company, the repository of those items shall be as designated by the Manager.

如果管理人认为，在公司存续期限过后还应保存任何前述记录，那么这些记录的保存地点应由管理人指定。

**8.5    FINANCIAL STATEMENTS**. At the end of each fiscal year, the books of the Company shall be closed and examined, statements reflecting the financial condition of the Company and its Profits or Losses shall be prepared, and a report about those matters shall be issued by the Company's accountants. Copies of the financial statements shall be given to all Members. In addition, all Members shall receive, not less frequently than at the end of each calendar quarter, copies of such financial statements regarding the previous calendar quarter as may be prepared in the ordinary course of business by the Manager or accountants selected by the Manager. The Manager shall cause an annual report to be sent to each Member within 120 days after the end of the fiscal year of the Company. The annual report may be sent by electronic transmission by the Company and shall include:

财务报表。每个财政年度结束时，公司的账簿应封闭并接受检查，应编制反映出公司财务状况及其损益情况的报表，还应由公司会计师签发与这些事宜有关的报告。财务报表的副本应分发给所有股东。此外，所有股东还应至少在各个公历季度结束时收到管理人或管理人所选择的会计师在正常营业过程中编制的关于上一个公历季

度的财务报表。管理人应促成在公司财政年度结束后 120 天以内，将年度报告寄送给各股东。年度报告可由公司通过电子传输手段发送，并应包括：

(a)    A balance sheet and income statement, and a statement of cash flows of the Company as of the close of the fiscal year; and

资产负债表和收益表及截至财政年度结束时公司现金流量表；和

(b)    A statement showing the Capital Account of each Member as of the close of the fiscal year and the distributions, if any, made to each Member during the fiscal year. Members representing at least 20% of the Members, by number, may request interim balance sheets and income statements, and may, at their own discretion and expense, obtain an audit of the Company books by certified public accountants selected by them; provided, however, that not more than one such audit shall be made during any fiscal year of the Company.

显示截至财政年度结束时各股东资本账户及财政年度期间向各个股东所作分配（如有的话）的报表。数量占股东总数20%的股东，可索要中期资产负债表和收益表，并可按照自己的判断和自担费用，安排由他们挑选的注册会计师对公司账簿进行审计；但条件是，公司任何一个财政年度期间不得进行多于一次的审计。

8.6    INCOME TAX RETURNS. Within 90 days after the end of each taxable year of the Company, the Manager shall send to each of the Members and Transferees all information necessary for the Members and Transferees to complete their federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for that year.

所得税申报表。在公司各个纳税年度结束后 90 天以内，管理人应向各股东和受让人寄送该股东和受让人填写其联邦和州所得税申报表或信息申报表所需要的全部信息，以及该年度公司联邦、州和地方所得税申报表或信息申报表的副本。

8.7    TAX MATTERS PARTNER. The Manager or its Representative shall act as Tax Matters Partner of the Company under Internal Revenue Code Section 6231(a)(7).

税务事宜合作伙伴：管理人或其代表应按照《国内税收法》第 6231（a）（7）节担任公司的税务事宜合作伙伴。

8.8    AUTHORITY TO BE EXERCISED BY TAX MATTERS PARTNER. The Tax Matters Partner is authorized to do the following:

须由税务事宜合作伙伴行使的权限：税务事宜合作伙伴有权做以下事情：

(a)    Keep the Members informed of administrative and judicial proceedings for the adjustment of Company items (as defined in Internal Revenue Code Section 6231(a)(3)) at the Company level, as required under Internal Revenue Code Section 6223(g) and the implementing Regulations;

向股东告知行政和司法程序，以便按照《国内税收法》及其实施规定的要求，在公司层面调整公司事项（定义参见《国内税收法》第 6231（a）（3）节）；

(b)    Enter into settlement agreements under Internal Revenue Code Section 6224(c)(3) and applicable Regulations with the Internal Revenue Service or the Secretary of the Treasury (the Secretary) with respect to any tax audit or judicial review, in which agreement the Tax Matters Partner may expressly state that the agreement shall bind the other Members, except that the settlement agreement shall not bind any Member who (within the time prescribed under the Internal Revenue Code and Treasury Regulations) files a statement with the Secretary providing that the Tax Matters Partner shall not have the authority to enter into a settlement agreement on behalf of that Member;

按照《国内税收法》第 6224（c）（3）节和适用法规，就任何税务审计或司法审查与国税局或财政部长（部长）签订和解协议，在该协议中，税务事宜合作伙伴可明确指明，该协议应对其他股东具有约束力，但如果任何股东（在《国内税收法》和财政部法规规定的时间期限内）向部长提交一份声明，指出税务事宜合作伙伴无权代表该股东签订和解协议，则和解协议不应对此股东具有约束力；

(c)    On receipt of a notice of a final Company administrative adjustment, file a petition for readjustment of the Company items with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under Internal Revenue Code Section 6226(a) and applicable Regulations;

在收到最终公司行政调整通知后，按照《国内税收法》第 6226（a）节和适用法规，向税务法院、公司主要营业地点所在地区的美国地区法院或美国联邦索赔法院提交一份重新调整公司事项的申请；

(d)    File requests for administrative adjustment of Company items on Company tax returns under Internal Revenue Code Section 6227(b) and applicable Regulations; and, to the extent those requests are not allowed in full, file a petition for adjustment with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under Internal Revenue Code Section 6228(a); and

按照《国内税收法》第 6227（b）和适用法规在公司税务申报表上提出对公司事项进行行政调整的申请；如果这些申请未得到全部许可，按照《国内税收法》第 6228（a）节的规定，向税务法院、公司主要营业地点所在地区的美国地区法院或美国联邦索赔法院，提出一项调整申请；和

(e)    Take any other action on behalf of the Members or the Company in connection with any administrative or judicial tax proceeding to the extent permitted by law or regulations, including retaining tax advisers (at the expense of the Company) to whom the Tax Matters Partner may delegate such rights and duties as deemed necessary and appropriate.

在法律或法规允许的范围内，代表股东或公司采取与任何行政或司法税务程序有关的任何其他行动，包括聘请税务事宜合作伙伴可向其委托被视为必需和合适的权利和职责的税务顾问（费用由公司承担）。

## ARTICLE IX
## 第九条

## TRANSFERS AND ENCUMBRANCES OF INTERESTS; WITHDRAWALS

## 权益的转让和产权负担；退出

**9.1    NO RIGHT TO DISSOCIATE**. A Member may not dissociate from the Company without the written consent of the Manager and a Majority of Voting Interest, excluding the Voting Interest of the Member who seeks consent to dissociate. Dissociation shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred before the effective date of dissociation. Following dissociation, the dissociating Member shall only have the rights of a Transferee with respect of the dissociating Member's Membership Interest. Unless the Members consent to the dissociation as set forth above, the dissociating Member shall not receive a distribution of its Transferable Interest until the dissolution and liquidation of the Company.

无权脱离公司：未经管理人和持有多数投票权的股东书面同意，股东不得脱离公司。上述持有多数投票权的股东不包括寻求脱离同意的股东的投票权。脱离不得免除股东在脱离生效日之前累积或发生的本协议项下义务和责任。脱离之后，脱离的股东应仅享有与脱离股东的股东权益有关的受让人权利。除非股东对上文载列的脱离给予同意，否则，脱离的股东在公司解散和清算之前，不应获得其可转让权益的分配。

**9.2    RESTRICTIONS ON TRANSFER**. Except as expressly provided in this Agreement, a Member shall not Transfer any part of the Member's Membership Interest in the Company, whether now owned or later acquired, unless the Manager consents to the Transferee's admission to the Company as a Member on that Transfer. No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Membership Interest in the Company unless the Encumbrance has been approved in writing by the Manager. Approval may be granted or withheld in the Manager's sole discretion. Any Transfer or Encumbrance of a Membership Interest without that approval shall be void. Notwithstanding any other provision of this Agreement to the contrary, a Member who is a natural person may Transfer all or any portion of his or her Membership Interest to any revocable trust created for the benefit of the Member, or any combination between or among the Member, the Member's spouse or domestic partner, and the Member's issue, provided that the Member retains a beneficial interest in the trust and all of the Voting Interest included in the Membership Interest. A Transfer of a Member's beneficial interest in the trust, or failure to retain the Voting Interest, shall be deemed a Transfer of a Membership Interest.

转让限制：除非本协议明确规定，任何股东不得转让其在公司中持有的任何一部分股东权益，而不论目前拥有还是后来获得，但管理人在该次转让后同意该受让人进入公司成为公司股东的除外。任何股东均不可对该股东在公司中持有的全部或任何

一部分股东权益附加产权负担，亦不得允许或使这些股东权益产生产权负担，但产权负担已经管理人书面批准的除外。批准可根据管理人自己的判断来给予或暂扣。未经批准，股东权益的转让或产权负担都应是无效的。尽管本协议有相反的任何其他规定，任何股东如果是一名自然人，可将全部或任何一部分股东权益转让给为股东利益创建的任何可撤销信托，或股东、股东配偶或国内合作伙伴及股东子嗣的任何组合，但条件是股东保留在该信托中的受益人权益及股东权益中包括的全部投票权权益。转让股东在信托中持有的受益人权益，或未能保留投票权权益，均应视为转让股东权益。

**9.3    RIGHT OF FIRST REFUSAL.** If a Member wishes to Transfer any or all of the Member's Membership Interest in the Company under a Bona Fide Offer (as defined below), the Member shall give Notice to the Manager at least 30 days in advance of the proposed sale or Transfer, indicating the terms of the Bona Fide Offer and the identity of the offeror. The Company and the other Members shall have the option to purchase the Membership Interest proposed to be transferred at the price and on the terms provided in this Agreement. If the price for the Membership Interest is other than cash, the fair value in dollars of the price shall be as established in good faith by the Manager. For purposes of this Agreement, "***Bona Fide Offer***" means an offer in writing setting forth all relevant terms and conditions of purchase from an offeror who is ready, willing, and able to consummate the purchase and who is not an Affiliate of the selling Member. For 30 days after the Notice is given, the Company shall have the right to purchase the Membership Interest offered, on the terms stated in the Notice, for the lesser of (a) the price stated in the Notice (or the price plus the dollar value of noncash consideration, as the case may be) and (b) the price determined under Section 9.8.

优先购买权：如果一个股东希望依照善意要约（定义参见下文）转让其在公司中持有的任何或全部股东权益，该股东应在拟议销售或转让前提前 30 天向管理人发出通知，其中指明善意要约的期限和要约人的身份。管理人和其他股东有权以本协议中规定的价格和条款拟转让的股东权益。如果股东权益的价格非现金方式，那么以美元价格标示的公允价值应由管理人真诚制定。为本协议之目的，"善意要约"系指以书面形式载列出从准备、愿意和能够完成购买、且并非出售股东关联机构的要约人手中购买的所有相关条款和条件的要约。在发出通知后 30 天里，公司应有权按照通知中规定的条款，购买被出售股东权益，价格为以下二者中的较少者：（a）通知中规定的价格（或价格加上非现金对价的美元价值，视具体情况而定）和（b）第 9.8 节项下确定的价格。

If the Company does not exercise the right to purchase all of the Membership Interest, then, with respect to the portion of the Membership Interest that the Company does not elect to purchase, that right shall be given to the other Members for an additional 30-day period, beginning on the day that the Company's right to purchase expires. Each of the other Members shall have the right to purchase, on the same terms, a part of the interest of the offering Member in the proportion that the Member's Percentage Interest bears to the total Percentage Interests of all of the Members who choose to participate in the purchase; provided, however, that the Company and the participating Members may not, in the aggregate, purchase less than the entire interest to be sold by the offering Member.

如果公司没有行使购买所有股东权益的权利，那么，就公司未选择购买的那部分股东权益而言，从公司购买权到期之日算起，其他股东应有额外三十天的期限享有该购买权。其他股东应有权依照相同条款，购买出售股东的一部分权益，购买比例应为该股东在所有选择参与购买的股东的权益总百分比中所占的比例；但条件是公司和参与购买的股东总共不得购买少于由出售股东出售的全部权益。

If the Company and the other Members do not exercise their rights to purchase all of the Membership Interest, the offering Member may, within 90 days from the date the Notice is given and on the terms and conditions stated in the Notice, sell or exchange that Membership Interest to the offeror named in the Notice. Unless the requirements of Section 9.2 are met, the offeror under this Section 9.3 shall become a Transferee.

如果公司和其他股东不行使购买全部股东权益的权利，则该出售权益的股东有权在通知发出之日后 90 天以内，按照通知中规定的条款和条件，将该股东权益出售或交换给通知中指明的要约人。除非符合第 9.2 节中的要求，第 9.3 节项下的要约人应成为一个受让人。

**9.4    TRIGGERING EVENTS.** On the happening of any of the following events ("***Triggering Events***"), the Manager shall have the option to purchase or sell to another Person the Membership Interest of a Member ("***Selling Member***") at the price and on the terms provided in Section 9.8 of this Agreement:

触发事件：若发生以下任何事件（"触发事件"），管理人应有权按照本协议第 9.8 节中规定的价格和条款，购买股东（"出售股东"）的股东权益或将该股东权益出售给另一人：

(a)    The death, incapacity, bankruptcy, or dissociation of a Member, or the winding up and dissolution of a corporate Member, or the merger or other corporate reorganization of a corporate Member as a result of which the corporate Member does not survive as an entity.

股东死亡、无能力、破产或脱离公司，或法人股东停业清理和解散，或者法人股东因法人股东不再作为实体存续而发生的合并或其他法人重整。

(b)    The failure of a Member to make the Member's Capital Contribution or any additional Capital Contributions under the provisions of Article V of this Agreement.

股东未按本协议第五条之规定进行股东出资或进行追加出资。

(c)    The occurrence of any other event that is, or that would cause, a Transfer in contravention of this Agreement.

发生导致或者可能导致转让违反本协议的任何其他事件。

**9.5**    MARITAL DISSOLUTION OR DEATH OF A SPOUSE. Notwithstanding any other provisions of this Agreement:

婚姻关系解除或配偶死亡。尽管本协议有任何其他规定：

(a)    If, in connection with the divorce or dissolution of the marriage of a Member, any court issues a decree or order that transfers, confirms, or awards a Membership Interest, or any portion of it, to that Member's spouse (an "*Award*"), then, notwithstanding that the transfer would constitute an unpermitted Transfer under this Agreement, that Member shall have the right to purchase from his or her former spouse the Membership Interest, or portion of it, that was so transferred, and the former spouse shall sell the Membership Interest or portion of it to that Member at the price set forth below in Section 9.8 of this Agreement. If the Member has failed to consummate the purchase within 180 days after the court Award (for purposes of this paragraph, the "*Expiration Date*"), the Company and the other Members shall have the option to purchase from the former spouse the Membership Interest or portion of it under Section 9.6 of this Agreement, provided that the option period shall commence on the later of (i) the day following the Expiration Date, or (ii) the date of actual notice of the Award.

如果一个股东离婚或解除婚姻关系，法院颁布一项法令或命令，将股东权益或其一部分转让、批准或判决给该股东的配偶（"判决"），那么尽管转让会构成一项不被本协议许可的转让，但该股东仍应有权从其前配偶手中购买之前如此转让的股东权益或其中的一部分，前配偶应按照本协议以下第 9.8 节中载列的价格将股东权益或其中的一部分出售给该股东。如果该股东未能在法院判决后 180 天以内（为本段之目的，"到期日期"）完成购买，那么公司和其他股东应有权依照本协议第 9.6 节从前配偶手中购买该股东权益或其中的一部分，但条件是选择权期限应从以下二者中的较迟者算起：（i）到期日期后次日，或（ii）判决的实际通知日期。

(b)    If, by reason of the death of a spouse of a Member, any portion of a Membership Interest is transferred to a Transferee other than (i) that Member or (ii) a trust created for the benefit of that Member (or for the benefit of that Member and any combination between or among the Member and the Member's issue) in which the Member is the sole Trustee and the Member, as Trustee or individually possesses all of the Voting Interest included in that Membership Interest, then the Member shall have the right to purchase the Membership Interest or portion of it from the estate or other successor of his or her deceased spouse or Transferee of the deceased spouse, and the estate, successor, or Transferee shall sell the Membership Interest or portion of it at the price set forth in Section 9.8 of this Agreement. If the Member has failed to consummate the purchase within 180 days after the date of death (for purposes of this paragraph, the "*Expiration Date*"), the Company and the other Members shall have the option to purchase from the estate or other successor of the deceased spouse the Membership Interest or portion of it under Section 9.6 of this Agreement, provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the death.

如果因某股东的配偶死亡，股东权益的任何一部分被转让给除以下二者以外的受让人：（i）该股东，或（ii）为该股东（或为该股东及股东与股东子嗣的组合）利益创建的信托，该股东为唯一受托人，而且该股东作为受托人或个人拥有该股东权益

46

中包括的所有投票权权益，那么该股东应有权从其已逝配偶的遗产或其他继任者手中，或从已逝配偶的受让人手中，购买股东权益或其一部分，遗产、继承人或受让人应按照本协议第 9.8 节中载列的价格出售股东权益或其一部分。如果股东未能在死亡后 180 天（为本段之目的，"到期日期"）以内完成购买，公司和其他股东应有权按照本协议第 9.6 节从已逝配偶的遗产或其他继任者受众购买股东权益或其一部分，但条件是，选择期限应从以下二者中的较迟者算起：（1）到期日期后次日，或（2）死亡实际通知日期。

**9.6** **OPTION PERIODS**. On the receipt of Notice by the Manager and the other Members as contemplated by Sections 9.1, 9.3, and 9.5, and on receipt of actual notice of any Triggering Event as determined in good faith by the Manager (the date of the receipt is hereinafter referred to as the "***Option Date***"), the Manager shall promptly cause a Notice of the occurrence of a Triggering Event to be sent to all Members, and the Company shall have the option, for a period ending 30 calendar days following the determination of the purchase price as provided in Section 9.8, to purchase the Membership Interest in the Company to which the option relates, at the price and on the terms set forth in Section 9.8 of this Agreement, and the other Members, pro rata in accordance with their prior Membership Interests in the Company, shall then have the option, for a period of 30 days thereafter, to purchase the Membership Interest in the Company not purchased by the Company, on the same terms and conditions as apply to the Company. If all other Members do not elect to purchase the entire remaining Membership Interest in the Company, then the Members electing to purchase shall have the right, pro rata in accordance with their prior Membership Interests in the Company, to purchase the additional Membership Interest in the Company available for purchase or the Manager shall have the right to sell such remaining interest to another Person. The Transferee of the Membership Interest in the Company that is not purchased shall hold the Membership Interest in the Company subject to all of the provisions of this Agreement.

选择权行权期限。在管理人和其他股东收到第 9.1、9.3 和 9.5 节规定的通知，且收到管理人善意确定的触发事件的实际通知后（收到日期以下被称作"行权日"），管理人应立即着手向所有股东发出触发事件发生通知，公司应有权在确定第 9.8 节规定的购买价格后 30 个公历日以内选择按照本协议第9.8节规定的价格和条款购买在公司中持有的股东权益，然后，其他股东应有权在此后 30 天期限内，按照其之前在公司中持有的股东权益的比例，依照适用于公司的相同条款和条件，购买未由公司购买的股东权益。如果所有其他股东未选择购买剩余的公司股东权益，那么选择购买的股东应有权按照其之前在公司中持有的股东权益的比例，购买可供购买的其余股东权益，或者管理人应有权将剩余权益出售给其他人士。未被购买的公司股东权益的受让人应按照本协议的所有规定持有公司股东权益。

**9.7** **NONPARTICIPATION OF INTERESTED MEMBER**. Neither the Member whose interest is subject to purchase under this Article, nor that Member's Affiliate, shall participate in any Vote or discussion of any matter pertaining to the disposition of the Member's Membership Interest in the Company under this Agreement.

利益股东不得参加：无论是依照本条款出售的股东，还是该股东的关联机构，都不得参与依照本协议再参加上述股东权益出售有关的任何事宜的投票或讨论。

**9.8    OPTION PURCHASE PRICE.** The purchase price of the Membership Interest that is the subject of an option to purchase as set forth herein shall be the Fair Option Price of the interest as determined under this Section 9.8. The term "***Fair Option Price***" means the fair value for such Membership Interest as between a willing buyer and a willing seller in an arm's-length transaction occurring on the date of valuation as determined by the Manager in good faith, taking into account all relevant factors that the Manager believes is determinative of value (and giving effect to any transfer taxes payable or discounts in connection with such sale).

行权价格：作为可依照本协议规定购买的选择权标的的股东权益的购买价格应为第9.8 节项下确定的权益的公允行权价格。"公允行权价格"一词系指该股东权益在有意愿的买卖双方于管理人善意确定的估值日发生的合理交易中的公允价值，同时考虑管理人认为对价值有决定作用的所有相关因素（并考虑与出售有关的应付转让税或贴现）。

**9.9    SUBSTITUTED MEMBER.** Except as expressly permitted under Section 9.2, a prospective transferee (other than an existing Member) of a Membership Interest may be admitted as a Member with respect to the Membership Interest ("***Substituted Member***") only (a) by consent of the Manager, and (b) on the prospective transferee's executing a counterpart of this Agreement to become a party to it. Any prospective transferee of a Membership Interest shall be deemed a Transferee, and, therefore, the owner of only a Transferable Interest until the prospective transferee has been admitted as a Substituted Member. Until the Transferee becomes a Substituted Member, the Transferring Member's voting power shall be deemed given to the Manager who shall have the power to exercise any rights and powers of that Member under this Agreement, including the right to Vote in proportion to the Percentage Interest that the Transferring Member would have had if the transfer had not been made.

顶替股东：除第9.2节明确允许外，股东权益的潜在受让人（除现股东外）只有（a）经管理人同意，和（b）在潜在受让人签署本协议文本并成为协议一方后，才会将被接受为股东权益的股东（"顶替股东"）。股东权益的任何潜在受让人都应被视为受让人，因此，在潜在受让人被接受为顶替股东之前，应被视为可转让权益的所有者。在受让人成为顶替股东之前，转让股东权益的股东的投票权应被视为赠与应有权行使本协议项下该股东任何权利和权力的管理人，包括按照转让股东在尚未进行转让时拥有的权益比例进行投票的权利。

**9.10    DUTIES OF SUBSTITUTED MEMBER.** Any Person admitted to the Company as a Substituted Member is subject to all the provisions of this Agreement that apply to the Member from whom the Membership Interest was transferred, except that the transferring Member shall not be released from liabilities as a Member solely as a result of the transfer, both with respect to obligations to the Company and to third parties incurred before the transfer.

顶替股东的职责。被公司接受为顶替股东的人士应受本协议中适用于股东权益被转让的股东的所有规定的约束，但转让的股东不得仅因为转让而被免除作为股东的责任，包括转让前对公司和第三方承担的义务。

**9.11**    SECURITIES LAWS. The initial sale of Membership Interests in the Company to the Initial Members has not been qualified or registered under the securities laws of any state, including California, or registered under the Securities Act of 1933, in reliance on exemptions from the registration provisions of those laws. Notwithstanding any other provision of this Agreement, Membership Interests may not be Transferred unless registered or qualified under applicable state and federal securities laws unless, in the opinion of legal counsel satisfactory to the Company, qualification or registration is not required. A Member who desires to transfer a Membership Interest shall be responsible for all legal fees incurred in connection with that opinion.

证券法律：公司股东权益面向初始股东的初始销售，尚未依照包括加利福尼亚州在内的任何州证券法律接受资质审查或注册，亦未依照 1933 年证券法注册，但可免除遵守这些法律的注册规定。尽管本协议有其他规定，但股东权益在依照适用的州和联邦证券法律注册或资质审查前不得转让，除非令公司满意的法律顾问认为，不需要资质审查或注册。希望转让股东权益的股东应负责承担与提供这种意见有关的一切法律费用。

**9.12**    REMEDIES. In addition to such other rights as may be available, the Manager shall, at its election, have the right to recover damages, if any, or to compel specific performance from the Selling Member.

救济：除可获得的其他权利外，管理人应按照其选择，有权获得损害赔偿（如有的话），或强迫出售股东特定履行。

## ARTICLE X
第十条

## DISSOLUTION OF THE COMPANY
公司解散

**10.1**    DISSOLUTION. The Company shall be dissolved on the first to occur of the following events:

解散：公司应在首先发生以下事件时解散：

(a)    The written agreement of all Members to dissolve the Company.

所有股东书面同意解散公司。

(b)    The sale or other disposition of substantially all of the Company's assets.

几乎全部公司资产被出售或作其他处置。

(c)    Entry of a decree of judicial dissolution under Corporations Code Section 17707.03.

公司法第 17707.03 节作出司法解散的裁定。

**10.2    Winding Up**. On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company. The Manager or, if there is no Manager, the Members, shall wind up the affairs of the Company. The Manager or Members winding up the affairs of the Company shall give Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company. After paying or adequately providing for the payment of all known debts of the Company, the remaining assets of the Company shall be distributed or applied in the following order:

停业处置：在公司解散后，公司不得从事除对公司业务和事务进行清理所需要业务以外的其他业务。管理人，或者如果没有管理人，股东应对公司事务进行停业处置。对公司事务进行处置的管理人或股东应通过邮件，向地址出现在公司记录中的公司所有已知债权人和索赔人发出开始停业处置通知。在偿还或妥善准备偿还公司所有已知债务后，公司剩余资产应按照以下顺序分配或使用：

(a)    To pay the expenses of liquidation;

支付清算费用；

(b)    To the establishment of reasonable reserves for contingent liabilities or obligations of the Company. On the determination that reserves are no longer necessary, they shall be distributed as provided in this Section 10.2; and

建立合理的储备，用于偿还公司的或有债务或义务。一旦确定不需要建立此储备，应按照第 10.2 节之规定予以分配；和

(c)    Among the Members with Positive Capital Account Balances.

利用资本账户正余额在股东中分配。

**10.3    DEFICITS**. Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if Company property remaining after the payment or discharge of the Company's debts and liabilities is insufficient to return the investment of each Member, the Member shall have no recourse against any other Members for indemnification, contribution, or reimbursement, except as specifically provided in this Agreement.

赤字。所有股东应仅将公司资产用作偿还股东投资，如果在偿还或清偿公司债务和负债后剩余的公司财产不足以各股东偿还各股东的投资，该股东不得要求任何其他股东赔偿、出资或报销，但本协议明确规定的除外。

**ARTICLE XI**
**第十一条**

# CONFIDENTIALITY
# 保密条款

**11.1** CONFIDENTIAL INFORMATION. "*Confidential Information*" means all trade secrets, "know-how," customer lists, pricing policies, operational methods, programs, and other business information of the Company created, developed, produced, or otherwise arising before the date of the Transfer. Each Member shall (a) protect, and shall use its reasonable best efforts to cause its Affiliates, owners, directors, managers, officers, employees, lenders accountants, representatives, agents, consultants and advisors to protect, the confidentiality of all proprietary and Confidential Information of the Company and its Affiliates, (b) shall use such proprietary and confidential information solely for the purpose of managing its investment in the Company, and (c) agrees not to disclose, and to use its reasonable best efforts to cause its Affiliates, owners, directors, managers, officers, employees, lenders, accountants, representatives, agents, consultants and advisors not to disclose, such proprietary and confidential information to any other Person other than such Person's lenders, accountants, representatives, agents, consultants and advisors who are advised of such Person's obligations hereunder and who are under a professional obligation to use such information solely for such Person's benefit; provided, however, that each such Person may disclose such information to the extent that such disclosure is pursuant to or in connection with a subpoena or court order, any investigation or audit by a governmental authority, any suit or proceeding with respect to this Agreement, or the filing of any tax returns.  In all such cases, each such Person shall disclose such information only to the extent required to fulfill such purpose or legal requirement.  If any such Person becomes legally compelled to disclose any such proprietary and confidential information, such Person shall promptly notify the Company of such fact so that it may seek an appropriate remedy to prevent such production and request the Person demanding such production to allow the Company a reasonable period of time to seek such remedy.  Notwithstanding anything to the contrary contained herein, a Person's obligations under this Section 11.1 shall survive the Transfer by such Person of all or any portion of its Membership Interest.

机密信息：“机密信息”系指转让日期前创建、开发、生产或以其他方式出现的公司所有商业秘密、“专业技术”、客户名单、定价政策、运营方法、计划和其他商业信息。每个股东均应(a) 尽其合理范围内的最大努力促使其关联方、股东、董事、管理层、员工、会计师、代表、代理和顾问保护公司及其关联方的保密信息；(b)将这些保密信息仅用于管理其在公司的投资； (c)不披露，且尽其合理范围内的最大努力促使其关联方、股东、董事、管理层、员工、会计师、代表、代理和顾问不披露该信息给贷款人、会计师、代表、代理、顾问之外的其他人，且该等贷款人、会计师、代表、代理、顾问应知晓其此协议项下的义务且具有仅将相关信息用于其利益的职业义务。但是可以在如下合理范围内披露：传票、法院命令、政府的调查或审计、与本协议有关的诉讼或者税务申报。在任何披露情形下，应仅在满足法律要求的范围内披露保密信息。如果被强制要求披露信息，则应立即将相关事件通知公司以便于公司寻求合适的救济避免披露或者要求披露义务人采取措施使得公司可以有合理的时间寻求救济。不论任何与之相反的约定，此 11.1 项下的义务不因股东转让其权益而终止。

**11.2**    **INJUNCTIVE RELIEF**. Each Member stipulates that a breach of the provisions of this Article XI shall result in irreparable damage and injury to the Company for which no money damages could adequately compensate it. If the Member breaches the provisions of this Agreement, in addition to all other remedies to which the Company may be entitled, the Company shall be entitled to an injunction to enforce the provisions of this Agreement, to be issued by any court of competent jurisdiction, to enjoin and restrain the Member and each and every Person concerned or acting in concert with the Member from the continuance of that breach. Each Member expressly waives any claim or defense that an adequate remedy at law might exist for any such breach.

禁止令救济：各股东规定，违反第十一条规定应该会对公司造成无法弥补的损害和伤害，货币赔偿不能对此作出合理赔偿。如果股东违反本协议的这些固定，除公司有权获得的所有其他救济外，公司还应还有权获得由具有主管管辖权的法院颁布的强制执行本协议这些规定的禁止令，并要求和限制股东及与股东合作的有关个人继续违反本规定。各股东明确放弃就此类违反行为可能存在的普通法上的合理救济提出索赔或辩护的权利。

**11.3**    **REFORMATION**. If any provision in this Article XI is deemed to exceed the time or geographic limits or any other limitation imposed by applicable law in any jurisdiction, that provision shall be deemed reformed in that jurisdiction to the maximum extent permitted by applicable law.

改正：如果第十一条中的任何规定被视为超过时间或地域限制或任何管辖地适用法律所施加的任何其他限制，那么该规定应视为在该管辖地被改正至适用法律许可的最大范围。

## ARTICLE XII
第十二条

## INDEMNIFICATION
赔偿条款

The Company shall have the power to indemnify any Person who was or is a party, or who is threatened to be made a party, to any Proceeding by reason of the fact that the Person was or is a Member, Manager, officer, employee, or other agent of the Company, or was or is serving at the request of the Company as a director, officer, employee, or other Agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred by that Person in connection with the proceeding, if that Person acted in good faith and in a manner that the Person reasonably believed to be in the best interests of the Company, and, in the case of a criminal proceeding, the Person had no reasonable cause to believe that the Person's conduct was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or on a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that the Person reasonably believed to be in the best interests of the

Company, or that the Person had reasonable cause to believe that the Person's conduct was unlawful.

如果任何人士善意行事，而且行事方式使得此人合理相信最符合公司利益，而且对于刑事程序，此人没有合理的理由相信此人的行为是非法的，那么一旦此人以前或现在是公司的股东、管理人、官员、雇员或其他代理人，或者以前或现在应公司要求担任另一家有限公司、法人、合伙、合资企业、信托或其他企业的董事、官员、雇员或其他代理人而成为任何诉讼程序的一方，或有可能成为该诉讼程序的一方，公司应有权就此人因该诉讼程序实际合理发生的费用、判决、罚款、清偿和其他款项作出赔偿。通过判决、命令、清偿、有罪判决或不辩护也不认罪的答辩而终止任何诉讼程序，本身不应创造一个假设，即此人并没有善意行事，且行事方式令此人有合理理由相信最符合公司利益，或令此人有合理理由相信此人行为是非法的。

To the extent that an agent of the Company has been successful on the merits in defense of any Proceeding, or in defense of any claim, issue, or matter in any Proceeding, the agent shall be indemnified against expenses actually and reasonably incurred in connection with the Proceeding. In all other cases, indemnification shall be provided by the Company only if authorized in the specific case by the Manager.

如果公司的代理人基于案情实质在任何诉讼程序中成功辩护，或在任何诉讼程序中的任何权利主张、问题或事宜成功辩护，那么代理人应就诉讼程序中实际合理发生的费用获得赔偿。在所有其他情况下，只有经管理人授权在特定案件中才应由公司提供赔偿。

"***Agent***," shall include a trustee or other fiduciary of a plan, trust, or other entity or arrangement described in Corporations Code Section 207(f).

"代理人"应包括公司法典第 207（f）中描述的计划、信托或其他实体或协定的受托人或其他受托人。

"***Proceeding***," means any threatened, pending, or completed action or proceeding, whether civil, criminal, administrative, or investigative.

"诉讼程序"系指有可能的、未决的或已完成的诉讼或诉讼程序，不论民事、行事、行政或调查程序。

Expenses of each Person indemnified under this Agreement actually and reasonably incurred in connection with the defense or settlement of a proceeding may be paid by the Company in advance of the final disposition of the proceeding, as authorized by the Manager on receipt of an undertaking by that Person to repay that amount unless it shall ultimately be determined that the Person is entitled to be indemnified by the Company. "***Expenses***" includes, without limitation, attorney fees and expenses of establishing a right to indemnification.

各人士在诉讼程序辩护或和解时实际合理发生并依照本协议获得赔偿的费用，可在收到该人士偿还该费用的承诺书后，经管理人授权，由公司在诉讼程序最终处分前

予以支付，但应该最终认定此人有权获得公司赔偿的除外。"费用"包括但不限于律师费和证明获得赔偿的权利的费用。

## ARTICLE XIII
### 第十三条

## ATTORNEY-IN-FACT AND AGENT
### 事实代理人和代理人

Each Member, by execution of this Agreement, irrevocably constitutes and appoints the Manager as the Member's true and lawful attorney-in-fact and agent, with full power and authority in the Member's name, place, and stead to execute, acknowledge, and deliver, and to file or record in any appropriate public office: (a) any certificate or other instrument that may be necessary, desirable, or appropriate to qualify the Company as a limited liability company or to transact business as one in any jurisdiction in which the Company conducts business; (b) any certificate or amendment to the Company's articles of organization or to any certificate or other instrument that may be necessary, desirable, or appropriate to reflect an amendment approved by the Members in accordance with the provisions of this Agreement; (c) any certificates or instruments that may be necessary, desirable, or appropriate to reflect the dissolution and winding up of the Company; (d) any certificates necessary to comply with the provisions of this Agreement; and (e) any consent resolutions as may be necessary or determined by the Manager to conduct the Company's Business. This power of attorney shall be deemed to be coupled with an interest and shall survive the Transfer of the Member's Transferable Interest. Notwithstanding the existence of this power of attorney, each Member agrees to join in the execution, acknowledgment, and delivery of the instruments referred to above if requested to do so by a Manager.

各股东签署本协议，表示其不可撤销地指定和任命管理人为该股东真实、合法的事实代理人和代理人，可全权代表该股东签署、确认和交付以下文件，并在合适的公共办公室存档或记录：（a）使公司具有一家有限公司资质或在公司经营业务的任何管辖地作为一家有限公司交易业务所需要的任何证明文件或其他文书；（b）对公司组织大纲的证明文件或修订，或反映出股东按照本协议之规定批准的修订所需要的任何证明文件或其他文书；（c）反映出公司解散和停业清理所需要的任何证书或文书；（d）遵守本协议规定所需要的任何证书；和（e）经营公司业务可能需要或管理人确定的任何同意决议。这份委托书应视为附带一种权益，并应在股东可转让权益转让后继续有效。尽管存在这份委托书，各股东仍同意在管理人提出要求的情况下，参加上述文书的签署、确认和交付。

## ARTICLE XIV
### 第十四条

## GENERAL PROVISIONS
## 一般规定

**14.1    ENTIRE AGREEMENT**. This Agreement, together with all the Exhibits, constitutes the entire agreement of the parties with respect to its subject matter. This Agreement replaces and supersedes all prior written and oral agreements by and among the Members and Manager or any of them.

完整协议：本协议及附件构成双方就其标的达成的完整协议。本协议替代和取代股东和管理人或其中任何人达成的所有先前的书面和口头协议。

**14.2    COUNTERPART EXECUTIONS**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Executed counterparts of this agreement may be delivered by facsimile transmission or by delivery of a scanned counterpart in portable document format (PDF) by e-mail, in either case with delivery confirmed. On such confirmed delivery, the signatures in the facsimile or PDF data file shall be deemed to have the same force and effect as if the manually signed counterpart had been delivered to the other party in person.

合同副本：本协议可一式多份，各份均应视为正本，但所有这些共同构成同一份文件。经签署的本协议副本可通过传真传输或通过电子邮件交付一份便携式文件格式（PDF）的扫描副本来交付，在这两种情况下均确认交付。确认交付后，传真或PDF数据文件中的签名应视为具有与手写签名副本被亲自交付给另一方相同的效力。

**14.3    GOVERNING LAW; SEVERABILITY**. This Agreement shall be construed and enforced in accordance with the laws of the state of California. If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid that invalidity, illegality, or unenforceability or, if that is not possible, the provision shall, to the extent of that invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect.

法律适用；可分割性：本协议应按照加利福尼亚州法律解释和执行。如果本协议的任何规定被任何具有主管管辖权的法院或仲裁员裁定为无效、非法或不可执行，那么如果可能的话，该规定应视为更狭义地加以引用，如果更狭义的解释可以避免这种无效性、非法性或不可执行性，或者如果不可能做到这一点，那么该规定应在该无效性、非法性或不可执行性的范围内被分割开来，本协议的剩余规定应依然保持有效。

**14.4    BINDING EFFECT**. This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

约束力：本协议应对双方及各自继承人、个人代表和许可继任者和受让人具有约束力。

**14.5**    **NUMBER AND GENDER**. Whenever used in this Agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require.

数字和性别：在本协议中使用时，单数概念应包括复数概念，复数概念也应包括单数概念，中性应包括男性和女性以及信托、商行、公司或法人，均应视本协议上下文和含义要求而定。

**14.6**    **FURTHER ASSURANCES**. The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the parties.

进一步保证：本协议双方应立即签署和交付任何及全部附加文件、文书、通知和其他保证，并应尽一切合理努力履行本协议项下各自义务和达成双方的目的。

**14.7**    **MEMBERS' OTHER BUSINESS**. Except as provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members in the carrying on of their own respective businesses or activities.

股东的其他业务：除非本协议有规定，本协议任何规定不得解释为以任何方式限制股东开展各自的业务或活动。

**14.8**    **AGENT**. Except as provided in this Agreement, no provision of this Agreement shall be construed to establish a Member as the agent of any other Member.

代理人：除非本协议有规定，否则，本协议任何规定不得视为使一名股东成为任何其他股东的代理人。

**14.9**    **AUTHORITY TO CONTRACT**. Each Member represents and warrants to the other Members that the Member has the capacity and authority to enter into this Agreement.

签订合同的权限：各股东向其他股东陈述和保证，其拥有签订本协议的能力和权限。

**14.10**    **TITLES AND HEADINGS**. The article, section, and subsection titles and headings in this Agreement are inserted as matters of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

标题和题目：本协议中的条、节和小节标题和题目仅为方便和便于参考而使用，不得用作任何其他用途，包括解释或执行本协议或其任何规定。

**14.11**    **AMENDMENT**. This Agreement may be altered, amended, or repealed only by a Writing signed by all of the Members; provided, however, that the Manager and any other Member shall agree to any amendments of this Agreement reasonably required by the Manager in order for

the Company to comply with applicable state law or conduct the Company's Business, which do not adversely affect the economic interests of any other Member hereunder.

修订：本协议仅可通过所有股东签署的文书来加以修改、修订或撤销；但条件是，管理人和任何其他股东应同意按照管理人为使公司遵守适用州法律或经营公司业务的合理要求对本协议作出修订，这不会对本协议项下任何其他股东的经济利益产生不利影响。

**14.12  TIME IS OF THE ESSENCE**. Time is of the essence for every provision of this Agreement that specifies a time for performance.

时间重要性：时间对本协议中指定履约时间的各项规定至关重要。

**14.13  NO THIRD PARTY BENEFICIARY INTENDED**. This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Agreement.

不得有第三方受益人：本协议仅为本协议双方及各自许可继任者和受让人之利益而订立，任何其他人士或实体不得通过本协议享有或获得任何权利。

**14.14  SPECIFIC PERFORMANCE; INJUNCTIVE RELIEF**. The Members acknowledge that the Company and the Members would be damaged irreparably and would have no adequate remedy of law if any provision of this Agreement is not performed in accordance with its specific terms. Accordingly, the Company and each Member is entitled to injunctive relief to prevent or remedy breaches of this Agreement and to enforce specifically the terms and provisions hereof, without having to prove the inadequacy of any remedy that may be available at law or being required to post bond or other security.

特定履行；禁止令救济：各股东确认，如果未按照特定条款履行本协议之任何规定，公司及股东会受到无法弥补的损害，而且不会享有适当的法律救济。同样，公司和各股东有权获得禁止令救济，以防止或补救对本协议的违反，并具体执行本协议的条款和规定，而不必证明在普通法上可获得的任何救济的不适合性，也不必提供担保或其他保证。

**14.15  DISPUTE RESOLUTION**. Except as otherwise provided herein, any controversy or claim arising out of or relating to this Agreement, or to the interpretation, breach or enforcement thereof, shall be submitted to arbitration in Irvine, California, in a manner agreed upon by the parties then in interest, or in default of such agreement, in accordance with the Comprehensive Arbitration Rules and Procedures and International Arbitration Rules (or similar commercial arbitration rules) of JAMS, and the United States Arbitration Act (Title 9, U.S. Code, as amended), and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.  Such arbitration shall be held in Irvine, California.  If the matter in controversy involves an aggregate sum of less than $2,000,000, one (1) arbitrator will be selected; if greater than or equal to $2,000,000, a panel of three (3) arbitrators will be appointed.  The arbitrators shall be empowered, but not required, to award such costs and reasonable attorneys' fees as they determine.  Notwithstanding the foregoing, there shall be no arbitration with respect

57

to any appraiser's determination hereunder of the fair market value of the Company or any Membership Interests, since such determination is final and conclusive on all parties.  In the event that this arbitration provision is unenforceable or is otherwise waived by the parties, each party hereto submits to the exclusive jurisdiction in the state and federal courts having jurisdiction in Orange County, California and irrevocably waives any defenses to such venue including any defense based upon the principles of *forum non conveniens*.

争议解决。除非另有约定，任何与本协议有关的争议、诉讼，或者解释、违约、执行，都应按照届时有关的各方或者本协议的默认方式提交加州尔湾按照 JAMS 的仲裁规则和程序以及国际仲裁规则（或类似的商业仲裁规则），以及美国仲裁法案（美国法典第 9 部分，及其修订）仲裁，仲裁裁决可以提交任何有管辖权的法院。仲裁应在加利福尼亚州的尔湾进行。如果争议事项合计少于两百万美元，则应选举一位仲裁员；如果等于或多于两百万美元，则需要任命三位仲裁员。仲裁员有权，但不是必须，对于费用及合理的律师费做出裁决。尽管有前述规定，对于任何评估人员做出的公司或股东权益的公允市场价值，不应有仲裁，因该等评估对所有成员是最终的。若本仲裁条款无效或者被各方豁免，则各方同意加州橙县的联邦法院和州法院有排他的绝对管辖权，各方放弃任何对于该管辖法院的异议和抗辩，包括管辖不便利的抗辩。

**14.16  COSTS OF LITIGATION**. In any legal or arbitration proceedings, or other actions between any of the parties hereto, to enforce any of the terms or conditions of this Agreement or any other contract concerning the Company, or any other action that in any other way pertains to Company affairs or this Agreement, the prevailing party, in addition to any other damages and compensation received, will be entitled to recover that party's litigation or arbitration costs, including reasonable attorneys' fees, expenses, and costs of any appeals.

诉讼费用：在任何法律或仲裁程序，或为执行本协议任何条款或条件、或与公司有关的任何其他合同的协议双方的其他诉讼，或以任何其他方式与公司事务或本协议有关的任何其他诉讼中，胜诉方除了已获得的任何其他损害赔偿或补偿外，还有权获得该方诉讼或仲裁费用的偿付，包括合理的律师费、支出和任何申诉费用。

**14.17  LANGUAGES**. This agreement is in both languages, English and Chinese. In the event of any inconsistency, the English version is the original language and the Chinese version is a translation for information purposes only. Then in case of conflict, the English version will prevail and will therefore be the binding version for both parties.

语言。本协议由中文和英文起草。如果两种语言版本有冲突，则英文版本为原始及有效版本，对双方有约束力，中文翻译仅供参考。

*[Remainder of page left intentionally blank]*[以下空白]

*[Signatures on next page]*[下一页为签名页]

**SCHEDULE A**

**MEMBER LIST AND MEMBERSHIP INTERESTS**

| MEMBER<br>股东 | CAPITAL CONTRIBUTION<br>出资额 | PERCENTAGE INTEREST<br>股东权益比例 |
|---|---|---|
| THRIVING FUTURE LLC | $23,839,965 | 34.179% |
| ALFA IDG LLC | $20,494,709 | 28.205% |
| RUC14 PLAYA LLC | $12,900,000 | 23.036% |
| GREENWELL HHC LLC | $ 5,349,344 | 9.552% |
| ZHONGJUN ZHENG | $ 1,476,576 | 2.637% |
| LCS CONSULTING GROUP LLC | $ 790,925 | 1.412% |
| CAIYING CHANG | $ 500,000 | 0.893% |
| TA PARTNERS LLC | $ 48,481 | 0.087% |
| TOTAL:合计 | $65,400,000 | 100.000% |

IN WITNESS WHEREOF, the parties have executed or caused to be executed this UPDATED AND RESTATED OPERATING AGREEMENT of TA PARTNERS APARTMENT FUND II LLC on the day and year first above written.

为昭信守，各方已于上文首次写明的日期签署或促使签署本协议。

**MANAGER /管理人:**

**TA PARTNERS LLC**

By:_____
    Johnny Lu, Member

By:_____
    Yaojun Liu, Member

IN WITNESS WHEREOF, the parties have executed or caused to be executed this UPDATED AND RESTATED OPERATING AGREEMENT of TA PARTNERS APARTMENT FUND II LLC on the day and year first above written.

为昭信守，各方已于上文首次写明的日期签署或促使签署本协议。

**MEMBERS/股东:**

**THRIVING FUTURE LLC**

By:_____

Yaojun Liu, Member

IN WITNESS WHEREOF, the parties have executed or caused to be executed this UPDATED AND RESTATED OPERATING AGREEMENT of TA PARTNERS APARTMENT FUND II LLC on the day and year first above written.

为昭信守，各方已于上文首次写明的日期签署或促使签署本协议。

**MEMBERS/股东:**

**ALFA IDG LLC**

By:_____

Johnny Lu, Member

IN WITNESS WHEREOF, the parties have executed or caused to be executed this UPDATED AND RESTATED OPERATING AGREEMENT of TA PARTNERS APARTMENT FUND II LLC on the day and year first above written.

为昭信守，各方已于上文首次写明的日期签署或促使签署本协议。

**MEMBERS/股东:**

**RUC14 Playa LLC**

By:

Manager: Renkai Zhang

IN WITNESS WHEREOF, the parties have executed or caused to be executed this UPDATED AND RESTATED OPERATING AGREEMENT of TA PARTNERS APARTMENT FUND II LLC on the day and year first above written.

为昭信守，各方已于上文首次写明的日期签署或促使签署本协议。

**MEMBERS/股东:**

**GREENWELL HHC LLC**

By: _____

Dongwei Cai, Member

IN WITNESS WHEREOF, the parties have executed or caused to be executed this UPDATED AND RESTATED OPERATING AGREEMENT of TA PARTNERS APARTMENT FUND II LLC on the day and year first above written.

为昭信守，各方已于上文首次写明的日期签署或促使签署本协议。

**MEMBERS/股东:**

**ZHONGJUN ZHENG**

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
ZHONGJUN ZHENG

IN WITNESS WHEREOF, the parties have executed or caused to be executed this UPDATED AND RESTATED OPERATING AGREEMENT of TA PARTNERS APARTMENT FUND II LLC on the day and year first above written.

为昭信守，各方已于上文首次写明的日期签署或促使签署本协议。

MEMBERS/股东:

LCS CONSULTING GROUP LLC

By:

IN WITNESS WHEREOF, the parties have executed or caused to be executed this UPDATED AND RESTATED OPERATING AGREEMENT of TA PARTNERS APARTMENT FUND II LLC on the day and year first above written.

为昭信守，各方已于上文首次写明的日期签署或促使签署本协议。

MEMBERS/股东:

CHANGYING CAI

By:_____
        Changying Cai

扫描全能王 创建

IN WITNESS WHEREOF, the parties have executed or caused to be executed this UPDATED AND RESTATED OPERATING AGREEMENT of TA PARTNERS APARTMENT FUND II LLC on the day and year first above written.

为昭信守，各方已于上文首次写明的日期签署或促使签署本协议。

**MEMBERS/股东:**

**TA PARTNERS LLC**

By:_____
　　　Johnny Lu, Member

By:_____
　　　Yaojun Liu, Member

# EXHIBIT B

尊敬的各位 RUC 14 的校友、投资人：

我是刘耀军，TA Partner 的股东和管理人之一，人大 94 历史本，98 经济法研。首先在这里对 Playa 项目出现的状况表示衷心的歉意。在项目过程中，我们作为管理人因为历史原因就最初的项目借款没有向投资人披露，一直隐瞒下来，并且通过重新借款增加了贷款金额，最后由于疫情、加息等原因无法开工建设，土地价值下降，导致我们希望通过以更高价格出售土地或者股权（甚至是 SPAC 上市）偿还借款的计划落空，形成了目前贷款违约并有可能被借款方没收的境地。

我们项目第一笔借款于 2019 年 6 月借款（批准金额 2000 万，实际贷款 1350 万），借款人是项目公司，借款被我和 Johnny Lu 转出用于偿还之前我们个人的投资欠款。

项目到 2021 年 1 月 26 日重新贷款，期限 6 个月，贷款金额 1400 万，贷款方为保富银行，借款方变更为 TA Partners，其原因是银行无法提供土地借款，作为交通，银行对 TA 公司提供经营性贷款，FUND II 以土地作为抵押。RUC 在 3 月 26 日进行投资，投资尽调和完成时，我以"项目公司没有借款，只是土地作为补充担保"这种自欺欺人的理由说服了自己，隐瞒了土地有抵押的情况。保富银行于 2021 年 10 月份变更贷款合同，提高贷款金额到 2000 万，这样我们又获得额外资金约 550 万。这笔资金中 400 万被我们转做了对 REVO FAST LLC 的投资，用于获得 REVO FAST 95%的股权，从而间接获得了 Fintech Ecosystem Development Corp（NASDAQ 代码 FEXD）这家 SPAC 公司的股权（约 290 万股），当时是一个偶然的机会这个 SPAC 之后 sponsor 的资金方突然放弃项目，而我们当时十分膨胀，想着自己控制一家 SPAC，将我们的地产项目置入上市公司，从而有一个公开上市融资平台，但是最后我们的方案遭到上市公司董事的阻挠无法推进，从而变更为被动的股权持有人。后来我们又尝试推进 SPAC 和一家电动车初创公司（INDI EV）合作，并作为合作条件之一向这家公司提供 300 万美元借款，目前这家公司已经破产。而 SPAC 经过几次延期仍为能够合并，并且额外支付了约 500 万美元的延期费用，其中分别通过两次 50 万股出售股票，两次 20 万股出售股票，以及两次 10 万股出售股票获得融资，出售价格 2-4 美元美股，目前仍剩余 130-140 万股权益。FEXD 目前股票挂牌价格 10.8 美元，但是其实际价值肯定没有 10 美元。如果该 SPAC 能够近期完成合并，合并后的半年后股票就可以解禁，获得部分现金。

由于上述 SPAC 投资带来的压力，我们又一次通过向 Hankey 提高借款金额获得资金，饮鸩止渴，贷款金额越来越高，利率越来越高，而 SPAC 合并却一推再推；而在寻找新的投资人方面也因为加息和成本提高诸多不利市场变化而没有结果。最终我们的贪婪导致了 Hankey 贷款违约并可能被没收的不利状况。

2023 年 5 月在我们管理的两个尔湾项目出现可能违约情况时，第一顺位借款人 MACK 要求我们必须支付约两个项目新一年的 500 万美元保险费（在疫情期间，类似项目的保险费从三年 100 万增长到了一年超过 200 万），为了保持项目推进，我们向第二顺位借款人 Varde 提出了补充借款的要求，经过协商 Varde 同意借款，但要求我们将我们拥有全部权益的 Santa Ana，部分权益的 Playa 和 Mount Washington 股权抵押给 Varde，这次我们又一次犯了错误，违背了基本职业操守，在 Playa 项目文加上伪造股东签字，获得了这部分额外借款。当然，这次我们的确没有任何私利念头，甚至也将我和 Johnny Lu 全资持有的 Santa Ana 项目也提供了股权质押，以保全两个尔湾项目。

对于以上状况，目前很难解决 Playa 土地解除质押问题，一方面是土地由于利率高企价值下降，二是金额很大，贷款方选择很少，而借款方担心高层建设项目未来两三年可能都无法获得建设贷款，三是项目公司股权还存在质押，而股权质押又要受制于尔湾两个项目和银行重组的结果，不确定性

很高。

鉴于上述解除土地质押的难度和不确定性，我和 Richard 在沟通时着重建议了尽快解决尔湾重组，收回 Santa Ana 项目，着眼于补偿，而不是拯救。这个原因也导致了我们在 Richard 提出的资料准备要求方面不够积极，给投资人和校友们造成了很多误解，就此我也需要反省和道歉。

**目前就 RUC 14 补偿方案，我们建议在尔湾重组解决后，**

(1)  以 Santa Ana 项目等同的评估值净值（2080 万评估值+420 万施工图纸费用-600 万贷款金额=1900）中的相等价值进行置换作为补偿。Santa Ana 和 Playa 一样，也是完成了施工图纸设计，而且建造成本单价比 Playa 的高层建筑要低很多，因此 Santa Ana 项目交给 RUC 14 和 13 投资人后，将由 RUC 投资人 100%持有，完全可以规划寻找大型开发商合作开发，获得更高收益。另外 Santa Ana 项目贷款金额较低，我们也希望增加 100 万借款作为利息储备（包含在上述 600 万贷款金额中），一边等待时机出售或者合作开发。

(2)  以剩余的 SPAC 股权作为补偿。SPAC 股权需要更动态来看，一方面是任何延期费用都要出售股权获得融资，最终剩余股权数量也许会下降；另一方面是上市后解除锁定期时的股价是高是低我很难给出指引，但无论如何都有机会获得 500 万美元甚至更高的资金。

(3)  另外我们在 Fullerton 的 35%的股权也将作为一个储备池，作为 RUC 13 和 14 项目退出后未收回全部本金的投资人。

即使通过上述补偿投资人收回全部本金甚至还有额外回报，我们也都辜负了对大家的信任。市场原因不多解释，仅再次对项目执行中的不合规行为再次道歉，希望得到大家的谅解并能够和大家达成一个切实可行的补偿方案。

拜谢。
刘耀军

2024 年 2 月 13 日星期二

# EXHIBIT C



STATE OF NEW YORK

```
                              )
                              )
                              )
COUNTY OF NEW YORK            )        ss
```

**CERTIFICATION**

This is to certify that the attached translation is to the best of my knowledge and belief a true and accurate

translation from Chinese into English of the attached Letter to RUC Investors from Larry Liu.

Edward J. Jacob
Divergent Language Solutions, LLC

State of New York

County of New York

Subscribed to and sworn before me this 13 day of Filorwing , 2024,

by Edward J. Jacob.

Notary Public

MATTHEW C. ZELAK
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01ZE6350239
Qualified In Kings County
Commission Expires   November 7, 2024



183 Madison Avenue, Suite 416 | New York, NY 10016 | p 917.979.4513 | f 415.525.4313
600 California Street, 11th Floor | San Francisco, CA 94108 | p 415.400.4538 | f 415.525.4313
divergent@divergentls.com | www.divergentls.com

Dear RUC 14 Alumni and Investors:

My name is Liu Yaojun. I am one of the shareholders and managers of TA Partner, National People's Congress 94 Historical Records, 98 Economic Law Research. First of all, I would like to express my sincere apologies for the situation related to the Playa project. During the implementation of the project, we as project managers did not disclose the initial project loans to investors due to historical reasons. We kept it secret and increased the loan amount by carrying out additional borrowings. Ultimately, construction could not start due to the pandemic, hikes in interest rates and other reasons. The decline in land value has caused our plans to repay the borrowed funds by selling land or equity at higher prices (or even SPAC listing) to fall through. This led to the current situation where loans are in default and there is a possibility of confiscation by the borrower.

The first loan for our project was in June 2019 (approved amount of 20 million, actual loan amount of 13.5 million), and the borrower was the project company. The borrowed amount was transferred by me and Johnny Lu to repay our personal investment debts.

The project was refinanced until January 26, 2021, with the term being 6 months. The loan amount was 14 million. The lender was Preferred Bank and the borrower was changed to TA Partners. The reason was that the bank cannot provide land loans. As a workaround, the bank provided operating loans to TA Company and FUND II used land as collateral. RUC invested on March 26th. When investment due diligence was completed, I concluded and persuaded myself that "the project company had no borrowings and the land only serves as a supplementary guarantee" and concealed the fact that the land was mortgaged. Preferred Bank changed the loan contract in October 2021, and increased the loan amount to 20 million, so that we would get about 5.5 million additional funds. Four million of this fund was converted into an investment in REVO FAST LLC. It was used to acquire 95% of equity in REVO FAST, thereby indirectly acquiring the equity (approximately 2.9 million shares) of the SPAC company Fintech Ecosystem Development Corp (NASDAQ code FEXD). It was an opportunity by chance. After the IPO of this SPAC company, the sponsor's financier suddenly gave up the project. Our minds were very inflated at that time and we thought that we would control a SPAC by ourselves and put our real estate projects into listed companies, thus having a publicly listed financing platform. But in the end, our plan was blocked by the directors of the listed company and we could not move forward, thereby changing to a passive equity holder. Later, we tried to promote SPAC cooperation with an electric vehicle startup company (INDI EV). As one of the conditions of cooperation, a loan of US$3 million was provided to this company, which is currently bankrupt. However, SPAC was still able to merge after several extensions. An additional extension fee of approximately US$5 million was paid, financed by two sales of 500,000 shares, two sales of 200,000 shares, and two sales of 100,000 shares, with sales prices of US$2-4. There are still 1.3-1.4 million shares of equity remaining. FEXD's current stock price is $10.8, but its actual value is not $10 for sure. If the SPAC can complete the merger in the near future, the shares can be unlocked half a year after the merger to partially obtain cash.

Due to the pressure brought by the above-mentioned SPAC investment, we once again obtained funds by raising the loan amount from Hankey as a way of solving the problem at hand. Loan amounts were getting higher and higher and interest rates were getting higher and higher, while SPAC mergers were being pushed back time and time again. Furthermore, the search for new investors has been in vain due to interest rate hikes and higher costs and various adverse market changes. Ultimately our greed led to the unfavorable situation of Hankey's loan defaulting and a possible forfeiture.

In May 2023, when two Irvine projects under our management experienced possible defaults, MACK, the first borrower, required us to pay insurance premiums of approximately US$5 million for two projects in the new year (during the pandemic, insurance premiums for similar projects increased from US$1 million in three years to more than US$2 million in one year). In order to keep the project moving forward, we made a request for additional borrowing from Varde (ranked second). After negotiation, Varde agreed to the loan, but they required us to surrender to Varde 100% interest in Santa Ana as well as part of our interest in Playa and Mount Washington. This time we made another mistake and violated basic professional ethics. This additional loan was obtained by adding forged shareholder signatures to the Playa project document. Certainly, this time we were not only thinking about ourselves. Even the Santa Ana project, which Johnny Lu and I wholly own, also provided equity pledges to preserve the two Irvine projects.

For the above situation, it is currently difficult to solve the problem of releasing the mortgage of Playa land. On the one hand, the value of land has declined due to high interest rates. Second, the amount is very large. There are few lenders to choose from, and borrowers are worried that they may not be able to obtain construction loans for high-rise construction projects in the next two to three years. Third, the equity of the project company is still pledged. The equity pledge will be subject to the results of the two projects in Irvine and the bank restructuring and there is a high



CamScanner Chuangjian

level of uncertainty.

In view of the above-mentioned difficulty and uncertainty in releasing land pledge, during our communication with Richard, we suggested resolving the Irvine restructuring as soon as possible and taking back the Santa Ana project, focusing on compensation, rather than salvation. This reason also resulted in us not being active enough in the data preparation requirements proposed by Richard and it caused a lot of misunderstandings among investors and alumni. Self-reflection is needed and I would like to apologize.

Regarding the RUC 14 compensation plan, we recommend that after the Irvine restructuring is resolved:

(1) Compensation to be the equivalent net appraised value of the Santa Ana project (20.8 million appraised value + 4.2 million construction drawings fee - 6 million loan amount = 1,900). Santa Ana, like Playa, also completed the construction drawings design. Moreover, the unit price of construction is much lower than that of high-rise buildings in Playa. Therefore, after the Santa Ana project is handed over to RUC 14 and 13 investors, it will be 100% held by RUC investors. It is entirely possible to plan and find large-scale developers to cooperate in development and get higher returns. In addition, the loan amount of the Santa Ana project is relatively low. We also hope to increase the loan amount by 1 million as interest reserves (included in the above 6 million loan amount) while waiting for the opportunity to sell or cooperate in development.

(2) Use remaining SPAC equity as compensation. SPAC equity needs to be viewed more actively. On the one hand, any extension costs must be paid, and the equity must be sold to obtain financing and the final amount of remaining equity may decline. On the other hand, it is difficult for me to give guidance on whether the stock price will be high or low when the lock-up period is released after listing. But no matter what, $5 million or more is a possibility.

(3) In addition, our 35% equity in Fullerton will also serve as a reserve pool for investors who have not recovered all their principal amount after the exit of the RUC13 and 14 projects. Even if the investors recover all their principal through the above compensation, there will even be additional returns and we would not want to betray the trust placed in everyone.

We will not further explain the various market factors, but once again, we would like to offer our apology for the non-compliance during project execution. I hope you can understand and work with us to agree on a practical compensation plan.

Thank you.
Liu Yaojun

[signature: Liu Yaojun]

Tuesday, February 13, 2024

 CamScanner Chuangjian

尊敬的各位 RUC 14 的校友、投资人：

我是刘耀军，TA Partner 的股东和管理人之一，人大 94 历史本，98 经济法研。首先在这里对 Playa 项目出现的状况表示衷心的歉意。在项目过程中，我们作为管理人因为历史原因就最初的项目借款没有向投资人披露，一直隐瞒下来，并且通过重新借款增加了贷款金额，最后由于疫情、加息等原因无法开工建设，土地价值下降，导致我们希望通过以更高价格出售土地或者股权（甚至是 SPAC 上市）偿还借款的计划落空，形成了目前贷款违约并有可能被借款方没收的境地。

我们项目第一笔借款于 2019 年 6 月借款（批准金额 2000 万，实际贷款 1350 万），借款人是项目公司，借款被我和 Johnny Lu 转出用于偿还之前我们个人的投资欠款。

项目到 2021 年 1 月 26 日重新贷款，期限 6 个月，贷款金额 1400 万，贷款方为保富银行，借款方变更为 TA Partners，其原因是银行无法提供土地借款，作为变通，银行对 TA 公司提供经营性贷款，FUND II 以土地作为抵押。RUC 在 3 月 26 日进行投资，投资尽调和完成时，我以"项目公司没有借款，只是土地作为补充担保"这种自欺欺人的理由说服了自己，隐瞒了土地有抵押的情况。保富银行于 2021 年 10 月份变更贷款合同，提高贷款金额到 2000 万，这样我们又获得额外资金约 550 万。这笔资金中 400 万被我们转做了对 REVO FAST LLC 的投资，用于获得 REVO FAST 95%的股权，从而间接获得了 Fintech Ecosystem Development Corp （NASDAQ 代码 FEXD）这家 SPAC 公司的股权（约 290 万股），当时是一个偶然的机会这个 SPAC 公司在 IPO 之后 sponsor 的资金方突然放弃项目，而我们当时十分膨胀，想着自己控制一家 SPAC，将我们的地产项目置入上市公司，从而有一个公开上市融资平台，但是最后我们的方案遭到上市公司董事的阻挠无法推进，从而变更为被动的股权持有人。后来我们又尝试推进 SPAC 和一家电动车初创公司（INDI EV）合作，并作为合作条件之一向这家公司提供 300 万美元借款，目前这家公司已经破产。而 SPAC 经过几次延期仍为能够合并，并且额外支付了约 500 万美元的延期费用，其中分别通过两次 50 万股出售股票，两次 20 万股出售股票，以及两次 10 万股出售股票获得融资，出售价格 2-4 美元美股，目前仍剩余 130-140 万股权益。FEXD 目前股票挂牌价格 10.8 美元，但是其实际价值肯定没有 10 美元。如果该 SPAC 能够近期完成合并，合并后的半年后股票就可以解禁，获得部分现金。

由于上述 SPAC 投资带来的压力，我们又一次通过向 Hankey 提高借款金额获得资金，饮鸩止渴，贷款金额越来越高，利率越来越高，而 SPAC 合并却一推再推；而在寻求新的投资人方面也因为加息和成本提高诸多不利市场变化而没有结果。最终我们的贪婪导致了 Hankey 贷款违约并可能被没收的不利状况。

2023 年 5 月在我们管理的两个尔湾项目出现可能违约情况时，第一顺位借款人 MACK 要求我们必须支付约两个项目新一年的 500 万美元保险费（在疫情期间，类似项目的保险费从三年 100 万增长到了一年超过 200 万），为了保持项目推进，我们向第二顺位借款人 Varde 提出了补充借款的要求，经过协商 Varde 同意借款，但要求我们将我们拥有全部权益的 Santa Ana，部分权益的 Playa 和 Mount Washington 股权抵押给 Varde，这次我们又一次犯了错误，违背了基本职业操守，在 Playa 项目文加上伪造股东签字，获得了这部分额外借款。当然，这次我们的确没有任何私利念头，甚至也将我和 Johnny Lu 全资持有的 Santa Ana 项目也提供了股权质押，以保全两个尔湾项目。

对于以上状况，目前很难解决 Playa 土地解除质押问题，一方面是土地由于利率高企价值有下降，二是金额很大，贷款方选很少，而借款方担心高层建设项目未来两三年可能都无法获得建设贷款，三是项目公司股权还存在质押，而股权质押又受制于尔湾两个项目和银行重组的结果，不确定性



很高。

鉴于上述解除土地质押的难度和不确定性，我和 Richard 在沟通时着重建议了尽快解决尔湾重组，收回 Santa Ana 项目，着眼于补偿，而不是拯救。这个原因也导致了我们在 Richard 提出的资料准备要求方面不够积极，给投资人和校友们造成了很多误解，就此我也需要反省和道歉。

目前就 RUC 14 补偿方案，我们建议在尔湾重组解决后，

(1)  以 Santa Ana 项目等同的评估值净值（2080 万评估值+420 万施工图纸费用-600 万贷款金额=1900）中的相等价值进行置换作为补偿。Santa Ana 和 Playa 一样，也是完成了施工图纸设计，而且建造成本单价比 Playa 的高层建筑要低很多，因此 Santa Ana 项目交给 RUC 14 和 13 投资人后，将由 RUC 投资人 100%持有，完全可以规划寻找大型开发商合作开发，获得更高收益。另外 Santa Ana 项目贷款金额较低，我们也希望增加 100 万借款作为利息储备（包含在上述 600 万贷款金额中），一边等待时机出售或者合作开发。

(2)  以剩余的 SPAC 股权作为补偿。SPAC 股权需要更动态来看，一方面是任何延期费用都要出售股权获得融资，最终剩余股权数量也许会下降；另一方面是上市后解除锁定期时的股价是高是低我很难给出指引，但无论如何都有机会获得 500 万美元甚至更高的资金。

(3)  另外我们在 Fullerton 的 35%的股权也将作为一个储备池，作为 RUC 13 和 14 项目退出后未收回全部本金的投资人。

即使通过上述补偿投资人收回全部本金甚至还有额外回报，我们也都辜负了对大家的信任。市场原因不多解释，仅再次对项目执行中的不合规行为再次道歉，希望得到大家的谅解并能够和大家达成一个切实可行的补偿方案。

拜谢。

刘耀军

2024 年 2 月 13 日星期二

# EXHIBIT D

## JOINT ACTION BY WRITTEN CONSENT

## OF THE MANAGER AND MEMBERS OF

## TA PARTNERS APARTMENT FUND II LLC,
### a California limited liability company

### April ___, 2023

In accordance with the California Revised Uniform Limited Liability Company Act (the "**Act**") and the applicable provisions of the Updated and Restated Operating Agreement of TA PARTNERS APARTMENT FUND II LLC, a California limited liability company (the "**Company**"), dated as of March 28, 2021 (as amended, the "**Operating Agreement**"), the undersigned manager of the Company ("**Manager**") and the undersigned members ("**Members**"), holding not less than the minimum number of votes necessary to authorize or take actions at a meeting in accordance with the Act and the Operating Agreement, hereby adopt the following recitals and resolutions by written consent (this "**Consent**"). Capitalized terms used but not otherwise defined in this Consent have the meanings ascribed to them in the Operating Agreement.

### *Approval of Transactions*

A.    The Members desire to consent to, to the extent such consent may be required under the Operating Agreement, the Manager causing the Company to enter into and consummate, certain transactions pursuant to which an affiliate of Värde Partners, Inc. ("**Värde**") will make a preferred equity investment in the Company in the amount of up to $_____ ("**Investment**").

B.    In connection with the Investment, the Company desires to consent to, to the extent such consent may be required under the Operating Agreement, the Manager causing the Company to create and adopt a preferred class of Membership Interest designated as the Preferred Membership Interest to be issued to Värde, the rights and preferences of which shall be within the discretion of the Manager and may include, without limitation, the terms set forth in Schedule A attached hereto (collectively, the "**Investment Terms**").

C.    The Members desire to consent to, to the extent such consent may be required under the Operating Agreement, the Manager, Thriving Future LLC and Alfa IDG LLC (collectively, the "**TA Members**"), at their option, pledging their respective rights in and to the Company in order to further secure the Investment (the "**Investment Pledge**"), on such terms as the Manager and the TA Members shall elect in their sole discretion.

D.    The Members desire to consent to, to the extent such consent may be required under the Operating Agreement, the Manager and the TA Members pledging (the "**Loan Pledge**") their respective interests in the Company to secure any loan made by Värde to the TA Members and/or

any affiliate of the TA Members or any guaranty thereof (collectively, "**TA Obligations**"), on such terms as the Manager and the TA Partners shall elect in their sole discretion.

E.    The Members desire to consent to, to the extent such consent may be required under the Operating Agreement, the Manager causing the Company, to (i) guaranty any TA Obligation, and/or (ii) mortgage or otherwise encumber the Property or any direct or indirect interest therein to secure such guaranty or to secure the TA Obligation itself (any such guaranty, mortgage and related documents, collectively or individually as the context may require, "**Property Security Documents**").

**NOW, THEREFORE, BE IT RESOLVED**, the Manager shall be authorized to create a preferred class of Membership Interests designated as the Preferred Membership Interest with such preferences and relative, participating, optional or other special rights, powers or duties, and to otherwise implement the Investment Terms, as shall be fixed by the Manager in the exercise of its sole discretion and reflected in documentation (including, without limitation, amendments to the Operating Agreement) approved by the Manager (collectively, the "**Investment Documents**");

**RESOLVED FURTHER**, that the Manager shall have the right to amend the Operating Agreement to facilitate the Investment, an Investment Pledge, a Loan Pledge and/or any Property Security Document on such terms as the Manager shall elect in its sole discretion (including, without limitation, the Investment Terms), and no such amendment shall require execution by a Member, and that any such amendment is hereby adopted, authorized and approved;

**RESOLVED FURTHER**, that the Investment and the Investment Documents are hereby adopted, authorized and approved;

**RESOLVED FURTHER**, any Investment Pledge, any Loan Pledge, any Property Security Document and any documentation entered into in connection therewith (collectively, "**Security Documents**") are hereby authorized and approved;

**RESOLVED FURTHER**, that the forms, terms and provisions of the Investment Documents and the Security Documents, and the performance thereunder and the transaction contemplated thereby, are each hereby adopted, authorized, and approved;

**RESOLVED FURTHER**, that any right of first refusal or similar option or right that the Company or the Members might have in connection with the creation, grant, transfer, encumbrance or conveyance of the Preferred Member Interest, any Investment Pledge or Loan Pledge or any transfer of any interests in the Company pursuant to the foreclosure of such pledge or assignment in lieu thereof is hereby waived;

**RESOLVED FURTHER**, that upon any foreclosure of any Investment Pledge or Loan Pledge or assignment in lieu thereof, the transferee pursuant thereto shall be admitted as a member and the Manager of the Company and shall succeed to all

2

ownership and management rights of the TA Members under the Operating Agreement;

**RESOLVED FURTHER**, that Johnny Lu (the "**Authorized Person**") be, and hereby is, authorized and directed, in the name and on behalf of the Manager of the Company, to execute and deliver the Investment Documents and the Security Documents and any other documents necessary, appropriate or desirable in connection with the Investment and/or any Security Document to such parties and with such changes as the Authorized Person may approve, the execution and delivery of which to be conclusive evidence that the same has been authorized and approved by these resolutions;

**RESOLVED FURTHER**, that the Authorized Person be, and hereby is, authorized and directed, in the name and on behalf of the Company, to take such further actions and to execute such further documents, instruments and certificates, as the Authorized Person deems necessary, appropriate or desirable, for the purpose of effectuating the intent of the Investment Documents and the Security Documents or any other action authorized by these resolutions, and the taking of such actions and the execution of any such documents or instruments by the Authorized Person in furtherance hereof shall constitute conclusive evidence of the necessity, appropriateness and desirability thereof, and the same hereby are ratified, approved, confirmed, and adopted in all respects;

**RESOLVED FURTHER**, that any person dealing with the Authorized Person in connection with any of the foregoing matters shall be conclusively entitled to rely upon the authority of the Authorized Person and its execution of any Investment Document, Security Document or other instrument, and the same shall be a valid and binding obligation of the Company, enforceable in accordance with its terms;

**RESOLVED FURTHER**, that any action authorized by any of the foregoing resolutions which has been taken by the Authorized Person prior to the date hereof be, and the same hereby is, ratified and confirmed in all respects;

**RESOLVED FURTHER**, that in the event of any conflict or inconsistency between the terms of this Consent and the terms of the Operating Agreement, the terms of this Consent shall govern and control.

**RESOLVED FURTHER**, that these resolutions may be executed in any number of counterparts, including electronically transmitted counterparts, and each such counterpart shall be deemed an original, and all of which, when taken together, shall constitute but one and the same instrument; and

**RESOLVED FURTHER**, that any third party dealing with the Company in connection with the Investment Documents or the Security Documents or any other action authorized by these resolutions shall be entitled to rely on the copy or facsimile of this action by written consent rather than the original hereof.

USActive 59117604

IN WITNESS WHEREOF, the undersigned has duly executed this Consent effective as of the date first written above.

**MANAGER**:

TA PARTNERS LLC,
a California limited liability company

By: _____
    Johnny Lu
    Authorized Signer

**MEMBERS**:

TA PARTNERS LLC,
a California limited liability company

By: _____
    Johnny Lu
    Authorized Signer

ALFA IDG LLC,
a California limited liability company

By: _____
    Johnny Lu
    Authorized Signer

3

THRIVING FUTURE LLC,
a California limited liability company

By: _____
       Yaojun Liu
       Authorized Signer

3

RUC14 PLAYA LLC
a California limited liability company

By: _____

    Renkai Zhang
    Manager

3

LCS CONSULTING GROUP LLC
a California limited liability company

By: _Hsing Wen Ho_
     Hsing-Wen Ho
     Authorized Signer

GREENWELL HHC LLC
a California limited liability company

By: _____

     Dongwei Cai
     Member

3

Zhongjun Zheng

3

Changying Cai

## SCHEDULE A

### PRINCIPAL INVESTMENT TERMS

Amount:  up to $_____

Interest:  20% per annum, which shall compound monthly and be due and payable on the Mandatory Redemption Date or upon any earlier redemption.

Mandatory Redemption Date:  The earlier of (i) the date that is six (6) months after the date the Investment is made, (ii) the date that the existing mortgage loan secured by the Property is refinanced, (iii) the date that a default occurs under any TA Obligation, any Investment Document or any Security Document and (iv) the date that a default occurs under the mortgage loan secured by the Property held by Preferred Bank or any other financing secured by any portion of the Property or any direct or indirect interest therein.

Payment Priority:  All distributions (whether of cash flow or capital proceeds) shall be made exclusively to the preferred member until the full redemption amount and any other amounts payable to the preferred member have been paid in full.

Use of Funds:  All amounts contributed by the preferred member shall be contemporaneously distributed to the TA Members.

Preferred Members:  In the event that all amounts due and owing to the preferred member are not paid timely, or there shall be any default in any other obligations to the preferred member, then the preferred member's rights and remedies shall include the right to take over control and management of the Company and to sell the Property for such price and on such other terms as the preferred member may elect in its sole discretion.

# EXHIBIT E

## JUNIOR MEZZANINE LOAN PLEDGE AND SECURITY AGREEMENT
## (PLAYA)

        **THIS JUNIOR MEZZANINE LOAN PLEDGE AND SECURITY AGREEMENT (PLAYA)** (this "**Pledge Agreement**"), is made as of April [__], 2023, by **THRIVING FUTURE LLC** ("**Thriving Future**"), **ALFA IDG LLC** ("**ALFA**"), **RUC14 PLAYA LLC** ("**RUC14**"), **GREENWELL HHC LLC** ("**Greenwell**"), **ZHONGJUN ZHENG** ("**Zheng**"), **LCS CONSULTING GROUP LLC** ("**LCS**"), **CAIYING CHANG** ("**Chang**" and together with Zheng, the "**Individual Pledgors**") and **TA PARTNERS LLC** ("**TA Partners**" and together with Thriving Future, ALFA, RUC14, Greenwell, LCS and the Individual Pledgors, individually and/or collectively, as the context may require, "**Pledgor**"), for the benefit of **VP IRVINE LENDER LLC**, a Delaware limited liability company, as lender (together with its successors and assigns, "**Lender**"), having an address c/o Värde Partners, Inc., 901 Marquette Ave S., Suite 3300, Minneapolis, Minnesota 55402.

### RECITALS

        A.     Each Pledgor is a member of **TA PARTNERS APARTMENT FUND II LLC**, a California limited liability company, having its principal place of business at 16800 Aston Street, Suite 275, Irvine, California 92606 ("**Fund II**").

        B.     Pursuant to the terms of that certain Junior Mezzanine Loan Agreement, dated as of February 15, 2022 (as amended, modified, supplemented, restated or replaced from time to time, the "**Loan Agreement**"), by and among Lender, 18831 Von Karman Milani LLC, a Delaware limited liability company ("**Milani Borrower**") and 17422 Derian Pistoia LLC, a Delaware limited liability company ("**Pistoia Borrower**"; and together with Milani Borrower, individually and collectively, as the context may require, "**Borrower**"), Borrower has become indebted to Lender with respect to a mezzanine loan in the original principal amount of FORTY-FIVE MILLION AND NO/100 DOLLARS ($45,000,000.00) (the "**Loan**"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

        C.     Pursuant to the terms of that certain Protective Advance and Reservation of Rights Agreement, dated as of the date hereof (the "**Protective Advance Agreement**"), Borrower has requested, among other things, that Lender make certain Required Payments and other Protective Advances (each as defined in the Protective Advance Agreement).

        D.     Pledgor and Fund II are Affiliates of Borrower and will indirectly benefit from Lender's entering into the Protective Advance Agreement with Borrower.

        E.     As a condition precedent to entering into the Protective Advance Agreement, Lender requires that Pledgor execute and deliver this Pledge Agreement to Lender. Pledgor acknowledges that it has and will receive material benefits from Lender's entering into the Protective Advance Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce Lender to enter into the Protective Advance Agreement, Pledgor agrees as follows:

  **1.** **Defined Terms**.  In addition to the definitions set forth in the foregoing Recitals, all of which are hereby incorporated into the substantive provisions of this Pledge Agreement, unless otherwise provided herein, all capitalized terms used but not defined in this Pledge Agreement shall have the respective meanings ascribed thereto in the Loan Agreement (as may be amended by the Protective Advance Agreement).  As used herein, the following terms shall have the following meanings:

    (a) "**Article 8 Matter**" shall have the meaning ascribed thereto in Section 4(h) hereof.

    (b) "**Borrower Obligations**" shall mean the due payment, performance and observance by Borrower of all of its obligations from time to time existing under the Loan Documents, including, without limitation, the Protective Advance Agreement.

    (c) "**Charter Documents**" means the agreements and instruments listed on Exhibit A hereto, as each of the same may hereafter be amended, restated, replaced, supplemented or otherwise modified from time to time.

    (d) "**Collateral**" shall have the meaning ascribed thereto in Section 2 hereof.

    (e) "**Membership Interests**" shall mean, collectively, one hundred percent (100%) of the limited liability company interests in Fund II held by Pledgor (as the equity members of Fund II).

    (f) "**Pledged Interests**" shall have the meaning ascribed thereto in Section 2 hereof.

    (g) "**Uniform Commercial Code**" means the Uniform Commercial Code as in effect from time to time in the State of New York except for matters which the Uniform Commercial Code of the State of New York provides shall be governed by the Uniform Commercial Code in effect in any state, in which case "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect from time to time in such other state.

  **2.** **Pledge and Delivery of Collateral**.

    (a) The Pledge.  As collateral security for the prompt payment and performance by Borrower of the Borrower Obligations, Pledgor hereby pledges and grants to Lender a security interest in all of Pledgor's right, title and interest in and to the following property, whether now owned by Pledgor or hereafter acquired and whether now existing or hereafter coming into existence (all being collectively referred to herein as "**Collateral**"):

      (i) the Membership Interests, and all options, warrants and other rights hereafter acquired by Pledgor in respect of the Membership Interests (whether in

connection with any capital increase, recapitalization, reclassification or reorganization of Fund II or otherwise) (all such Membership Interests, and all such options, warrants and other rights being hereinafter collectively referred to as the "**Pledged Interests**");

        (ii)      all certificates, instruments, or other writings representing or evidencing the Pledged Interests, and all accounts and general intangibles arising out of, or in connection with, the Pledged Interests;

        (iii)     any and all moneys or property due and to become due to Pledgor now or in the future in respect of the Pledged Interests, or to which Pledgor may now or in the future be entitled to in its capacity as a member of Fund II, whether by way of a dividend, distribution, return of capital, or otherwise;

        (iv)     all other claims which Pledgor now has or may in the future acquire in its capacity as a member of Fund II against Fund II and its property;

        (v)      all right, title and interest of Pledgor under the Charter Documents, including, without limitation, (i) all rights of Pledgor to receive moneys or distributions with respect to the Pledged Interests due and to become due under or pursuant to any Charter Document, (ii) all rights of Pledgor to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the Pledged Interests, (iii) all claims of Pledgor for damages arising out of or for breach of or default under any Charter Document, (iv) any right of Pledgor to perform under each Charter Document and to compel performance and otherwise exercise all rights and remedies thereunder, and (v) all of its right, title and interest as a member to participate in the operation or management of Fund II and all of Pledgor's ownership interests under each Charter Document; all voting and consent rights of Pledgor arising thereunder or otherwise in connection with Pledgor's ownership of the Pledged Interests, and (vi) all proceeds of any of the foregoing property of the Pledgor, including without limitation, any proceeds of insurance thereon, all "securities," "accounts," "general intangibles," "instruments" and "investment property," in each case as defined in the Uniform Commercial Code, constituting or relating to the foregoing; and

        (vi)     to the extent not otherwise included in clauses (i) through (v), all proceeds of and to any of the property of Pledgor described in clauses (i) through (v) above and, to the extent related to any property described in said clauses or such proceeds, all books, correspondence, credit files, records, invoices and other papers of Pledgor.

        (b)     <u>Acknowledgment of Pledge</u>.  Upon the execution and delivery of this Agreement, Pledgor shall cause Fund II to execute and deliver to Lender a letter in the form attached hereto as <u>Exhibit B</u>.  Pledgor hereby represents that (a) it consents to Fund II's execution and delivery to Lender of a letter in the form attached hereto as <u>Exhibit B</u> and (b) Fund II's representations in such letter are true and complete.  Pledgor shall cause Fund II to comply with Fund II's covenants and warranties in such letter, and Pledgor shall, and shall cause Fund II to, comply with the requirements in the Loan Documents applicable to Pledgor and Fund II, as applicable.

(c)    <u>Obligations Unconditional</u>.    The obligations of Pledgor hereunder are absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of the Loan Agreement, the Note or any other Loan Documents, or any substitution, release or exchange of any guarantee of or security for any of the Borrower Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or Pledgor (other than the defense or claim of actual payment or performance), it being the intent of this <u>Section 2(c)</u> that the obligations of Pledgor hereunder shall be absolute and unconditional under any and all circumstances.  Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not affect the liability of Pledgor hereunder:

(i)    at any time or from time to time, without notice to Pledgor, the time for any performance of or compliance with any of the Borrower Obligations shall be extended, or such performance or compliance shall be waived;

(ii)    any of the acts mentioned in any of the provisions of the Loan Agreement, the Note, or any other Loan Documents shall be done or omitted (except with respect to the payment in full of the Debt);

(iii)    the maturity of any of the Borrower Obligations shall be accelerated, or any of the Borrower Obligations shall be modified, supplemented or amended in any respect, or any right under the Loan Agreement, the Note, or any other Loan Documents, or any other agreement or instrument referred to herein or therein shall be waived or any other guarantee of any of the Borrower Obligations or any security or collateral therefor shall be terminated, released or exchanged in whole or in part or otherwise dealt with (provided that any such acceleration of the Borrower Obligations or any such modification, amendment, waiver, termination, release or exchange is effected in accordance with the Loan Documents); or

(iv)    any lien or security interest granted to, or in favor of Lender as security for any of the Borrower Obligations shall fail to be perfected or shall be released (other than in connection with the payment in full of the Debt).

(d)    <u>Financing Statements</u>.    So long as the Borrower Obligations remain outstanding, Pledgor hereby authorizes Lender to file at any time one or more UCC financing statements covering the Collateral and Uniform Commercial Code (the "**UCC**") assignment financing statements assigning the UCC financing statements which constitute part of the Collateral required to perfect or continue the perfection of the Collateral, each in the office of the Secretary of State of the State of California.  At Borrower's expense, Lender shall file a UCC-3 termination of such UCC financing statement upon payment in full of the Borrower Obligations.

**3.    Reinstatement**.  The obligations of Pledgor under this Pledge Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of Borrower in respect of the Borrower Obligations is rescinded or must be otherwise restored by any holder of any of the Borrower Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise and Pledgor agrees that it will indemnify Lender within ten (10) Business Days following written demand for all reasonable out-of-pocket costs and

expenses (including, without limitation, reasonable fees of counsel) actually incurred by Lender in connection with such rescission or restoration.

        **4.**      **Representations, Warranties of Pledgor**. Pledgor represents and warrants as of the date hereof that:

        (a)      Existence; Capacity. Other than the Individual Pledgors, Pledgor: (i) is a limited liability company duly organized and validly existing under the laws of the state of its formation; (ii) has all requisite power, and has all governmental licenses, authorizations, consents and approvals required to own its assets and carry on its business as now being or as proposed to be conducted; and (iii) is qualified to do business in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary under applicable law.

        (b)      Litigation. There are no legal or arbitral proceedings or any proceedings by or before any Governmental Authority or agency, now pending or (to the actual knowledge of Pledgor) threatened in writing against Pledgor, the Collateral and/or Fund II which would reasonably be expected to materially adversely affect the condition (financial or otherwise) or business of Pledgor and/or Fund II or the condition or ownership of the Collateral.

        (c)      No Breach. None of the execution and delivery of this Pledge Agreement or the other Loan Documents to which Pledgor is a party, the consummation of the transactions herein or therein contemplated and compliance with the terms and provisions hereof or thereof will conflict with or result in a breach of, or require any consent (except such consents as have been obtained) under the organizational documents of Pledgor or Fund II, or any applicable law or regulation, or any order, writ, injunction or decree of any court or Governmental Authority having jurisdiction over Pledgor or any of Pledgor's assets, or any agreement or instrument to which Pledgor is a party or by which it is bound or to which it is subject, or constitute a default under any such agreement or instrument, or (except for the security interest granted pursuant to this Pledge Agreement) result in the creation or imposition of any lien upon any assets of Pledgor.

        (d)      Necessary Action. Pledgor has all requisite power and authority to execute, deliver and perform its obligations under this Pledge Agreement; the execution, delivery and performance by Pledgor of this Pledge Agreement has been duly authorized by all necessary action, as applicable; and this Pledge Agreement has been duly and validly executed and delivered by Pledgor and constitutes its legal, valid and binding obligation, enforceable against Pledgor in accordance with its terms, subject to Creditors' Rights Laws in general and to general principles of equity.

        (e)      Approvals. No authorizations, approvals and consents of, and no filings and registrations with, any Governmental Authority (except as have been obtained) are necessary for (i) the execution, delivery or performance by Pledgor of this Pledge Agreement or for the validity or enforceability thereof, (ii) the grant by Pledgor of the assignments and security interests granted hereby, or the pledge by Pledgor of the Collateral pursuant hereto, (iii) the perfection or maintenance of the pledge, assignment and security interest created hereby except for the filing of financing statements under the Uniform Commercial Code or (iv) the exercise by Lender of the rights and remedies in respect of the Collateral pursuant to this Pledge Agreement.

(f)     Ownership.  Pledgor owns one hundred percent (100%) of the outstanding limited liability company interests in Fund II, and pursuant to this Pledge Agreement, Lender has received a pledge of one hundred percent (100%) of the outstanding limited liability company interests in Fund II.  Pledgor has good and indefeasible title to the Collateral, free and clear of all pledges, liens, mortgages, hypothecations, security interests, charges, options or other encumbrances whatsoever, except the security interest created by this Pledge Agreement.  The Pledged Interests are not and will not be subject to any contractual restriction upon the transfer thereof (except for any such restrictions contained herein).  The organizational chart attached as Schedule I to this Pledge Agreement is true, correct and complete, and accurately reflect the ownership interest of Pledgor in Fund II, as of the date hereof.

(g)     Valid Security Interest.  This Pledge Agreement creates a valid security interest in the Collateral, securing the performance of the Borrower Obligations, and upon the filing in the appropriate filing offices of the financing statements to be filed in accordance with this Pledge Agreement, such security interests will be perfected, first priority security interests, and to Pledgor's knowledge, all filings and other actions necessary to perfect such security interests will have been duly taken.

(h)     Article 8 Opt Out.  Pledgor represents and warrants that none of the Collateral (or any portion thereof or direct interest therein) is represented by any certificates.  Pledgor acknowledges and agrees that Pledgor shall not, nor shall Pledgor cause or permit Fund II to, during the term of this Pledge Agreement (i) take or make any action, decision, determination or election that would constitute an Article 8 Matter, or (ii) create or issue any certificates representing the Pledged Interests or any portion thereof or direct interest therein, in each case, without Lender's prior written consent, such consent to be granted or withheld in the sole and absolute discretion of Lender.  As used herein, **"Article 8 Matter"** shall mean any action, decision, determination or election by Fund II or Pledgor that the Pledged Interests or any portion thereof or direct interest therein constitute a "security" within the meaning of, and governed by, Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of New York and the State of California.

5.     **Covenants of Pledgor**.  Pledgor covenants that:

(a)     Delivery and Other Perfection.  (i) Pledgor hereby represents and warrants that (A) the Pledged Interests are not securities governed by Article 8 of the Uniform Commercial Code as in effect in the State of California and New York on the date hereof and (B) Section 9.1 of the LLC Agreement (as defined on Exhibit A) is in full force and effect.

(ii)     Pledgor hereby covenants and agrees that (A) it will not agree to any amendment or repeal of Section 9.1 of the LLC Agreement, and (B) in any event it shall promptly notify Lender in writing if for any reason the Pledged Interests shall constitute securities for purposes of the Uniform Commercial Code in any applicable jurisdiction.

(iii)     If, notwithstanding the terms and conditions of Section 4(h) of this Pledge Agreement, at any time after the date hereof any Collateral shall be evidenced by an instrument or a certificate, then Pledgor shall or shall cause Fund II to promptly deliver any such instrument or certificate, duly endorsed or subscribed by Pledgor or accompanied by appropriate instruments of

transfer or assignment duly executed in blank by Pledgor, to Lender as additional Collateral and pending such delivery to Lender, any such instruments or certificates received by Pledgor shall be held by Pledgor in trust, as agent for Lender.

        (b)    No Transfer. Except as otherwise permitted under the Loan Documents and without limiting the provisions of Section 5(a) hereof, Pledgor will not sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to, the Collateral, nor will it create, incur or permit to exist any pledge, lien, mortgage, hypothecation, security interest, charge, option or any other encumbrance with respect to any Collateral, or any interest therein, or any proceeds thereof, except for the security interest provided for by this Pledge Agreement.

        (c)    No Waiver, Amendment, Etc. Without limiting any other restrictions set forth in this Pledge Agreement, Pledgor shall not directly or indirectly, without the prior written consent of Lender (which consent shall not be unreasonably withheld, conditioned or delayed), attempt to waive, alter, amend, modify, supplement any provision of the Charter Documents in any manner that would reasonably be expected to result in a Material Adverse Change on the Collateral (or in any manner that is otherwise prohibited under the Loan Documents or, so long as the Borrower Obligations are outstanding, the Charter Documents). Pledgor agrees that all rights to do any and all of the foregoing have been collaterally assigned to Lender, but Pledgor agrees that, upon request from Lender from time to time pursuant to and in accordance with this Pledge Agreement and the Loan Documents, Pledgor shall do any of the foregoing or shall join Lender in doing so or shall confirm the right of Lender to do so and shall execute such instruments and undertake such actions as Lender may reasonably request in connection therewith.

        (d)    Settlement and Release. Subject to the terms of the Loan Agreement, Pledgor shall not make any election, compromise, adjustment or settlement in respect of any of the Collateral without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed (provided that an Event of Default has not occurred and is continuing).

        (e)    Preservation of Collateral. Lender may, in its good faith and reasonable discretion, for the account and expense of Pledgor pay any amount or do any act required of Pledgor hereunder that Pledgor has failed to timely perform in accordance with the terms and conditions of the Loan Documents or necessary or reasonably requested by Lender to preserve, protect, maintain or enforce the Borrower Obligations, the Collateral or the security interests granted herein, provided Pledgor has failed to pay such amount or take such action within ten (10) Business Days after written demand by Lender. Any such payment shall be deemed an advance by Lender to Pledgor and shall be payable by Pledgor within ten (10) Business Days after written demand together with interest thereon at the Default Rate from the date that is ten (10) Business Days after such written demand by Lender until paid.

        (f)    Warranty of Title. Pledgor shall warrant and defend the right, title and interest of Lender in and to the Collateral and the proceeds thereof against the claims and demands of all Persons whomsoever other than Lender pursuant to this Pledge Agreement.

        (g)    Files and Records. Pledgor shall maintain, at its principal office, and, upon reasonable request, make available to Lender, at Pledgor's office during normal business hours,

the originals, or copies in any case where the originals have been delivered to Lender (or are otherwise unavailable) of the instruments, documents, policies and agreements constituting the Collateral (to the extent not held by Lender) and related documents and instruments, and all files, surveys, certificates, correspondence, appraisals, computer programs, tapes, discs, cards, accounting records and other information and data (to the extent existing in Pledgor's possession and control) relating to the Collateral.

(h)     Litigation.  Pledgor shall promptly give to Lender notice of all pending legal or arbitration proceedings, and of all proceedings pending by or before any governmental or regulatory authority or agency, affecting Pledgor or Fund II, to the extent such proceedings if adversely determined would be reasonably likely to have a Material Adverse Effect.

(i)     Existence, Etc.  Pledgor shall and shall cause Fund II to preserve and maintain its existence and all of its material rights, privileges and franchises. Pledgor shall comply and cause Fund II to comply, in each case with all Legal Requirements and pay and discharge or cause Fund II to pay or discharge all taxes, assessments and governmental charges or levies imposed on it or on its income or profits or on any of their property prior to the date on which penalties attach thereto, except for any such tax, assessment, charge or levy the payment of which is being contested in good faith and by proper proceedings in accordance with the express provisions of the Loan Documents.

(j)     Charter Documents.  Pledgor shall, at its expense:

(i)     perform and observe in all material respects all the terms and provisions of the Charter Documents to be performed or observed by it, maintain the Charter Documents in full force and effect (subject to any amendment or modification expressly permitted herein or in the other Loan Documents), enforce the Charter Documents in accordance with their respective terms, and take all such action to such end relating to the Charter Documents as may be from time to time reasonably requested by Lender, provided that such action shall not increase Pledgor's obligations or decrease Pledgor's rights hereunder, in each case other than to a *de minimis* extent; and

(ii)     furnish to Lender promptly upon receipt thereof copies of all material written notices, requests and other documents received by Pledgor under or pursuant to the Charter Documents, and from time to time furnish to Lender such information and reports, to the extent in Pledgor's possession or control, regarding the Collateral as Lender may reasonably request.

(k)     Principal Place of Business and State of Organization.  Other than the Individual Pledgors, Pledgor will not change Pledgor's principal place of business or state of organization.

(l)     Waivers.  Pledgor waives, to the extent permitted by applicable law, (i) all rights to require Lender to proceed against any other Person, entity or collateral or to exercise any remedy set forth herein or in any other agreement, (ii) the defense of the statute of limitations in any action upon any of the Borrower Obligations, (iii) any right of subrogation or interest in the Borrower Obligations or Collateral until all Borrower Obligations have been indefeasibly paid and

performed in full, (iv) any rights to notice of any kind or nature whatsoever, unless specifically required in this Pledge Agreement or the Loan Agreement, or non-waivable under any applicable law, and (v) to the extent permissible, its rights under Section 11-9-207 of the Uniform Commercial Code. Pledgor agrees that the Collateral, other collateral or any other guarantor or endorser may be released, substituted or added with respect to the Borrower Obligations, in whole or in part, without releasing or otherwise affecting the liability of Pledgor, the pledge and security interests granted hereunder, or this Pledge Agreement. Lender is entitled to all of the benefits of a secured party set forth in Section 11-9-207 of the Uniform Commercial Code. Pledgor acknowledges and agrees that the obligations of Pledgor hereunder are absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of the Loan Agreement, the Note or any other Loan Documents, or any substitution, release or exchange of any guarantee of or security for any of the Borrower Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or Pledgor, it being the intent of this Section 5(l) that the obligations of Pledgor hereunder shall be absolute and unconditional under any and all circumstances until all the Borrower Obligations have been indefeasibly paid and performed in full.

      6.    **Intentionally Omitted**.

      7.    **Further Assurances; Remedies**. In furtherance of the grant of the pledge and security interest pursuant to Section 2 hereof, Pledgor hereby agrees with Lender as follows:

      (a)    Delivery and Other Perfection. Pledgor shall:

      (i)    if any of the above described Collateral required to be pledged by Pledgor under Section 2(a) hereof is received by Pledgor, forthwith either (x) transfer and deliver to Lender such collateral so received by Pledgor all of which thereafter shall be held by Lender, pursuant to the terms of this Pledge Agreement, as part of the Collateral or (y) upon Lender's request, promptly take such action as Lender shall deem reasonably necessary or appropriate to duly file on record the security interest created hereunder in such Collateral referred to in said Section 2(a);

      (ii)    upon Lender's request, give, execute, deliver, file and/or record any notice, instrument, document, agreement or other papers that may be reasonably necessary (in the reasonable judgment of Lender) to create, preserve, perfect or validate the security interest granted pursuant hereto or to enable Lender to exercise and enforce its rights hereunder with respect to such pledge and security interest, including, without limitation, after the occurrence and during the continuance of an Event of Default, causing any or all of the Collateral to be transferred of record into the name of Lender or its nominee (and Lender agrees that if any Collateral is transferred into its name or the name of its nominee, Lender will thereafter promptly give to Pledgor copies of any notices and communications received by it with respect to the Collateral); and

      (iii)    permit representatives of Lender, upon reasonable advance written notice, at any time during normal business hours to inspect and make abstracts from its books and records pertaining to the Collateral.

(b)     <u>Preservation of Rights</u>.  Except in accordance with applicable law, Lender shall not be required to take steps necessary to preserve any rights against prior parties to any of the Collateral.

(c)     <u>Pledged Collateral</u>.

(i)     Pledgor shall not and shall not have the right to directly or indirectly, without the prior written consent of Lender, waive, alter, amend, modify, supplement or change in any manner that would be reasonably expected to result in a material adverse effect on the Collateral, Lender's rights therein, or release, subordinate, terminate or cancel in whole or in part, or give any consent under, any of the instruments, documents, policies or agreements constituting the Collateral or exercise any of the rights, options or interests of Pledgor as party, holder, mortgagee or beneficiary thereunder except as otherwise expressly permitted under the Loan Agreement or hereunder.  Pledgor agrees that all rights to do any and all of the foregoing have been collaterally assigned to and, during the continuance of an Event of Default, may be exercised by Lender but Pledgor agrees that, upon reasonable written request from Lender during the continuance of an Event of Default, from time to time, Pledgor shall do any of the foregoing or shall join Lender in doing so or shall confirm the right of Lender to do so and shall execute such instruments and undertake such actions as Lender may reasonably request in writing in connection therewith.  Pledgor shall not make any election, compromise, adjustment or settlement in respect of any of the Collateral without the prior written consent of Lender (which consent, so long as no Event of Default exists, shall not be unreasonably withheld, conditioned or delayed).  Notwithstanding anything herein to the contrary, so long as no Event of Default shall have occurred and be continuing, Pledgor shall have the right to exercise all of Pledgor's rights under the Charter Documents to which it is a party for all purposes not inconsistent with any of the terms of this Pledge Agreement, the Note, the Loan Agreement or any other Loan Document including, without limitation, the right to exercise any and all voting rights, the right to receive distributions on the Collateral and other rights related to the Pledged Interests, provided that Pledgor agrees that it will not take any action in any manner that is inconsistent with the terms of this Pledge Agreement, the Note, the Loan Agreement or any other Loan Document.

(ii)     Anything to the contrary notwithstanding, (A) Pledgor shall remain liable under the Charter Documents to perform all of its duties and obligations thereunder to the same extent as if this Pledge Agreement had not been executed, (B) the exercise by Lender of any of the rights hereunder shall not release Pledgor from any of its duties or obligations under the Charter Documents, and (C) Lender shall have no obligation or liability for Pledgor's actions or omissions under the Charter Documents by reason of this Pledge Agreement, nor shall Lender be obligated to perform any of the obligations or duties of Pledgor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder, except as provided by applicable law.

(d)     <u>Events of Default, Etc.</u>  During any period in which an Event of Default has occurred and is continuing:

(i)     Lender shall have all of the rights and remedies with respect to the Collateral

of a secured party under the Uniform Commercial Code (whether or not said Uniform Commercial Code is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if Lender were the sole and absolute owner thereof (and Pledgor agrees to take all such action as may be appropriate to give effect to such right);

(ii)     Lender in its discretion may, in its name or in the name of Pledgor or otherwise, demand, sue for, collect, direct payment of or receive any money or property at any time payable or receivable on account of or in exchange for any of the Collateral, but shall be under no obligation to do so;

(iii)     Lender may, at its option, apply all or any part of the Collateral in accordance with Section 7(f) hereof;

(iv)     Lender may, in accordance with the terms hereof and upon at least ten (10) Business Days' prior written notice to Pledgor of the time and place, with respect to the Collateral or any part thereof which shall then be or shall thereafter come into the possession, custody or control of Lender or any of its agents, sell, assign or otherwise dispose of all or any part of such Collateral, at such place or places as Lender deems best, and for cash or on credit or for future delivery (without thereby assuming any credit risk), at public or private sale, without demand of performance or notice of intention to effect any such disposition (except as provided above and except such notice as is required above or by applicable statute and cannot be waived) and Lender or anyone else may be the purchaser, assignee or recipient of any or all of the Collateral so disposed of at any public sale (or, to the extent permitted by law, at any private sale), and thereafter hold the same absolutely, free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise), of Pledgor, any such demand, notice or right and equity being hereby expressly waived and released.  Unless prohibited by applicable law and except as provided herein, Lender may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the same may be so adjourned;

(v)     Lender may exercise all membership rights, powers and privileges in Fund II to the same extent as Pledgor is entitled to exercise such rights, powers and privileges;

(vi)     Lender may, in connection with a sale of the Pledged Interests, cause any purchaser of all or any part of any Pledged Interests to be admitted as a new member or owner of Fund II to the extent of such Pledged Interests, and cause Pledgor to withdraw as a member or owner of Fund II to the extent such Pledged Interests are sold or transferred in accordance with Section 7(d)(iv) hereof, and complete by inserting the Effective Date (as defined therein) and the name of the assignee thereunder;

(vii)     Lender may exercise any and all rights and remedies of Pledgor under or in

connection with the Charter Documents or otherwise in respect of the Collateral, including, without limitation, any and all rights of Pledgor to demand or otherwise require payment of any amount under, or performance of any provisions of, the Charter Documents; and

(viii)    all payments received, directly or indirectly, by Pledgor under or in connection with the Charter Documents or otherwise in respect of the Collateral shall be received in trust for the benefit of Lender, shall be segregated from other funds of Pledgor and shall be promptly paid over to Lender in the same form as so received (with any necessary endorsement).

The proceeds of any collection, sale or other disposition under this <u>Section 7(d)</u> shall be applied by Lender pursuant to <u>Section 7(f)</u> hereof.

Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and applicable state securities laws, Lender may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Pledgor acknowledges that any such private sales may be at prices and on terms less favorable to Lender than those obtainable through a public sale without such restrictions, and, notwithstanding such circumstances, Pledgor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Lender shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the issuer thereof to register it for public sale.

(e)    <u>Private Sale</u>.  Lender shall not incur any liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to <u>Section 7(d)(iv)</u> hereof conducted in a commercially reasonable manner and in accordance with the Uniform Commercial Code, it being agreed that some or all of the Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. Pledgor hereby waives to the extent such waiver is not prohibited by applicable law any claims against Lender arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Borrower Obligations, even if Lender accepts the first offer received from an unrelated third party offeree, and does not offer the Collateral to more than one offeree. The Uniform Commercial Code states that the Lender is able to purchase the Pledged Interests only if they are sold at a public sale. Lender has advised Pledgor that SEC staff personnel have issued various No-Action Letters describing procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the Uniform Commercial Code, yet not public for purposes of Section 4(2) of the Securities Act of 1933. The Uniform Commercial Code permits Pledgor to agree on the standards for determining whether Lender has complied with its obligations under Article 9 of the Uniform Commercial Code. Pursuant to the Uniform Commercial Code, Pledgor specifically agrees (x) that, to the extent such waiver is not prohibited by applicable law, it shall not raise any objection to Lender's purchase of the Pledged Interests (through bidding on the Borrower Obligations or otherwise) and (y) that a foreclosure sale conducted in conformity with the principles set forth in such No-Action Letters (i) shall be considered to be a "public" sale for purposes of the Uniform Commercial Code; (ii) will be considered commercially reasonable notwithstanding that Lender has not registered or

sought to register the Pledged Interests under the Securities Laws, even if Pledgor or Fund II agrees to pay all costs of the registration process; and (iii) shall be considered to be commercially reasonable notwithstanding that the Lender purchases the Pledged Interests at such a sale.

(f)    Application of Proceeds.  Except as otherwise herein expressly provided, the proceeds of any collection, sale or other realization of all or any part of the Collateral pursuant hereto, and any other cash at the time held by Lender under this Section 7, shall be applied by Lender:

First, to the payment of the actual out-of-pocket costs and expenses of such collection, sale or other realization, including reasonable out of pocket costs and expenses of Lender (including the reasonable out-of-pocket fees and expenses of its counsel), and all third party costs and expenses made or actually incurred by Lender in connection therewith;

Next, to the payment in full of the Borrower Obligations; and

Finally, to the payment to Pledgor, or its successors or assigns, or as a court of competent jurisdiction may direct, of any surplus then remaining.

As used in this Section 7, "**proceeds**" of Collateral shall mean cash, securities and other property realized in respect of, and distributions in kind of, Collateral, including any thereof received under any reorganization, liquidation or adjustment of debt of Pledgor or any issuer of or obligor on any of the Collateral.

(g)    Attorney-in-Fact.  Without limiting any rights or powers granted by this Pledge Agreement to Lender, upon the occurrence and during the continuance of an Event of Default, Lender is hereby appointed the attorney in fact of Pledgor for the purpose of carrying out the provisions of this Section 7 and taking any action and executing any instruments which Lender may deem necessary or advisable to accomplish the purposes hereof, which appointment as attorney in fact is irrevocable and coupled with an interest.  Without limiting the generality of the foregoing, so long as Lender shall be entitled under this Section 7 to make collections in respect of the Collateral, Lender shall have the right and power to receive, endorse and collect all checks made payable to the order of Pledgor representing any payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same.

(h)    Intentionally Omitted.

(i)    Opinion of Counsel.  Pledgor shall cause to be delivered to Lender concurrently herewith, an opinion of counsel to Pledgor, acceptable to Lender in its reasonable discretion, with respect to the authority of, and due execution and delivery by, Pledgor, and the enforceability of this Pledge Agreement.

(j)    Non-Recourse.  Anything herein to the contrary notwithstanding, Lender shall not enforce any liability of Pledgor to perform or observe the obligations contained in this Pledge Agreement by an action or proceeding wherein a money judgment shall be sought against Pledgor, except that Lender may bring a foreclosure action or other appropriate action or proceeding to enable Lender to enforce and realize upon the security interest hereunder; provided,

however, that any judgment in any such action or proceeding shall be enforceable against Pledgor only to the extent of Pledgor's interest in the Collateral. Lender, by accepting this Pledge Agreement, agrees that it shall not sue for, seek or demand any deficiency judgment against Pledgor in any such action or proceeding under, or by reason of or in connection with this Pledge Agreement.

        **8.**    **Termination**. Upon the indefeasible payment and performance in full of all Borrower Obligations, this Pledge Agreement shall terminate and Lender (a) shall forthwith cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral and money received in respect thereof, to or on the order of Pledgor and (b) at Pledgor's sole cost and expense, execute and deliver to Pledgor (or authorize Pledgor to file) UCC-3 termination statements or similar documents and agreements in form satisfactory to Lender to terminate all of Lender's rights under this Pledge Agreement.

        **9.**    **Miscellaneous.**

        (a)    <u>No Waiver</u>. No failure on the part of Lender or any of its agents to exercise, and no course of dealing with respect to, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by Lender or any of its agents of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies provided herein are cumulative and are not exclusive of any remedies provided by law.

        (b)    <u>Waiver of Trial By Jury</u>. EACH OF THE PARTIES TO THIS PLEDGE AGREEMENT AGREES TO WAIVE IRREVOCABLY ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM BASED UPON OR ARISING OUT OF THIS PLEDGE AGREEMENT OR ANY OF THE DOCUMENTS REFERRED TO IN THIS PLEDGE AGREEMENT OR ANY TRANSACTION CONTEMPLATED IN THIS PLEDGE AGREEMENT. This waiver is intended to apply to all disputes, whether in contract or in tort or otherwise. Each party acknowledges that (i) this waiver is a material inducement to enter into this Pledge Agreement, (ii) it has already relied on this waiver in entering into this Pledge Agreement and (iii) it will continue to rely on this waiver in future dealings. Each party represents that it has reviewed this waiver with its legal advisers and that it knowingly and voluntarily waives its jury trial rights after consultation with its legal advisers. In the event of litigation, this Pledge Agreement may be filed as a written consent to a trial by the court.

        (c)    <u>Governing Law</u>.

        (i)    THIS PLEDGE AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT TO THE LOAN AGREEMENT WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY

OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS PLEDGE AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, EACH OF PLEDGOR AND, BY ITS ACCEPTANCE HEREOF, LENDER, HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS PLEDGE AGREEMENT, AND THIS PLEDGE AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(ii)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST PLEDGOR OR LENDER ARISING OUT OF OR RELATING TO THIS PLEDGE AGREEMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT LOCATED IN THE COUNTY AND STATE OF NEW YORK AND EACH OF PLEDGOR AND, BY ITS ACCEPTANCE HEREOF, LENDER, WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND EACH OF PLEDGOR AND, BY ITS ACCEPTANCE HEREOF, LENDER, HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST PLEDGOR IN ANY JURISDICTION.

PLEDGOR HEREBY DESIGNATES AND APPOINTS:

LEGALINC CORPORATE SERVICES INC.
1967 WEHRLE DRIVE, SUITE 1-086
BUFFALO, NEW YORK 14221
ATTN: ANNA MANUKYAN

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN THE STATE OF NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO PLEDGOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON PLEDGOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  PLEDGOR (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME

TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN THE STATE OF NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN THE STATE OF NEW YORK WITHOUT LEAVING A SUCCESSOR.  NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(d)    Notices.  All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person with receipt acknowledged by the recipient thereof and confirmed by telephone by sender, (ii) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, or (iv) by electronic mail (with a copy delivered by one of the other methods provided for in this clause (d)), in each case addressed as follows:

| | |
|---|---|
| If to Lender: | VP Irvine Lender LLC<br>c/o Värde Partners, Inc.<br>901 Marquette Ave S., Suite 3300<br>Minneapolis, Minnesota 55402<br>Attention:  Legal Department<br>E-mail: legalnotices@varde.com |
| with a copy to: | Cadwalader, Wickersham & Taft, LLP<br>200 Liberty Street<br>New York, New York 10281<br>Attention:  Alan W. Lawrence, Esq.<br>E-mail:  alan.lawrence@cwt.com |
| If to Pledgor: | c/o TA Partners LLC<br>16800 Aston Street, Suite 275<br>Irvine, California 92606<br>Attention: Johnny Chien Sheng Lu<br>E-mail:  johnny@tapartners-llc.com |
| with copies to: | Gordinier, Kang & Kim LLP<br>300 Spectrum Center Dr., Suite 1090<br>Irvine, California 92618<br>Attention: John C. Kang, Esq.<br>E-mail:  john@gkkllp.com |

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

(e)    Waivers, etc.  The terms of this Pledge Agreement may be waived, altered or amended only by an instrument in writing duly executed by Pledgor and Lender.  Any such amendment or waiver shall be binding upon Lender and Pledgor.

(f)    Successors and Assigns.  This Pledge Agreement shall be binding upon the successors and assigns of Pledgor and inure to the benefit of the successors and assigns of Lender (provided, however, that Pledgor shall not assign or transfer its rights hereunder without the prior written consent of Lender).  Without limiting the foregoing, Lender may at any time and from time to time without the consent of Pledgor but subject to the terms of the Loan Agreement, assign or otherwise transfer all or any portion of its rights and remedies under this Pledge Agreement to any other Person or entity, either separately or together with other property of Pledgor for such purposes in connection with a transfer of Lender's interest in the Loan.  Without limiting the foregoing, in connection with any assignment of the Loan in accordance with the Loan Agreement, Lender may assign or otherwise transfer all of its rights and remedies under this Pledge Agreement to the assignee and such assignee shall thereupon become vested with all of the rights and obligations in respect thereof granted to Lender herein or otherwise.  Each representation and agreement made by Pledgor in this Pledge Agreement shall be deemed to run to, and each reference in this Pledge Agreement to Lender shall be deemed to refer to, Lender and each of its permitted successors and assigns.

(g)    No Liability on Part of Lender.  Lender, by its acceptance of this Pledge Agreement, the Collateral and any payments on account thereof, shall not be deemed to have assumed or to have become liable for any of the obligations or liabilities of Pledgor.  Lender shall have no duty to collect any sums due in respect of any of the Collateral in its possession or control, or to enforce, protect or preserve any rights pertaining thereto, and Lender shall not be liable for failure to collect or realize upon the Collateral, or any part thereof, or for any delay in so doing, nor shall Lender be under any obligation to take any action whatsoever with regard thereto.  Lender shall, if requested by the payor of any revenue payment, give receipts for any payments received by Lender on account of the Collateral.

(h)    Further Assurances.  Pledgor agrees that, from time to time upon the written request of Lender, Pledgor will execute and deliver such further documents and do such other acts and things as Lender may reasonably request in order fully to effect the purposes of this Pledge Agreement, provided that the Borrower Obligations shall not be increased and Pledgor's rights shall not be decreased as a result of any such request, except, in each case, to a *de minimis* extent.

(i)    Delay Not a Waiver.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.

(j)    Counterparts.  This Pledge Agreement may be executed by facsimile or other electronic means, and in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Pledge Agreement by signing any such counterpart.

(k)    <u>Severability</u>.  If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of Lender in order to carry out the intentions of the parties hereto as nearly as may be possible and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

(l)    <u>Recitals</u>.  The recital and introductory paragraphs hereof are a part hereof, form a basis for this Pledge Agreement and shall be considered prima facie evidence of the facts and documents referred to therein.

(m)    <u>Gender; Number</u>.  As used in this Pledge Agreement, the masculine, feminine or neuter gender shall be deemed to include the others, and the singular shall include the plural (and vice versa), whenever the context so requires.

(n)    <u>Joint and Several Liability</u>.  If Pledgor consists of more than one Person or party, the obligations and liabilities of each such Person or party hereunder shall be joint and several.

[BALANCE OF PAGE INTENTIONALLY BLANK;<br>SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** Pledgor has executed this Pledge Agreement as of the day and year first above written.

**PLEDGOR:**

**THRIVING FUTURE LLC,**
a California limited liability company

By: _____
      Name: Yaojun Liu
      Title:  Sole Member

**ALFA IDG LLC,**
a California limited liability company

By: _____
      Name: Johnny Lu
      Title: Sole Member

**RUC14 PLAYA LLC**

By: _____
      Name:
      Title:

**ZHONGJUN ZHENG**

_____

**LCS CONSULTING GROUP LLC**

By: _____
      Name:
      Title:

**GREENWELL HHC LLC**

By: _____
       Name:
       Title:

**CAIYING CHANG**

_____

**TA PARTNERS LLC,**
a California limited liability company

By: _____
       Name: Johnny Lu
       Title: Authorized Signer

**[SIGNATURES CONTINUE ON NEXT PAGE]**

**ACCEPTED BY LENDER:**

**VP IRVINE LENDER LLC**,
a Delaware limited liability company

By:    Värde Partners, Inc.,
       a Delaware corporation,
       its manager


       By:   _____
           Name:
           Title:


**[END OF SIGNATURE PAGES]**

## CONSENT OF FUND II
### (Pledge and Security Agreement)

Fund II hereby (a) acknowledges receipt of a copy of the executed Pledge Agreement to which this Consent of Fund II is attached, (b) consents to the Pledge Agreement, (c) agrees to comply with the terms and provisions thereof, (d) agrees not to do anything or cause, permit or suffer anything to be done which is prohibited by, or contrary to, the terms of the Pledge Agreement, and (e) agrees to register on its books and records Lender's security interest in the Pledged Interests as provided in the Pledge Agreement.

Without limiting the foregoing (and notwithstanding anything to the contrary in any Charter Document of Fund II), from and after the date hereof, Fund II agrees:

(a) to deliver directly to Lender any and all instruments evidencing any right, option or warrant, issued to, or to be received by, Pledgor by virtue of its ownership of the Pledged Interests issued by Fund II or upon exercise by Pledgor of any option, warrant or right attached to such Pledged Interests;

(b) to recognize Lender's or any other successful bidder's automatic right to become a member in Fund II following a sale of the Pledged Interests in accordance with Section 7(d) of the Pledge Agreement; and

(c) in the event of a sale of the Pledged Interests in accordance with Section 7(d) of the Pledge Agreement, Fund II will, upon Lender's request and at Pledgor's expense: (i) provide Lender with such other information in Fund II's possession as may be necessary or, in Lender's reasonable opinion, advisable to enable Lender to effect the sale of the Pledged Interests; and (ii) do or cause to be done all such other acts and things as may be reasonably necessary to make the sale of the Pledged Interests or any part thereof valid and binding and in compliance with applicable law.

Fund II further acknowledges and agrees that it shall do all of the foregoing without any further notice from or consent or agreement of Pledgor.

### [SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, Fund II has executed this Consent as of the date first set forth above.

**TA PARTNERS APARTMENT FUND II LLC**, a California limited liability company

By: _____

Name:

Title:

## EXHIBIT A

## CHARTER DOCUMENTS

1.    Updated and Restated Operating Agreement of **TA PARTNERS APARTMENT FUND II LLC,** dated as of March 28, 2021 (the "**LLC Agreement**").

2.    Articles of Organization of **TA PARTNERS APARTMENT FUND II LLC,** filed with the Secretary of State of California on [_____].

**EXHIBIT B**

**FORM OF ACKNOWLEDGMENT OF PLEDGE**

April [ __ ], 2023

VP Irvine Lender LLC
c/o Värde Partners, Inc.
901 Marquette Ave S., Suite 3300
Minneapolis, Minnesota 55402
Attention: Legal Department

Ladies and Gentlemen:

Reference is made to the Pledge and Security Agreement dated as of the date hereof (the "**Pledge Agreement**") between Thriving Future LLC, ALFA IDG LLC, RUC14 Playa LLC, Greenwell HHC LLC, Zhongjun Zheng, LCS Consulting Group LLC, Caiying Chang and TA Partners LLC (collectively, the "**Pledgor**"), and you, as Lender, and to the Junior Mezzanine Loan Agreement, dated as of February 15, 2022 ("**Loan Agreement**"), by and among 18831 Von Karman Milani LLC, a Delaware limited liability company, 17422 Derian Pistoia LLC, a Delaware limited liability company (collectively, "**Borrower**") and Lender and other parties as more particularly named therein. Capitalized terms used but not defined herein have the meanings provided in the Pledge Agreement and, if not defined therein, shall have the meanings provided in the Loan Agreement (as may be amended by that certain Protective Advance and Reservation of Rights Agreement, dated of even date herewith, between Lender and Borrower).

In connection with the pledge of the Collateral to you by the Pledgor, the undersigned hereby represents, warrants and agrees with you as follows:

(a)    The undersigned represents and warrants that none of the Collateral (or any portion thereof or direct interest therein) is represented by any certificates. The undersigned acknowledges and agrees that it shall not, during the term of the Pledge Agreement (i) take or make any action, decision, determination or election that would constitute an Article 8 Matter, or (ii) create or issue any certificates representing the Pledged Interests or any portion thereof or direct interest therein, in each case, without Lender's prior written consent, such consent to be granted or withheld in Lender's sole discretion;

(b)    If, notwithstanding paragraph (a) above and the terms and conditions of Section 4(h) of the Pledge Agreement, at any time after the date hereof any Collateral shall be evidenced by an instrument or a certificate, then the undersigned shall deliver directly to you at your address set forth above, any and all instruments and/or certificates evidencing any right, option or warrant issued to, or to be received by, Pledgor by virtue of its ownership of the Pledged Interests or upon exercise by Pledgor of any option, warrant or right attached to such Pledged Interests;

(c)       The Pledged Interests constitute all of the limited liability company interests in the undersigned; there are no options or rights outstanding to acquire any interests in the undersigned, and the undersigned will not issue any additional limited liability company interests or securities without the prior written consent of Lender;

(d)       The undersigned has not entered into an agreement with any third party to act on such third party's instructions without further consent of Pledgor with respect to the Pledged Interests or the other Collateral; and agrees that it will not enter into any such agreement with any third party concerning any of the Pledged Interests or the other Collateral without Lender's prior written consent;

(e)       So long as the Obligations remain outstanding, the undersigned shall pay directly to you any and all cash distributions which might be declared and payable (including any unpaid distributions accrued prior to the date hereof) on any of the Pledged Interests or any of the other Collateral, and which but for the provisions of this letter would be paid to Pledgor;

(f)       The Pledged Interests have been duly authorized and validly issued and are not subject to, nor will the undersigned at any time permit it to become subject to, any restrictions governing its issuance, transfer, ownership or control other than those currently set forth in the undersigned's Limited Liability Company Agreement or under applicable law;

(g)       The undersigned will comply with instructions originated by you in accordance with the Loan Documents relating to the Pledged Interests without further consent from Pledgor;

(h)       That since the date of the undersigned's (the "**Company**") formation and at all times on and after the date hereof and until such time as the Obligations shall be paid and performed in full:

(A)       Company has not and will not enter into any contract or agreement with any Affiliate of Company, except upon terms and conditions that are intrinsically fair, commercially reasonable, and no less favorable to it than would be available on an arms-length basis with third parties other than any such party;

(B)       Company has not incurred and will not incur any Indebtedness, other than unsecured trade payables incurred by Company in the ordinary course of its operations, in an amount not to exceed $250,000 in the aggregate at any time. No Indebtedness other than the Obligations may be secured (senior, subordinate or *pari passu*) by the Collateral and no Indebtedness other than the business loan from Hankey Capital, LLC and evidenced by a Promissory Note, dated December 15, 2022, may be secured (senior, subordinate or *pari passu*) by the real property more commonly known as 6055 Center Drive, Los Angeles, California;

(C)       Company has not made and will not make any loans or advances to any third party, and has not and shall not acquire obligations or securities of its Affiliates;

       (D)     Company has been, is, and intends to remain solvent and has paid and will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same become due; provided, that the foregoing shall not require any direct or indirect member, partner or shareholder of Company to make any additional capital contributions to Company;

       (E)     Neither Pledgor nor any Affiliate of Pledgor, Guarantor, or any other Person holding any direct or indirect interest in Company, has sought or intends to seek or effect the liquidation, dissolution, winding up, consolidation, asset sale or merger, in whole or in part, of Company; and

       (F)     Company has not and will not assume or guarantee or become obligated for the debts of any other Person and does not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person.

     (i)     Company will not amend the Company's LLC Agreement or any of its other organizational documents without the consent of Lender.

     The undersigned agrees that, if at any time you shall determine to exercise your right to sell all or any of the Collateral, the undersigned will, upon your request and at Pledgor's expense:

       (a)     provide you with such other information as may be necessary or, in your reasonable opinion, advisable to enable you to effect a commercially reasonable sale of such Collateral;

       (b)     do or cause to be done all such other acts and things as may be necessary to make the sale of such Collateral or any part thereof valid and binding and in compliance with applicable law; and

       (c)     do or cause to be done all such other acts and things as may be necessary to constitute you or your designees or transferees a member of the undersigned.

You are hereby authorized, in connection with any sale of the Collateral, to deliver or otherwise disclose to any prospective purchaser of such Collateral (i) any information provided to you pursuant to subsection (a) above and (ii) any other information in your possession relating to the undersigned or such Collateral.

[SIGNATURE PAGE FOLLOWS]

Very truly yours,

**TA PARTNERS APARTMENT FUND II LLC,**
a California limited liability company

By: _____
Name:
Title:

As of the date first written above, Pledgor hereby acknowledges and consents to the Company entering into, and being bound by the terms and conditions of, this acknowledgment of the Pledge Agreement.

**THRIVING FUTURE LLC,**
a California limited liability company

By: _____
Name: Yaojun Liu
Title:   Sole Member

**ALFA IDG LLC,**
a California limited liability company

By: _____
Name: Johnny Lu
Title: Sole Member

**RUC14 PLAYA LLC**

By: _____
Name:
Title:

**ZHONGJUN ZHENG**

_____

**LCS CONSULTING GROUP LLC**

By: _____

    Name:

    Title:

**GREENWELL HHC LLC**

By: _____

    Name:

    Title:

**CAIYING CHANG**

_____

**TA PARTNERS LLC,**
a California limited liability company

By: _____

    Name: Johnny Lu

    Title: Authorized Signer

# EXHIBIT F




**This page is part of your document - DO NOT DISCARD**



# 20230788395



**Pages: 0005**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**11/15/23 AT 10:17AM**

| | |
|---|---|
| FEES: | 38.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 113.00 |



**L E A D S H E E T**



**202311153300012**

**00023964718**



**014395428**

**SEQ:
01**

**SECURE - Daily - Time Sensitive**



**THIS FORM IS NOT TO BE DUPLICATED**



23-00352-2CT7 NOD

E604535

Recording Requested By

Simplifile

and When Recorded Mail to:

CHICAGO TITLE INSURANCE COMPANY
5170 Golden Foothill Parkway, Suite 130
El Dorado Hills, CA  95762

Trustee Sale No: 23-00352-2CTT
Loan No:  *****7-000/TA Partners Apartment Fund II LLC
APN Number: 4104-001-087

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST
## IMPORTANT NOTICE

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property.  No sale date may be set until approximately 90 days from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is $1,659,669.89 as of November 15, 2023, and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage.  If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing.  In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay.  You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made.  However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than three months after this notice of default is recorded) to,

among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

Hankey Capital, LLC, a California limited liability company
Attn.: Patricia Hankey
4751 Wilshire Blvd., Suite 110
Los Angeles, CA 90010
Phone: (323) 801-7128

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.  Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

## REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

NOTICE IS HEREBY GIVEN: That default has been declared by Hankey Capital, LLC, a California limited liability company, the current beneficiary under that certain Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents dated as of December 14, 2021, executed by TA Partners Apartment Fund II LLC, a California limited liability company, as trustor (the "Original Trustor"), to secure obligations in favor of Hankey Capital, LLC, a California limited liability company, as beneficiary (the "Original Beneficiary"), recorded on December 21, 2021, as Instrument No. 20211889208 of official records in the office of the Recorder of Los Angeles County, California (the "Original Deed of Trust"), and that

The Original Deed of Trust together with that certain Modification of Deed of Trust dated as of October 5, 2022, recorded in the official records in the office of the Recorder of Los Angeles County, California on December 22, 2022, as Instrument No. 20221194332, together with that certain Modification of Deed of Trust dated as of June 16, 2023, recorded in the official records in the office of the Recorder of Los Angeles County, California on September 19, 2023, as Instrument No. 20230627368, and any modifications thereto are collectively referred to herein from time to time as the "Deed of Trust", and that

The Deed of Trust encumbers certain property more particularly described therein (the "Trust Property"), and that

The Deed of Trust secures the payment of and the performance of certain obligations, including but not limited to, the obligations set forth in that certain Promissory Note with a face amount of $27,500,000.00 (the "Original Note"), and that

The Original Note, together with all renewals of, extensions of, modifications of, refinancing of, consolidations of, and substitutions for the Original Note are collectively referred to herein from time to time as the "Note", and that

The Note and any other documents evidencing the obligations secured by the Deed of Trust, together with any modifications thereto, are collectively referred to herein from time to time as the "Secured Obligations", and that

The term "Trustor" as used herein shall mean either the Original Trustor under the Deed of Trust or, if applicable, its successors in interest, and that

The term "Trustee" as used herein shall mean the Original Trustee under the Deed of Trust or, if applicable, its successors in interest, and that

The term "Beneficiary" as used herein shall mean the Original Beneficiary under the Deed of Trust or, if applicable, its successors in interest, and that

Capitalized terms not defined herein shall have the same meaning as those in the Note, Secured Obligations, the Deed of Trust and/or any other loan documents, and that

A breach of, and default in, the obligations for which said Deed of Trust is security has occurred in that the Trustor has failed to perform obligations pursuant to or under the Secured Obligations and/or the Deed of Trust, specifically: failed to pay payments which became due; and all subsequent payments; together with late charges due; together with default interest due; together with other fees and expenses incurred by the Beneficiary; and that

The Trustor has failed, or shall hereafter fail, to pay all other and subsequent interest and/or principal together with late charges and/or default interest and/or any and all other obligations and indebtedness as may become due under the terms of or under the Secured Obligations and/or Deed of Trust and not performed and/or paid including, without limitation, reimbursement to the Beneficiary and/or the Trustee of any of the following fees, costs and expenses heretofore or hereafter incurred, suffered or paid by the Beneficiary and/or the Trustee in connection with the Secured Obligations and/or Deed of Trust, the Trustor or the Trust Property:

1. Attorneys' fees and costs including, without limitation, those incurred in connection with foreclosure of the Deed of Trust, appointment of a receiver with respect to the Trust Property, litigation over the amount, validity, enforcement or priority of the Secured Obligations and/or Deed of Trust, or commencement of an action or proceeding for relief from any bankruptcy court or other judicial or administrative stay, order or injunction, and all other such matters;
2. Real and/or personal property taxes, or payments under or with respect to prior or junior liens or encumbrances, insurance premiums and all other such matters;
3. Protection, preservation, repairs, restoration or completion of the Trust Property, and all other such matters;
4. Compliance with any applicable laws, regulations or orders, and all other such matters;
5. Trustee's fees, trustee's sale guarantee premiums, and other foreclosure costs, and all other such matters; and that

It is the intention of the Beneficiary to include herein all delinquent sums or obligations now or hereafter secured by and under the Deed of Trust, whether presently known or unknown, and whether or not specifically set forth herein, and that

By reason thereof, the Beneficiary has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the Trust Property to be sold to satisfy the obligations secured thereby.

**Date: November 15, 2023**                                     TS #:23-00352-2CTT

**CHICAGO TITLE INSURANCE COMPANY, Trustee**

**Katy Holdeman, Authorized Signor**

# EXHIBIT G



**This page is part of your document - DO NOT DISCARD**



# 20240113756



**Pages:
0005**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**02/21/24 AT 03:23PM**

| | |
|---|---|
| FEES: | 31.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 106.00 |



**L E A D S H E E T**



**202402210120074**

**00024231141**



**014546516**

**SEQ:
01**

**SECURE - Daily - Time Sensitive**



**THIS FORM IS NOT TO BE DUPLICATED**

*E460077*

23-00352-2CT1-N06



Recording Requested by:

**Simplifile**

and When Recorded Mail to:

CHICAGO TITLE INSURANCE COMPANY
5170 Golden Foothill Parkway, Suite 130
El Dorado Hills, CA 95762

---

**Trustee Sale No. 23-00352-2CTT      Loan No: *****7-000/TA Partners Apartment Fund II LLC**
**APN 4104-001-087**

## NOTICE OF TRUSTEE'S SALE

## YOU ARE IN DEFAULT UNDER A DEED OF TRUST, SECURITY AGREEMENT AND FIXTURE FILING WITH ASSIGNMENT OF RENTS DATED DECEMBER 14, 2021. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.

On March 18, 2024, at 11:00 AM, by the fountain located at 400 Civic Center Plaza, Pomona, CA 91766, CHICAGO TITLE INSURANCE COMPANY, as the duly appointed Trustee (the "Trustee"), under and pursuant to the power of sale contained in that certain Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents recorded on December 21, 2021, as Instrument No. 20211889208 of official records in the office of the Recorder of Los Angeles County, CA, executed by: TA Partners Apartment Fund II LLC, a California limited liability company, as Trustor (the "Trustor"), in favor of Hankey Capital, LLC, a California limited liability company, as Beneficiary, together with that certain Modification of Deed of Trust dated as of October 5, 2022, recorded in the official records in the office of the Recorder of Los Angeles County, California on December 22, 2022, as Instrument No. 20221194332, together with that certain Modification of Deed of Trust dated as of June 16, 2023, recorded in the official records in the office of the Recorder of Los Angeles County, California on September 19, 2023, as Instrument No. 20230627368, and any modifications thereto are collectively referred to herein from time to time as the "Deed of Trust", WILL SELL AT PUBLIC AUCTION TO THE HIGHEST BIDDER, in lawful money of the United States, all payable at the time of sale, that certain property situated in said County, California describing the land therein as:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

**NOTICE TO POTENTIAL BIDDERS:** If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the Property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the Property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the Property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this Property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the Property.

**NOTICE TO PROPERTY OWNER:** The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this Property, you may call **1.866.684.2727** or visit this Internet Website **www.servicelinkasap.com**, using the file number assigned to this case **23-00352-2CTT**. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Website. The best way to verify postponement information is to attend the scheduled sale.

The real Property heretofore described is being sold "as is". The street address and other common designation, if any, of the real Property described above is purported to be: 6055 Center Drive, Los Angeles, CA

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein.

Said sale will be made without covenant or warranty, express or implied, regarding title, possession, or encumbrances, to pay the remaining unpaid balance of the obligations secured by and pursuant to the power of sale contained in that certain Deed of Trust (together with any modifications thereto).

The total amount of the unpaid balance of the obligations secured by the Property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of this Notice of Trustee's Sale is estimated to be $30,624,288.89 (Estimated), provided, however, prepayment premiums, accrued interest and advances will increase this figure prior to sale. Beneficiary's bid at said sale may include all or part of said amount. In addition to cash, the Trustee will accept a cashier's check drawn on a state or national bank, a check drawn by a state or federal credit union or a check drawn by a state or federal savings and loan association, savings association or savings bank specified in Section 5102 of the California Financial Code and authorized to do business in California, or other such funds as may be acceptable to the trustee. In the event tender other than cash is accepted, the Trustee may withhold the issuance of the Trustee's Deed Upon Sale until funds become available to the payee or endorsee as a matter of right. The Property offered for sale excludes all funds held on account by the Property receiver, if applicable.

DATE: February 21, 2024

CHICAGO TITLE INSURANCE COMPANY, TRUSTEE
23-00352-2CTT
5170 Golden Foothill Parkway, Suite 130
El Dorado Hills, CA 95762
916-636-0114

Sara Berens, Authorized Signor

**SALE INFORMATION CAN BE OBTAINED ON LINE AT www.servicelinkasap.com**
**AUTOMATED SALES INFORMATION PLEASE CALL 1.866.684.2727**

23-00352-2CTT

EXHIBIT "A"

PARCEL 1:

LOT 18 OF TRACT NO. 51419, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF
CALIFORNIA, AS PER MAP RECORDED IN BOOK 1204, PAGES 42 TO 50, INCLUSIVE, OF MAPS, IN THE OFFICE
OF THE COUNTY RECORDER OF SAID COUNTY, AS AMENDED BY THAT CERTAIN CERTIFICATE OF
CORRECTION RECORDED MAY 11, 1998, AS INSTRUMENT NO. 98-790045, AND THAT PORTION OF LOT 17
OF SAID TRACT NO. 51419, LYING SOUTHEASTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT 17, BEING DISTANT NORTH 11° 24' 41" WEST,
51.82 FEET FROM THE SOUTHEAST CORNER OF SAID LOT 17; THENCE, SOUTH 65° 22' 00" WEST, 229.98
FEET, TO A POINT IN THE NORTHEASTERLY LINE OF CENTER DRIVE, SAID POINT BEING DESIGNATED AS
POINT "B"'.

TOGETHER WITH THAT PORTION OF SAID LOT 17, LYING BELOW CENTER DRIVE AT A SURFACE ELEVATION
OF 18.00 FEET, AND SOUTHEASTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT SAID POINT "B"; THENCE, IN A DIRECT LINE, SOUTH 65° 22' 00" WEST, 106.10 FEET.

ALSO TOGETHER WITH THAT PORTION OF SAID LOT 17, LYING BELOW A SURFACE ELEVATION OF 63.00
FEET AND SOUTHEASTERLY OF THE FOLLOWING DESCRIBED LINE:

COMMENCING AT SAID POINT "B"; THENCE, NORTH 24° 00' 13" WEST, 8.50 FEET, TO THE TRUE POINT OF
BEGINNING; THENCE, NORTH 65° 22' 00" EAST, 231.88 FEET, TO THE EASTERLY LINE OF SAID LOT 17.

NOTE: ELEVATION 18.00 IS BASED ON CITY OF LOS ANGELES BENCHMARK NO. 17-02735, 1974
ADJUSTMENT.

EXCEPT FROM SAID LAND ALL OIL, MINERALS, NATURAL GAS AND OTHER HYDROCARBONS BY
WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THE HEREIN CONVEYED PARCEL OF LAND
AND THE RIGHTS THERETO, TOGETHER WITH THE CERTAIN OTHER CONDITIONS, WITHOUT HOWEVER, THE
RIGHT TO DRILL, MINE, EXPLORE AND OPERATE THROUGH THE SURFACE OF THE UPPER 100 FEET OF THE
SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED OR OTHERWISE IN SUCH MANNER AS TO
ENDANGER THE SAFETY OR ANY HIGHWAY THAT MAY BE CONSTRUCTED ON SAID LAND, AS EXCEPTED IN
SAID PARCEL 1A (AMENDED) AND PARCEL 1B (AMENDED) OF FINAL ORDER OF CONDEMNATION (STATE
PARCEL 6005) FILED IN SUPERIOR COURT CASE NO. 646222, IN AND FOR SAID COUNTY, A CERTIFIED COPY
OF SAID FINAL ORDER BEING RECORDED MARCH 3, 1958 IN BOOK D58, PAGE 847, OF SAID OFFICIAL
RECORDS, BY SAID DEED (STATE PARCEL 6006) RECORDED AUGUST 25, 1959, IN BOOK D582, PAGE 496, OF
SAID OFFICIAL RECORDS, AND BY SAID PARCEL 1 OF FINAL ORDER OF CONDEMNATION (STATE PARCEL
5532) FILED IN SUPERIOR COURT CASE NO. 766683, IN AND FOR SAID COUNTY, A CERTIFIED COPY OF SAID
FINAL ORDER BEING RECORDED APRIL 29, 1963, IN BOOK D2009, PAGE 5, OF SAID OFFICIAL RECORDS.

ALSO EXCEPT THEREFROM ALL OIL, OIL RIGHTS, MINERALS AND MINERAL RIGHTS, NATURAL GAS,
NATURAL GAS RIGHTS AND OTHER HYDROCARBON BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN
OR UNDER THE PARCEL OF LAND HEREINABOVE DESCRIBED, WITHOUT HOWEVER, THE RIGHT TO DRILL,
MINE, EXPLORE AND OPERATE THROUGH THE SURFACE OF THE UPPER 100 FEET OF THE SUBSURFACE OF

THE LAND HEREINABOVE DESCRIBED OR OTHERWISE IN SUCH MANNER AS TO ENDANGER THE SAFETY OR ANY HIGHWAY THAT MAY BE CONSTRUCTED ON SAID LAND, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING AND OPERATING THEREFOR AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM LANDS OTHER THAN THOSE HEREINABOVE DESCRIBED, OIL OR GAS WELLS, TUNNELS AND SHAFTS, INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LANDS HEREINABOVE DESCRIBED AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF, AND TO REDRILL, TUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES, WITHOUT HOWEVER, THE RIGHT TO DRILL, MINE, EXPLORE AND OPERATE THROUGH THE SURFACE OF THE UPPER 100 FEET OF THE SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED OR OTHERWISE IN SUCH MANNER AS TO ENDANGER THE SAFETY OF ANY HIGHWAY THAT MAY BE CONSTRUCTED ON SAID LAND, AS EXCEPTED IN THE FINAL DECREE OF CONDEMNATION, A CERTIFIED COPY THEREOF BEING RECORDED MARCH 31, 1958, IN BOOK D58, PAGE 847, OFFICIAL RECORDS.

SAID LAND IS ALSO SHOWN AS PARCEL 2 ON CERTIFICATE OF COMPLIANCE FOR LOT LINE ADJUSTMENT AA-2005-3599-PMEX, RECORDED MAY 3, 2006, AS INSTRUMENT NO. 06-970093, OF OFFICIAL RECORDS.

PARCEL 2:

NON-EXCLUSIVE EASEMENTS FOR WALKWAYS, ACCESS, SLOPES, DRAINAGE, ENCROACHMENT AND OTHER UTILITY EASEMENTS ON, OVER AND ACROSS THE COMMON AREA AS DESCRIBED THEREIN, AND PROVIDED FOR AND SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN THAT CERTAIN INSTRUMENT ENTITLED, "AGREEMENT AND DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS FOR HOWARD HUGHES CENTER," RECORDED JUNE 24, 1993, AS INSTRUMENT NO. 93-1210312, OF OFFICIAL RECORDS, AS AMENDED.